1

```
VOLUME:    1
PAGES:     103
EXHIBITS:  See Index
```

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO.:  04-11464 MLW

_____

MARY GOMES, GUARDIAN, et al.,
                         Plaintiffs

vs.

THE CITY OF BROCKTON, et al.,
                         Defendants

_____

DEPOSITION of JESSE DRANE, taken pursuant to Rule
30 of the Federal Rules of Civil Procedure, before Anne Ouellette, a
Professional Court Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Law Office of Paul Adams,
One Centre Street, 2nd Floor, Brockton, MA  02301, on May 11,
2006, commencing at 2:26 p.m.

Catherine L. Zelinski Court Reporter
22 North Lakeview Road
Norton, Massachusetts  02766
508.285.8198/FAX 508.285.9968

2

APPEARANCES OF COUNSEL:

For the Plaintiffs:
    LAW OFFICE OF PAUL ADAMS
    (BY:  P. J. ADAMS, ESQ.)
    One Centre Street
    2nd Floor
    Brockton, Massachusetts  02301

For the Defendant, Jesse Drane:
    KOPELMAN & PAIGE, P.C.
    (BY:  JOSEPH L. TEHAN, JR., ESQ.)
    101 Arch Street
    12th Floor
    Boston, Massachusetts  02110

For the Defendant, City of Brockton:
    WYNN & WYNN, P.C.
    (BY:  JOHN A. WALSH, ESQ.)
    90 New State Highway
    Raynham, Massachusetts  02767

3

I N D E X

Testimony of:                                    Page

Jesse Drane
Examination by Mr. Adams                         5 / 97
Examination by Mr. Tehan                         84


INDEX OF EXHIBITS

Exhibits   Description                                   Page
1          Brockton Police Department Arrest Report      22
2          Docket from Brockton District Court           35
3          Booking Sheet                                 41
4          Prisoners Watch Form                          55
5          Prisoners Watch Form, dated 6/26/01           97

4

```
1                   P R O C E E D I N G S
2
3            MR. TEHAN:  P.J., could I put stips on the
4    record?
5            MR. ADAMS:  I assume the usual; right?
6            MR. TEHAN:  Yes.
7            MR. ADAMS:  And you want 30 days?
8            MR. TEHAN:  Yes.
9            MR. ADAMS:  And we'll waive notary.
10           MR. TEHAN:  That's it.
11           MR. ADAMS:  Okay.
12           MR. TEHAN:  That's all.  Just to state it once
13   again, we'll have the usual stipulations, all objections except
14   as to form, motions to strike reserved until time of trial, waive
15   notarization of filing.  I would like Officer Drane to review the
16   transcript and sign it, and we've agreed it would be deemed
17   signed as transcribed if no changes are made within 30 days
18   of our receipt.
19           MR. ADAMS:  Do you want to have her send the
20   original to you for his review at your office?
21           MR. TEHAN:  Well, I'm going to take a copy, so
22   I'm fine.
23           MR. ADAMS:  So, send the copy with the errata
24   sheet to you?
```

5

```
1            MR. TEHAN:  Yes.
2            MR. ADAMS:  Great.  Could you swear him in,
3    please.
4
5            JESSE DRANE, having been first duly sworn,
6    testifies as follows:
7
8    EXAMINATION BY MR. ADAMS:
9            MR. ADAMS:  Good afternoon, Officer Drane.
10           WITNESS:  Good afternoon.
11           MR. ADAMS:  I'm P.J. Adams and I represent the
12   plaintiff, or the plaintiffs, which is the guardian of Richard
13   Gomes and his mother, individually, Mary Gomes.  Have you
14   ever had your deposition taken before?
15           WITNESS:  In this case, no, but in other cases,
16   yes.
17           MR. ADAMS:  So, you understand it's a
18   question-and-answer format and all your responses need to
19   be verbal so that the court reporter can take them down.
20           WITNESS:  Yes.
21           MR. ADAMS:  Because she can't put down nods
22   of the head, or gestures, sometimes those can be
23   ambiguous.  So, you have to pretty much state your answers
24   clearly, whether it's "yes" or "no," or something more
```

7

```
1    A.  Yes.
2    Q.  Is it less than seven years or something like that?
3    A.  The contract states, yeah, anybody less than seven years
4        have to live in the city.
5    Q.  How long have you been in Lakeville?
6    A.  Since 1999, October 15, 1999.
7    Q.  And you've been a Brockton Police officer you said, almost
8        20 years, 20 years coming up?
9    A.  Twenty years, already.  I started in 1986.
10   Q.  Are you married?
11   A.  Yes, sir.
12   Q.  How long have you been married?
13   A.  Fifteen wonderful years.
14   Q.  Do you have any children?
15   A.  Three sons.
16   Q.  How old is your oldest son?
17   A.  My oldest one is 14.
18   Q.  And your youngest boy?
19   A.  I have a 14-year-old, 13-year-old, and an 11-year-old.
20   Q.  Do you have any other jobs besides being a policeman?
21   A.  Just fatherhood.
22   Q.  Fatherhood and husbandry.
23   A.  Yes, exactly.  I can't forget that.
24   Q.  Where did you grow up?
```

6

```
1    expansive than that.
2            WITNESS:  I understand.
3            MR. ADAMS:  If at any time during the course of
4    the proceeding you need take a break to go to the bathroom,
5    get a glass of water, need to take medication, need to call
6    your wife, need to talk to your attorney, just let me know and
7    we can take a break and get done whatever you need to get
8    done.  I don't anticipate we're going to be that long and I will
9    try to move it along as quickly as I can so that everybody can
10   go about their business.
11           WITNESS:  Okay.
12   Q.  Let me ask you to state your full name and spell your last for
13       the record?
14   A.  Jesse Drane, Jr., D, as in dog, R-A-N-E.
15   Q.  Do you reside in Brockton, Mr. Drane?
16   A.  I reside in Lakeville.
17   Q.  So, you've been an officer with the Brockton Police
18       Department for some time then?
19   A.  I just started my 20th year.
20   Q.  Is there still a residency requirement for --
21   A.  Not for me.
22   Q.  Not for you, for the younger --
23   A.  I'm grandfathered.
24   Q.  For the younger officers, though; right?
```

8

```
1    A.  I grew up in Brockton, born and raised.
2    Q.  East side, west side?
3    A.  East side boy, in the projects, Hill Street.
4    Q.  Okay.  What is your date of birth, by the way?
5    A.  10/28/60.
6    Q.  Did you go to Brockton High?
7    A.  Graduated in 1978.
8    Q.  Did you go to high school after Brockton High?
9    A.  I --
10   Q.  I mean -- That's one of those questions lawyers ask like, you
11       know, do you know whether or not the corpse was dead?  I'm
12       sorry, I apologize?
13   A.  That's okay.  I did two years at Massasoit.
14   Q.  You did two years at Massasoit and you got an associate's
15       degree?
16   A.  I have my associate's degree and I just graduated from Curry
17       College with my bachelor's degree.
18   Q.  Congratulations.
19   A.  Thank you.
20   Q.  What was your associate's degree in?
21   A.  Criminal justice.
22   Q.  Is it the same degree, a bachelor's, in law enforcement and
23       criminal justice?
24   A.  Yes.
```

9

1　Q.　From Curry?
2　A.　Yes, and a minor in psychology.
3　Q.　Have you always worked the same shift while being with the
4　　　Brockton Police Department?
5　A.　No, sir.
6　Q.　So, you've worked a variety of different shifts; is that fair to
7　　　say?
8　A.　Yes, bounced around, yes.
9　Q.　Have you always worked in the patrol division?
10　A.　Pretty much, yes.
11　Q.　Is it fair to say that there's two basic divisions in the Brockton
12　　　Police Department, a patrol division and a detective division?
13　A.　Yes.
14　Q.　So, there's a chief of detectives?
15　A.　Yes.
16　Q.　And then there's a chief of like the patrol division, or a
17　　　supervisor of the patrol division?
18　A.　There's a supervisor of the patrol division, different
19　　　supervisors for different shifts.
20　Q.　For each different shift?
21　A.　Yeah.
22　Q.　There are three basic shifts, right, the eight-to-four, the
23　　　four-to-midnight and the midnight-to-eight?
24　A.　Actually, there's a new shift that they implemented a number

10

1　　　of years ago, it's the 7 p.m. to 3 a.m. shift.
2　Q.　Is that like a high impact shift?
3　A.　That's what they call it, the impact shift.
4　Q.　They call it the impact shift?
5　A.　Yes.
6　Q.　Have you worked all four of the shifts?
7　A.　Every single one of them.
8　Q.　Throughout your career, have you worked the basic patrol
9　　　days on, days off, of four on, two off?
10　A.　Yes, basically, yes.
11　Q.　You never worked in the detective division; is that correct?
12　A.　Detectives, no. I worked 'plain clothes,' but not -- I still
13　　　Officer Drane.
14　Q.　What would you work 'plain clothes' for?
15　A.　That was when they had the Gang Unit or whatever you want
16　　　to call it, Youth Unit, or whatever you want to call it there. Tha
17　　　was a number of years ago.
18　Q.　Were you ever the G.R.E.A.T. officer?
19　A.　Yes.
20　Q.　Are you now?
21　A.　No, I'm great, but not G. R. E. A. T. in school.
22　Q.　I don't know if these gentlemen know what that is so I'll just
23　　　them know, or you can let them know. There's like similar to
24　　　the D. A. R. E. program, which is pretty much state-wide or

11

1　　　nation-wide, Brockton has a program -- isn't that correct, Mr.
2　　　Drane, called the G. R. E. A. T. program?
3　A.　Yeah, Gang Resistance Educational Training?
4　Q.　How long were you a G. R. E. A. T. Unit officer?
5　A.　Almost three years.
6　Q.　Were you there at the same time as Steve Ferris?
7　A.　Yes.
8　Q.　Was John Carr ever a G. R. E. A. T. unit?
9　A.　He came on after I left; he took my place, actually.
10　Q.　You've been to court before; correct?
11　A.　Oh, yeah.
12　Q.　And you've testified in criminal cases; correct?
13　A.　Yes.
14　Q.　Let me just ask you, you understand basically, why you're
15　　　here today?
16　A.　Yes.
17　Q.　And it's to talk about a certain event, a certain arrest you
18　　　made?
19　A.　Yes.
20　Q.　Why don't you tell me about that arrest, what you remember
21　　　of it?
22　A.　I was dispatched to 2077 Main Street, which is a Shaw's
23　　　Supermarket down on the south side of Brockton in regards
24　　　to --

12

1　Q.　Let me interrupt you for a second.
2　A.　Yeah.
3　Q.　Is that the one that's down by the Maui restaurant?
4　A.　Yes.
5　Q.　Then what happened?
6　A.　I was directed to CVS by the loss prevention officer from
7　　　Shaw's. I proceeded to CVS and encountered two parties
8　　　coming out of CVS at the time with the loss prevention guy
9　　　from Shaw's and also the manager from CVS. I don't recall
10　　　his name off-hand but he was coming out of the store at the
11　　　same time that the two individuals were coming out, male and
12　　　female.
13　Q.　Do you recall what the dispatcher told you when he or she
14　　　radioed you and sent you to the Shaw's on the south side?
15　A.　I believe they were chasing, loss prevention was chasing a
16　　　male and female shoplifter from Shaw's.
17　Q.　When you got to the scene -- you drove to Shaw's first; is that
18　　　correct?
19　A.　No, actually, I recall -- I think I encountered them at CVS. I
20　　　believe loss prevention had came over to CVS, I believe.
21　Q.　How did you know to go to CVS, did you get another radio
22　　　call?
23　A.　Yeah. They were heading toward CVS.
24　Q.　So, the dispatcher called you back and said --

13

1  A.  Loss prevention from Shaw's was heading over to CVS
2      where they had ducked into CVS.
3  Q.  And they asked you to meet them over there; correct?
4  A.  Yes.
5  Q.  So, when you got to CVS, which is right on Main Street, just
6      south of the Maui restaurant; correct?
7  A.  Yes.
8  Q.  When you go to that CVS, did you pull into the parking lot
9      from Main Street?
10 A.  Yes.
11 Q.  Did you park right out front by the front door there?
12 A.  Yes.
13 Q.  There's only one door; right?  It's on the corner, the northeast
14     corner of the building?
15 A.  That's correct.
16 Q.  So, you parked right out by that door; is that correct?
17 A.  Yes.
18 Q.  What did you do then?
19 A.  After I had a conversation with the loss prevention --
20 Q.  Well, let me stop you for a second.  You're parked?
21 A.  Yes.
22 Q.  Did you get out of your cruiser?
23 A.  Oh, yeah, yes.
24 Q.  Did you go in the store?

14

1  A.  No, because all parties were outside the CVS.
2  Q.  Were they outside when you arrived, when you pulled up with
3      your cruiser?
4  A.  Yes.
5  Q.  You said there was a female suspect and a male suspect;
6      correct?
7  A.  Yes.
8  Q.  The people, the supposed shoplifters; correct?
9  A.  Yes.
10 Q.  Were they standing or were they sitting when you arrived?
11 A.  They were standing.
12 Q.  Were they being physically restrained or held by anybody
13     when you arrived?
14 A.  No.
15 Q.  So, when you got there they weren't running away or trying to
16     get away, as far as you see; is that correct?
17 A.  That's correct.
18 Q.  So, you get out of your cruiser.  Do you have to walk around
19     your cruiser or is --
20 A.  No, just walked right to the front of it.
21 Q.  So, you parked so that the driver's door of your cruiser is
22     basically right by the front door, so you can open the door
23     and get right out; is that correct?
24 A.  I was facing the door, facing the two parties had came out of

15

1      CVS along with a CVS employee and then loss prevention.  I
2      got out of the car and then walked to the front of the cruiser.
3  Q.  Did you ask a question first, or did somebody approach you
4      first, I mean, what's the first conversation you remember?
5  A.  The party from Shaw's identified himself.
6  Q.  Do you remember what he said?
7  A.  He said, "These two individuals --"
8  Q.  Well, you said he identified himself, how did he identify
9      himself?
10 A.  He said his name -- I forgot his last name, Laparra, or
11     something like that.
12 Q.  Lapanna, maybe?
13 A.  Lapanna, from loss prevention from Shaw's.
14     He said "I'm Angelo Lapanna," or "I'm Mr. Lapanna --"
15 A.  Yeah.
16 Q.  "-- from Shaw's loss prevention," something along those
17     lines?
18 A.  Yeah, something like that, yes.
19 Q.  And then he began to describe to you what happened; is that
20     fair to say?
21 A.  Yes.
22 Q.  To the best of your memory, as best as you can describe it,
23     can you tell me the details of what he told you what had
24     happened?

16

1  A.  Individual went into the store, attempted to steal items, put
2      them in his pocket or whatever.  He came out and
3      approached the individual, the individual took the items out of
4      his pocket, threw them on the -- wherever -- on the ground,
5      proceeded to take off out the door with Angelo in pursuit.
6      The female and the male ran together towards CVS where he
7      -- where I encountered Angelo, and like I said, the manager
8      from CVS and the two parties, Gomes and Pina.
9  Q.  Let's see if we can go through this a little bit at a time.  Is tha
10     how he described it to you, he said, "They attempted to
11     steal"?
12 A.  They had put items in their pocket.  One of the individuals put
13     items in their pocket.
14 Q.  Did he describe the items to you, what they were?
15 A.  I don't recall what they were.
16 Q.  Did he ever show you the items?
17 A.  He might have; I'm not sure.
18 Q.  Did he describe to you, or tell you in any way, anything about
19     those items that you can remember?
20 A.  He could have.
21 Q.  Did he give you any idea of how he knew that they were items
22     belonging to the store?
23 A.  He observed him put the items in his pocket and then as he
24     approached the individual, took the items out of his pocket,

17

1   threw them down and proceeded to run.
2   Q.  Let me ask you, after you had this conversation with Mr.
3       Lapanna, did you talk to Mr. Gomes, the male suspect, as you
4       refer to him, or the female suspect, at all?
5   A.  I did speak to him eventually, yes.
6   Q.  Can you describe that conversation for me?
7   A.  First, I had -- after speaking to Angelo -- I spoke to the
8       manager of CVS and then they --
9   Q.  Let me ask you this, what was the conversation with the
10      manager of CVS, how did that go?
11  A.  I believe it was, they went into the store, they attempted to put
12      items in their pocket but were -- I believe, they were seen or
13      they saw the manager and they decided to just go out the
14      store.
15  Q.  Did you search either of these individuals?
16  A.  Yes.
17  Q.  Did they have any items on them at that time, which were
18      identified as merchandise of either CVS or Shaw's?
19  A.  I don't recall.
20  Q.  If they had had such items, items that they had stolen or
21      shoplifted, would you have taken those items as evidence?
22  A.  Not necessarily, no.
23  Q.  If you were making an arrest would you have taken those
24      items as evidence?

18

1   A.  No.
2   Q.  Let me ask you, when you make an arrest for a crime, do you
3       ever take evidence of the crime?
4   A.  Not all the time, no.  You can't take a car for evidence.
5   Q.  Well, actually, you can take a car for evidence, can't you?  I
6       mean, if you pull somebody over in a stolen car, you can have
7       the tow truck come and impound it, and bring it back?
8   A.  Then we don't have no -- we don't bring it into court for --
9   Q.  You can bring photographs of it into court; correct?
10  A.  Photographs, yes.
11  Q.  Does Brockton Police Department have -- as far as you know
12      -- an inventory policy for vehicles that it impounds?
13  A.  No.
14  Q.  But as far as you know, you can bring the vehicle in and -- a
15      stolen vehicle, perhaps, for example -- bring it in and search it
16      and photograph it for damages along those lines?
17  A.  Yeah, you could, yeah.
18  Q.  What other circumstances where there was physical
19      evidence of a crime would you not take custody of the
20      evidence, during the arrest?
21  A.  Damage of a motor vehicle where the windshield was
22      smashed, you might have photos taken, you might just take a
23      report.  Items that were attempted to be shoplifted, or items
24      that were recovered, you might give them back to the store

19

1   owner.
2   Q.  Is there any set policy on this in the Brockton Police
3       Department with when and when not to take physical
4       evidence into custody?
5   A.  No.
6   Q.  So, it's left entirely to the officer's discretion; is that correct
7   A.  That's correct.
8   Q.  I get a little lost sometimes, so sometimes I have to go
9       backwards?
10  A.  That's okay.
11  Q.  I believe I asked you if you searched the two individuals, and
12      you said you did; is that correct?
13  A.  Yes.
14  Q.  Did you find any store merchandise?  I know I asked you that
15      too, but I don't remember your answer.
16  A.  I don't recall if I found anything.
17  Q.  You might have but you don't -- and then you might not have?
18  A.  I don't recall.
19  Q.  So, you can't say "yes" or "no"?
20  A.  Yeah.
21  Q.  If you had found physical items of evidence or merchandise
22      of either CVS or Shaw's pursuant to your search of these
23      individuals, do you think you would have noted that fact in your
24      police report?

20

1   A.  Not necessarily.  Sometimes loss prevention officers make a
2       report themselves.
3   Q.  Do you know if in this case, Mr. Lapanna, or the manager of
4       CVS, ever made a report?
5   A.  I don't recall.
6   Q.  When you say, "They make a report," do they make a report
7       that's filed with the court or with the police department?
8   A.  Well, if they -- If you're going to summon somebody in, they
9       might do a report, they might for the court make a statement
10      of fact, or whatever, of what they saw.  But with myself it's -- I
11      don't recall getting a statement from Angelo, or anybody else,
12      the manager from CVS.
13  Q.  You don't happen to know if Mr. Lapanna still works at Shaw's,
14      do you?
15  A.  I'm not sure.
16  Q.  Did you ever see him again after that day and that incident?
17  A.  No.
18  Q.  Is it fair to say that you weren't friends, and you haven't had
19      conversations or anything like that; is that fair to say?
20  A.  That's fair to say.
21  Q.  When you arrived on the scene was it your impression that
22      the male suspect and the female suspect were being held or
23      restrained there by either the manager of CVS or Mr.
24      Lapanna?

21

1  A. What do you mean, restrained?
2  Q. They weren't letting them go.
3  A. I don't think so, no.
4  Q. Do you have any impression or any sense if they had tried to
5     go, if they had tried to run off, either the manager of CVS or
6     Mr. Lapanna from Shaw's would have attempted to restrain
7     them, would have held them, would have tried to prevent
8     them from leaving?
9              MR. TEHAN:  Objection.
10 Q. That's a bad question; that's why he objected.  He didn't like
11    the form of the question.  So, we're going to go backwards
12    and do it again.  You don't have to try to answer it.  Even I
13    know that's a bad question.
14             MR. WALSH:  For the record, I knew that was a
15    bad question.
16 Q. Did you have any sense or impression that Mr. Lapanna or
17    the manager of CVS would have sought to prevent the male
18    suspect, or the female suspect from leaving?
19 A. No.
20 Q. Do you have any sense that they might have grabbed them,
21    either the manager or Mr. Lapanna, would have grabbed the
22    male suspect or the female suspect had they attempted to
23    leave?
24 A. No.

22

1  Q. What did you do with regard to the female suspect?
2  A. I asked her for identification, she identified herself.  The
3     identification proved to be her.  I asked the male suspect for
4     identification, which he did not provide at the time.
5  Q. Do you recall the name of the female suspect?
6  A. The last name is Pina, but I don't remember her first name.
7  Q. Did you arrest Ms. Pina?
8  A. No.
9  Q. Did you do anything with regard to Ms. Pina?
10 A. A court complaint was sought for Ms. Pina.
11 Q. So, you filed an application for a criminal complaint; is that fair
12    to say?
13 A. Yes.
14 Q. The affidavit in support of the application for the criminal
15    complaint, that was your police report; correct?
16 A. Yes.
17             MR. ADAMS:  Could we get this marked, please.
18
19             (Brockton Police Department Arrest Report, was
20    marked as Exhibit No. 1.)
21
22 Q. Now, you said that the male individual didn't provide you with
23    any identification; is that correct?
24 A. That's correct.

23

1  Q. Do you know if he had any identification in his possession?
2  A. I believe he didn't.
3  Q. It's not a crime not to have identification in your possession,
4     is it?
5  A. No, it's not, no.
6  Q. I suppose in limited circumstances it is.  For example, you
7     can be arrested if you don't have your license on you when
8     you commit a traffic violation; correct?
9  A. If you don't have your license on you, if it's not suspended,
10    you wouldn't be arrested.  You'd be civilly fined.
11 Q. So, go on.  You said the female individual identified herself.
12    Did she do that by actually showing you a piece of
13    identification?
14 A. Yeah, she showed me identification along with her name and
15    date of birth, which matched what he had for her
16    identification.
17 Q. Do you call what her identification was?
18 A. I believe it was -- I want to word it right.  The Commonwealth
19    of Massachusetts --it's not the WIC Program, it's the -- what
20    do you call it -- the welfare.  I don't want to say welfare.
21 Q. No, you can say, "welfare," that's fine.
22             MR. TEHAN:  He did.
23             MR. WALSH:  It's too late.
24             MR. ADAMS:  We all know what that is.

24

1  Q. General Relief, or whatever it happens to be called.
2  A. I try to put it nicely, you know.
3  Q. Department of Transitional Assistance; is that what it's
4     called now?
5  A. Exactly, that's what I was looking for, yes.
6  Q. They change the names like every -- Every new governor, they
7     name it something else.
8  A. I have to get up to date with those.
9              MR. ADAMS:  But I think, am I right, gentlemen, is
10    it the Department of Transitional Assistance, now, I think?
11 A. Yes.
12 Q. So, she had an ID from Department of Transitional
13    Assistance?
14 A. Yes.
15 Q. Who did you ask for ID first?
16 A. I asked both for identification.
17 Q. And she provided you with --
18 A. Identification, yes.
19 Q. Was she carrying a purse?
20 A. I don't recall, no.
21 Q. It was in her pocket; is that fair to say?
22 A. I believe so, yes.
23 Q. So, was she wearing jeans?
24 A. I don't recall.

25

```
 1    Q.  You don't recall?
 2    A.  No.
 3    Q.  What time of year was this?
 4    A.  I don't recall.
 5              MR. TEHAN:  Perhaps, because it's been awhile
 6        he could look at the report to refresh himself on it.
 7              MR. ADAMS:  We'll get to that.  I'm just testing
 8        his memory for now without the report.
 9    Q.  Do you recall how anybody was dressed?  I mean, did
10        anybody have on heavy winter coats, or anything like that, do
11        you remember that?
12    A.  No.
13    Q.  So, it's fair to say it probably wasn't wintertime?
14    A.  It wasn't, I believe, yes.
15    Q.  There wasn't snow on the ground when you pulled into the
16        CVS?
17    A.  No.
18    Q.  There wasn't ice on the sidewalk where the individuals were
19        standing?
20    A.  No.
21              MR. WALSH:  It means it probably wasn't spring,
22        too.
23              MR. ADAMS:  Well, here in New England I
24        suppose you're right, Mr. Walsh.
```

26

```
 1    Q.  What did you do when the male individual wasn't able to
 2        provide you with any identification?
 3    A.  Name, date of birth.
 4    Q.  How did he respond when you asked him for his name and
 5        date of birth?
 6    A.  He gave me a name with a date of birth, and I was checking
 7        for warrants or anything else, any information that would give
 8        me an idea of who he was, and nothing came back.
 9    Q.  If I was walking down the street and I didn't have my ID on
10        me, and you stopped me and you asked me to identify
11        myself, and I gave you my name and I didn't have any
12        warrants out on me, nothing would come back; correct?
13              MR. TEHAN:  Object to form.
14    A.  I don't know what you mean.
15    Q.  Let me try it this way.  You say you took the name and the --
16        anything besides the name?  Date of birth, also?
17    A.  Yes, and then a Social Security number on top of that.
18    Q.  So, you have three pieces of information he's given you, his
19        name, his date of birth, and his Social Security number;
20        correct?
21    A.  Yes.
22    Q.  Now, you go back to the police car; correct?
23    A.  No.
24    Q.  You have a portable radio unit on your shoulder and hip?
```

27

```
 1    A.  Yes.
 2    Q.  And you called back in to the dispatcher or in to the station,
 3        and what do you do?  You request a warrant check?
 4    A.  Request any information that you can gather, if there's, you
 5        know, if he's been in the system before, if he's, you know,
 6        anything that would give you an inkling of who he might be.
 7    Q.  So, you called in the name he gave you, the date of birth, and
 8        the Social Security number; is that correct?
 9    A.  First, the name and the date of birth, and nothing came back.
10        So, I checked on the -- I asked for a Social Security number.
11    Q.  So, how long did you have to wait before nothing came back
12        on the name and the date of birth?
13    A.  Probably about five minutes.
14    Q.  Even though nothing came back from the name and date of
15        birth, you had him give you the Social Security number and
16        called that in also; is that correct.
17    A.  Yes.
18    Q.  Why did you do that?
19    A.  Just to verify who he might be.  He can give me any name
20        that he wants.
21    Q.  And he gave you the --
22              MR. ADAMS:  Strike that.
23    Q.  What did you do when you put the Social Security -- you
24        called the Social Security number in; is that correct?
```

28

```
 1    A.  Yes.
 2    Q.  Did anything come back on that?
 3    A.  It came back to a female.
 4    Q.  How did you find that out?
 5    A.  The dispatcher told me it came back to a female.  The
 6        information, that Social Security number that was given, came
 7        back to a female.
 8    Q.  Does the Brockton Police Department have general access
 9        to Social Security numbers of individuals?
10    A.  No.
11    Q.  If I was nowhere in the system, anywhere, as having
12        previously been arrested, could you just pump my Social
13        Security number in and get who I was?
14    A.  The registry has the information.
15    Q.  Assuming I didn't have a driver's license, could you just run
16        my Social Security number and find out who I was from
17        having my Social Security number, if I didn't have any
18        warrants or I had never been previously arrested?
19    A.  Say that again.
20    Q.  Assume I don't have a driver's license.
21    A.  Uh-huh.
22    Q.  And I give you my Social Security number.
23    A.  Uh-huh.
24    Q.  And also that I've never previously been arrested or had any
```

29

1  record with the Commissioner of Probation, never been to
2  jail, could you take my Social Security number, call it in and
3  f
4         MR. TEHAN:  I'll object; you may answer.
5  A.  You could have a Mass ID which also has you through the
6  registry.
7  Q.  The same question and assume I also don't have a Mass ID.
8         MR. TEHAN:  Same objection, you can answer.
9  A.  I could find out if he's been arrested before, if he hasn't been
10  arrested before, you know.  Those are questions I've asked.
11  Q.  Do you recall the Social Security number that he gave you
12  that the dispatcher told you came back female?
13         MR. TEHAN:  Does he recall the exact number?
14         MR. ADAMS:  Yes.
15  A.  No.
16  Q.  Did you write the number down?
17  A.  I might have; I may have.
18  Q.  So, when you asked him for the Social Security number, did
19  you write it down in a memo book?
20  A.  No, just a piece of paper.
21  Q.  A loose piece of paper you carried on you?
22  A.  Yes.
23  Q.  After he gave it to you, did you read it back to him to make
24  sure you had taken it down correctly?

30

1  A.  Yes.
2  Q.  When you called it in to this dispatcher, did you do the same
3  thing?
4  A.  Yes.
5  Q.  Do you know if the dispatcher wrote it down?
6  A.  Could have.
7  Q.  But you don't know, of course, because you weren't there?
8  A.  Exactly.
9  Q.  When the dispatcher called you back and said it came back a
10  female, did you read the number back to the dispatcher and
11  ask him to check it again, make sure that the right number had
12  been checked?
13  A.  Yes.
14  Q.  What happened next?
15  A.  After I tried to verify his identification I believe -- after nothi
16  came to light on his name, and date of birth, and Social
17  Security number, I believe I proceeded to arrest him after
18  exhausting all avenues of obtaining an identification?
19  Q.  When the dispatcher told you it came back a female, you
20  don't know how the dispatcher determined that, do you?
21  A.  No.
22  Q.  So, you could have a woman who had previously been
23  arrested --
24         MR. ADAMS:  Strike that.

31

1  Q.  The police department keeps records of aliases that people
2  use; is that correct, people who've been arrested before?
3  A.  Most of the time, yes.
4  Q.  Part of the alias record the police department keeps they also
5  keep a record of other Social Security numbers the person
6  might have used when they got arrested; correct?
7  A.  They could.
8  Q.  You didn't hang onto your notes where you took down the
9  Social Security number that he provided you, did you?
10  A.  No.
11  Q.  And you don't know if the dispatcher printed a report, or made
12  a report of her inquiry or his inquiry, regarding that Social
13  Security number, do you?
14  A.  No.
15  Q.  After you asked him for his name and his date of birth and it
16  came back with no information, did you ask him for his
17  address?
18  A.  Yes.
19         MR. TEHAN:  I'll object.  It's an incomplete
20  question because he also testified with the Social Security
21  number, but you may proceed.
22  Q.  Well, let me ask you more specifically.  Between the time you
23  asked him for name and his date of birth, and the time you
24  asked him for his Social Security number, did you ask him for

32

1  his address?
2  A.  Yes.
3  Q.  You asked him for his name and his date of birth, first;
4  correct?
5  A.  Yes.
6  Q.  And then you asked him for his address; is that correct?
7  A.  No, I asked him for his Social Security number.
8  Q.  And then after you asked him for his Social Security number,
9  you asked him for his address?
10  A.  I could have, yes.
11  Q.  You could have but you're not sure?
12  A.  At that point, I could have asked him for his address.
13  Q.  You might have asked him for his address while you were
14  waiting for the dispatcher to come back with the Social
15  Security check?
16  A.  I could have, yeah.
17         MR. TEHAN:  There is no question before you,
18  so I'll just state, don't guess about things.  Tell him what you
19  know and that's all.
20  Q.  Exactly.  If you don't remember whether or not you asked him
21  for his address, just say so?  It's fine.  Do you remember
22  whether or not you asked him for his address?
23  A.  Oh, I did ask him.
24  Q.  There at the scene?

33

```
 1    A.  Yes.
 2    Q.  Officer Drane -- and it is Officer Drane; right --it's not
 3        Sergeant or Lieutenant Drane?
 4    A.  No, Officer Drane.
 5    Q.  Which means you work for a living; right?
 6    A.  That's right.
 7            MR. TEHAN:  Don't go there.
 8    Q.  I'm going to show you what's been marked as Exhibit 1 for
 9        your deposition, and ask you to take some time to look at it.
10            MR. TEHAN:  You all set?
11    A.  Yeah.
12    Q.  You've had an opportunity now, Mr. Drane, to review what's
13        been marked as Exhibit 1 with your attorney; is that correct?
14    A.  Yes.
15    Q.  Do you recognize that?
16    A.  Yes.
17    Q.  What is that, please?
18    A.  My arrest report.
19    Q.  It's a copy of your police incident report; is that correct?
20    A.  It
21            MR. TEHAN:  It actually says, "Arrest Report."
22    Q.  Well, it's a copy of your Arrest Report; is that correct?
23    A.  Yes.
24    Q.  And this is the document -- this also operates as the
```

34

```
 1        affidavit that you submit to court in support of your application
 2        for a criminal complaint; correct?
 3    A.  Yes.
 4    Q.  And that's why at the bottom in the box where it says, "Signed
 5        under the penalties of perjury," there's a signature; correct?
 6    A.  That's correct.
 7    Q.  Is that your signature?
 8    A.  Yes.
 9    Q.  At the bottom it's also assigned by a supervisor; correct?
10    A.  Yes.
11    Q.  Is that Sergeant Gomes?
12    A.  No, Sergeant Lafratta, at the time.
13    Q.  It says, "Report Date."  Now, is that the date you signed the
14        report or --
15            MR. ADAMS:  Strike that.
16    Q.  Who wrote that date there, do you know?
17    A.  I did.
18    Q.  So, that's your handwriting, "2001/06/25"; is that correct?
19    A.  Yes.
20    Q.  How soon after you arrested Mr. Gomes would you say you
21        wrote this report?
22    A.  Probably about a half-hour after.
23    Q.  Because the report itself doesn't have a date and time of
24        the report on it; right?  It doesn't have a time of the report on
```

35

```
 1        it; is that correct?
 2    A.  Time, arrest date and time.
 3    Q.  It's got an arrest date and time, and it has an incident date
 4        and time, but it doesn't have a report date and time.  Well, it's
 5        got a report date that you've handwritten down the bottom;
 6        correct?
 7    A.  Yes.
 8    Q.  But it doesn't have a time, a day, anywhere on it that indicates
 9        the time the report was written or completed; is that correct?
10    A.  That's correct.
11    Q.  And this report, this wasn't submitted to court for a couple of
12        days; is that correct?
13    A.  I'm not sure when it was submitted.
14            MR. ADAMS:  Can we get that marked, please.
15
16            (Docket from Brockton District Court, was marked
17        as Exhibit No. 2.)
18
19            MR. WALSH:  What's that, P.J.?
20            MR. ADAMS:  That is the docket in the case, you
21        know, the official record.  It would be the official record if it
22        had the big seal on it.
23    Q.  Officer Drane, I'm going to show you what's been marked as
24        Exhibit 2 to your deposition, and ask you to take a look at it.
```

36

```
 1            MR. ADAMS:  Off the record.
 2            (Off the Record.)
 3
 4    EXAMINATION BY MR. ADAMS(cont'd):
 5    Q.  Have you ever seen a document similar to this, Officer
 6        Drane?
 7    A.  No.
 8    Q.  I am going to represent to you that it's the official record of
 9        the case in the Brockton District Court that resulted from your
10        police report, your application, your affidavit for application,
11        the complaint that's Exhibit 1.  So, you understand that?
12    A.  Yes.
13    Q.  Would you agree with me that the first entry at the bottom of
14        the sheet, the docket entries, is dated 6/27/01, and recites
15        that "An application for a complaint is filed"?
16            MR. TEHAN:  Objection, the testimony speaks
17        for itself, but you may answer.
18    A.  Yeah, that's where application for complaint filed, yes.
19    Q.  And that's a couple days after you dated and signed your
20        police report; correct?
21    A.  Yes.
22    Q.  This police report -- this incident happened -- what day of the
23        week was it, do you recall?
24    A.  Monday.
```

37

1    Q.  You just referenced Exhibit 1 of your police report.  So, the
2        day you arrested Mr. Gomes, this individual, was a Monday?
3    A.  Yes.
4    Q.  Do you know if it was a Monday holiday or was it a regular
5        day?
6    A.  I don't recall.
7    Q.  Do we have any Monday holidays in June?  I'm not even sure,
8        do you know?
9    A.  I'm not sure.
10   Q.  I don't think we do?
11   A.  I work.
12   Q.  Well, you work irrespective of being a holiday; correct?
13   A.  Exactly.
14   Q.  If it's one of your four on, you're on; correct?
15   A.  Exactly.
16   Q.  Let's assume it wasn't a holiday, it wasn't a Monday holiday,
17       courts were open; is that correct.
18   A.  Yes, that day, yes.
19   Q.  If it wasn't a Monday holiday the courts were open; correct?
20   A.  Yes.
21   Q.  And you arrested Mr. Gomes at, according to your police
22       report, approximately what time of day?
23   A.  Arrest date, arrest time, 3:53 p.m.
24   Q.  So, it was almost four o'clock; is that correct?

38

1    A.  Yes.
2            MR. ADAMS:  Oh, strike that.  Let me see, is that
3        correct?
4    A.  Yeah, 3:53 is 15:53, military time.
5    Q.  I understand.  So, is it fair to say you didn't have enough time
6        to take him to the police report -- to take him to the police
7        station, do the booking, and get him to court for an
8        arraignment?
9    A.  Yes, that's correct.
10   Q.  So, he was going to have to go to court the next morning;
11       correct?
12   A.  Yes.
13   Q.  If he was held?
14   A.  If he was held.
15   Q.  But generally, the bail commissioner or assistant clerk
16       magistrate with powers to bail somebody, generally, shows
17       up in court -- at the police station?
18   A.  At the police station, yes.
19   Q.  Do you know who the bail commissioner or clerk was on this
20       day?
21   A.  At this time, no.
22   Q.  Do you recall what shift you were working this day?
23   A.  I was working eight-to-four, traffic.
24   Q.  So, this was pretty much the end of your day?

39

1    A.  Pretty much, yes.
2    Q.  So, you arrested Mr. Gomes right at the end of your shift,
3        essentially; correct?
4    A.  Yes.
5    Q.  Basically, seven minutes to four is what your arrest reports
6        says was the arrest time, so you packaged him up into the car
7        and finished up work; correct?
8            MR. TEHAN:  Objection to "packaged up."
9    Q.  I'll rephrase.  You handcuffed Mr. Gomes; correct?
10   A.  Yes.
11   Q.  And you handcuffed him in front or behind?
12   A.  Behind.
13   Q.  And you placed him in the back of your police cruiser;
14       correct?
15   A.  Yes, double lock on the handcuffs.
16   Q.  Then with respect to Ms. Pina, you wrote down all her
17       information; correct?
18   A.  Yes.
19   Q.  Did you do that before or after you handcuffed Mr. Gomes?
20   A.  It was during the whole procedure that we went through.
21   Q.  Did Mr. Gomes resist or in any way try to run away or avoid
22       you when you sought to place him under arrest?
23   A.  Not that I recall, no.
24   Q.  Did he say anything about the allegations that Mr. Lapanna

40

1        and the manager of CVS were making?
2    A.  Not that I recall, no.
3    Q.  He neither admitted it nor denied it; is that fair to say?
4    A.  I don't recall.
5    Q.  And it's fair to say there's nothing about him admitting or
6        denying that in your police report; is that correct?
7    A.  That's correct.
8    Q.  If he had made any sort of admissions, is it fair to say, that's
9        something you would have included in your police report?
10   A.  I could have, yes.
11   Q.  Once you had Mr. Gomes secured in the rear of your police
12       cruiser and you'd taken all the information you needed from
13       Ms. Pina, did you take any other additional information from
14       Mr. Lapanna or from the manager of CVS?
15   A.  Just their names.
16   Q.  And you got Mr. Lapanna's telephone number, too; is that
17       correct?
18   A.  Yes.
19   Q.  Now, I'm going to ask you to take a look at your police report
20       again, that is Exhibit 1, and I'll ask you to look at the Social
21       Security number that appears under the defendant's
22       information in that report.  Do you know where you got that
23       number from?
24   A.  He might have provided it; I'm not sure.  He may have

41

1    provided it.
2    Q. If you didn't get this number from Mr. Gomes, where else
3        would you have gotten it from?
4    A. Say that again.
5    Q. If this number, this Social Security number that's under
6        defendant's information on your police report, if you didn't get
7        it from Mr. Gomes, the male you arrested, where else would
8        you have gotten this information?
9    A. Off the booking sheet.
10            MR. ADAMS: Let's get this marked, please.
11
12            (Booking Sheet, was marked as Exhibit No. 3.)
13
14            MR. TEHAN: You said three was the Booking
15   Sheet.
16            MR. ADAMS: Yes, it is.
17            MR. TEHAN: Thank you.
18   Q. Officer Gomes, I'm going to -- I'm sorry, I apologize for that.
19   A. That's okay.
20   Q. Officer Drane, I'm going to show you what's been marked as
21       Exhibit 3 to your deposition and I'm going to ask you, do you
22       recognize that?
23   A. Yes.
24   Q. What is that?

42

1    A. That's the booking sheet that we do when somebody's
2        arrested and brought into the booking area.
3    Q. Is this the booking sheet for Mr. Gomes that you arrested?
4    A. Yes.
5    Q. And the Mr. Gomes you arrested at CVS and that's under the
6        -- for the arrest report that's Exhibit 1 to your deposition;
7        correct?
8    A. Yes.
9    Q. Would you agree with me that there's two different names on
10       the booking sheet and on the arrest report?
11   A. Yes.
12   Q. Do you know which one of these documents was created
13       first, the booking sheet or the arrest report?
14   A. This was created first, and then that's done afterwards.
15   Q. So, Exhibit 3, which is the booking sheet was created first; is
16       that correct?
17   A. Yes.
18   Q. And then you wrote your police report after the booking sheet
19       was created; correct?
20   A. Yes.
21            MR. WALSH: Are you done with that, P.J.,
22       Exhibit 3?
23            MR. ADAMS: No, not yet.
24            MR. WALSH: When you're done I just want to

43

1    take a glance at it.
2            MR. ADAMS: I got extras if you want one.
3            MR. WALSH: If you have one handy, but if you
4    don't --
5            MR. ADAMS: I can jump up and print them out
6        because I've got them scanned in.
7    Q. Would you compare the Social Security numbers -- well, is it
8        fair to say at the top of the right of the booking sheet there
9        appears to be a Social Security number for Mr. Gomes, for
10       this individual?
11   A. Yes.
12   Q. Is it fair to say that the Social Security information which is on
13       the top half, on the right side of your arrest report, Exhibit 1,
14       that Social Security information and the Social Security
15       information that's reported on Exhibit 3, is it the same?
16   A. No.
17   Q. You are right. So, it's different with respect to the two middle
18       numbers; is that correct?
19   A. That's correct.
20   Q. When you were first interviewing Mr. Gomes, did you get
21       any impression as to his mental state?
22   A. What do you mean?
23   Q. I mean, did he seem confused?
24   A. No, not at that time, no.

44

1    Q. Did he seem disoriented?
2    A. No.
3    Q. Did he seem, in any way, intoxicated or under the influence of
4        alcohol or any drugs?
5    A. Not at the time I spoke to him, no.
6    Q. He wasn't slurring his words?
7    A. No.
8    Q. His eyes weren't glassy?
9    A. No.
10   Q. And he was fairly, or appropriately responsive to your
11       questions?
12   A. Yes.
13   Q. When you asked him a question, did he answer?
14   A. Yes.
15   Q. Did he answer fairly promptly?
16   A. Whatever you deem promptly, yes.
17   Q. When you prepare your police report, do you have a copy of
18       the booking sheet?
19   A. Sometimes.
20   Q. Do you recall whether or not you had a copy of the booking
21       sheet when you prepared this police report that's Exhibit 1 in
22       this case?
23   A. I'm not sure.
24   Q. You may have; you may not have?

45

1   A.  That's right.
2   Q.  Do you recall what you did when you got to the station with Mr.
3       Gomes?
4   A.  Proceeded through the booking process, his information.
5   Q.  Well, let me pause you there for a second.  I've been to the
6       Brockton Police Station, never as an arrestee.
7   A.  Lucky you.
8   Q.   Never as an arrestee, thank God, but I've been up there to
9       assist individuals or to report a crime.  So, I'm familiar,
10      somewhat, with the physical plant.  When you drive up to the
11      Brockton Police Station there's a parking lot to the north of
12      the station; correct.
13  A.  Yes.
14  Q.  And there's also a smaller parking area with an underneath
15      garage entrance on the south part of the building; right?
16  A.  Say that again.
17  Q.  There's garages that you can drive cars into?
18  A.  The cruisers into, yes.
19  Q.  The garage doors on the south face of the building; right?
20  A.  There's a north garage door and there's a south garage door.
21  Q.  When you pulled your cruiser up to the station with Mr.
22      Gomes in it, did you pull into the garage, one of the garages?
23  A.  Yes, through the garage door, yes.  I pulled into north --
24      'north door,' they call it.

46

1   Q.  So, you drive in with Mr. Gomes in north door and then they
2       close the door behind you; correct?
3   A.  Yes.
4   Q.  And they control the door from the inside?
5   A.  The control room, yes.
6   Q.  The what?
7   A.  The control room, the dispatch area.
8   Q.  You let them know you're inside or they have a video camera
9       they can see you're inside and they close the door?
10  A.  Sometimes, yes.
11  Q.  And that's to insure that suspects don't get out of your cruiser
12      and make you have to go chase them all over?
13  A.  God's green earth, yes.
14  Q.  So, you're in the garage now, underneath the station, having
15      driven through the north garage door, what do you do?  Do
16      you get out of your car and take Mr. Gomes out?
17  A.  Take him out, proceed to the booking area.  There's a
18      booking area right there.
19  Q.  So, the booking area is in the basement level, the same level
20      as the garage?
21  A.  No, the booking are -- No, the garage area and the booking
22      area is the same level as yourself walking into the lobby of
23      the police station.  They're all on the same level.
24  Q.  Is there a level below that?

47

1   A.  There's a level below that, yes.
2   Q.  Does that also have cruisers in it or parked in it, or no garage
3       there?
4   A.  That's employees' entrance only.
5   Q.  And then you get in there from the south side, is it?
6   A.  No, that's call the east door.
7   Q.  Oh, okay.  That's the one directly across from the BAT bus
8       station?
9   A.  The BAT bus, yes.
10  Q.  And the old granite wall for the train station there; right?
11  A.  Yes, the 'Old Bat Cave' they used to call it, for the
12      motorcycles.
13  Q.  You take him into the booking area and is there a booking
14      officer on duty?
15  A.  Yes.
16  Q.  Do you recall who the booking officer was on duty that night?
17  A.  Not unless I looked at the report itself.
18  Q.  Let me show you Exhibit 3.  You take a look at it.  Does that
19      refresh your memory as to who the booking officer was?
20  A.  Yeah, myself.
21  Q.  So, is it fair to say that there wasn't a booking office on duty?
22  A.  There is but he might not have been there at the time.  He
23      might have been at roll call.
24  Q.  Well, it was shift's end or shift's beginning anyway; correct?

48

1   A.  Yeah, exactly.
2   Q.  Because it was right around four o'clock?
3   A.  Yes.
4   Q.  So, if there's not a booking officer actually there at the
5       booking station the arresting officer can do the booking
6       himself; correct?
7   A.  Yes.
8   Q.  So, you actually did the booking?
9   A.  Yes.
10  Q.  Can you describe that process for me?  What is it that you do
11      when at the Brockton Police Department when you go
12      through the booking process with a suspect?
13          MR. TEHAN:  This a general question?
14          MR. ADAMS:  Yes, general question.
15          MR. TEHAN:  Okay.
16  Q.  Not what you did, specifically, with Mr. Gomes but what you
17      generally do?
18  A.  Name, Social Security number, under "Remarks," we might
19      have a caution.  It might be drugs, it might be dangerous, it
20      might be combative, address, if there's any scars, male,
21      female, so forth and so on, and all personal information that
22      you need for a booking sheet.
23          MR. ADAMS:  Excuse me.  Off the record for a
24      second.

49

1      EXAMINATION BY MR. ADAMS(cont'd):
2    Q.  Where do you get information for the booking report?  Do
3        you get it --
4    A.  From him, from the suspects.
5    Q.  So, you get it from the suspect?
6    A.  Yes.
7    Q.  He gave you one name, according to your police report, he
8        gave you one name at CVS and is that the same name that
9        he gave you at the booking station?
10   A.  He could have; this could have been modified.  I'm not sure.
11       He might have gave information after I left.  I'm not sure.
12   Q.  So, the booking report could have been modified?
13   A.  It could have been.
14   Q.  Who would have modified it?
15   A.  Who would've modified it?  The booking officer himself but it
16       would have me as the booking officer.  They wouldn't
17       necessarily mark it that it has been changed?
18           MR. TEHAN:  Were you answering that question
19       generally, or as to this case when you just answered that?
20   A.  Yes, to this case.
21   Q.  I'm asking as to this case.
22           MR. TEHAN:  All right.  Sorry, I got a little lost
23       there, sorry.
24           MR. ADAMS:  I'm asking as to this case because

50

1        I'm asking about the names on this report and this case.
2            MR. TEHAN:  Understood.
3            MR. ADAMS:  This particular booking sheet.
4    Q.  So, you don't know if during booking he gave you the name --
5            MR. ADAMS:  Strike that.
6    Q.  Do you remember whether or not at booking, he gave you the
7        name Richard Gomes or Joseph Gomes?
8    A.  This information here is from -- we can transpose it, with this
9        TBRO number here, we can transpose it onto a face sheet
10       our arrest reports itself, so he might have gave us, might have
11       gave me this name during booking, and then after he might
12       have gave this name after I had left.
13           MR. TEHAN:  Your answer stands but I'll caution
14       you, not what he might have done, what you remember he did.
15   A.  Yes.
16   Q.  It wasn't exactly my question.  My question was, if you have
17       an independent memory, without looking at these, you know,
18       and what I'll do is I'll put these aside for awhile and when I ask
19       about the Exhibits, we'll ask about the Exhibits?
20           MR. TEHAN:  I'll hold them for you.
21   Q.  Do you have an independent memory of what name he gave
22       you during booking?
23   A.  No, I do not.
24   Q.  When you were describing the -- what is it -- the TBRO

51

1        number?
2    A.  Yes.
3    Q.  What is a TBRO number?
4    A.  It's a number that they have for arrest reports, I mean, arrest
5        booking sheets?
6    Q.  Do you know what TBRO stands for?
7    A.  No.
8    Q.  So, there's a number system for incidents; there's a number
9        system for arrests; is that correct?
10   A.  Yes.
11   Q.  The arrest number never changes; is that correct, as far as
12       you know?
13   A.  As far as I know.
14           MR. ADAMS:  Can I see those again, John?
15   Q.  Is it an arrest number or is it a case number, actually?  It's a
16       case number, isn't it?
17   A.  On what?
18   Q.  Well, we'll look at the documents now, Exhibit No. 1 and
19       Exhibit No. 3, in the top right corner of both, this appears to
20       be a case number; would you agree with me?
21   A.  Yes.
22   Q.  And the case number on those two documents appears to be
23       the same; is that correct?
24   A.  Yes.

52

1    Q.  In each of those documents it appears to be the same?
2    A.  That's correct.
3    Q.  You also refer to earlier what's known as, I guess, you refer to
4        it as a TBRO number; correct?
5    A.  Yes.
6    Q.  And that you've indicated to me, that's the number that's at
7        the top left-hand corner of the booking sheet; is that correct?
8    A.  Yes.
9    Q.  I think you also indicated that when the booking information is
10       filled out at the booking station --
11           MR. ADAMS:  Strike that.
12   Q.  You take information from the arrestee at the booking station;
13       correct?
14   A.  Yes.
15   Q.  And you fill out a form on a computer; is that correct?
16   A.  Yes.
17   Q.  There's like a template of different information on the
18       computer and you type it in?
19   A.  Yes.
20   Q.  After you get all that information in, what do you do?
21   A.  Advise him of his rights and then he signs it, or he doesn't
22       sign it, he or she, and then they're placed in the cell.
23   Q.  When you say "they place them in a cell," is --
24           MR. TEHAN:  He didn't say that.

53

1      MR. ADAMS:  Okay, strike that.
2      MR. TEHAN:  He said, "when they're placed in a
3   cell."
4   A.  That's correct.
5   Q.  I misheard you, I'm sorry?
6   A.  That's okay.
7   Q.  Who places the arrestee in a cell?
8   A.  The arresting officer could place him, the booking officer
9      could place him, the sergeant or a supervisor might place him
10     in.  There's no format, no standard format.
11  Q.  Okay, I understand.  Is there an officer who's in charge of the
12     cells?
13  A.  What do you mean?
14  Q.  How many cells are there in the custody area, the detention
15     area of the Brockton Police Department?
16  A.  Males, there's twenty; females, there's four, four or five, four;
17     then juveniles, there's three or two.
18  Q.  And sometimes that area could be kind of full; right, on a
19     Saturday night or something like that?
20  A.  It could be.
21  Q.  You could have as many as 10 or 15 people in custody at a
22     particular time?
23  A.  Or more, or less, yes.
24  Q.  I remember incidents in Brockton where there's probably

54

1      more.  What about the Brockton Fair time, you might be full
2      up there?
3   A.  Oh, yeah.
4   Q.  And of course, you're on the force long enough to remember
5      when they had the antique car or racing, or whatever it was,
6      up in front of Zayre's about 15 or 20 years ago?
7   A.  I happily missed that incident.  I was coming back from
8      Florida.
9   Q.  Lieutenant Sullivan had to take control of that situation?
10  A.  God rest his soul.
11  Q.  God rest his soul, yeah, great guy.  So, is there an officer who
12     is in charge of the persons in custody at the police station?
13  A.  There's a booking officer, yes.
14  Q.  The booking officer is in charge of the prisoners; is that
15     correct?
16  A.  Yes.
17  Q.  He's the one -- if somebody gets sick it's his job to take care
18     of that; is that correct?
19  A.  Yes.
20  Q.  Is the booking officer -- now, when you say "the booking
21     officer," you're -- on Exhibit 3, you're the booking officer; is
22     that fair to say?
23  A.  Yes.
24  Q.  But when you say "the booking officer who's in charge of the

55

1      prisoners," he's actually assigned to the booking desk;
2      correct?
3   A.  That's correct.
4   Q.  That's his station, duty station, as it were, for his shift.  He's
5      not leaving the booking desk unless he's going to the
6      bathroom, or on a coffee break, or something like that?
7   A.  Yes.
8   Q.  Do you recall who the booking officer was on four-to-midnight
9      on June 25, 2001, the day you arrested Mr. Gomes?
10  A.  I don't recall.
11  Q.  Is the booking officer supposed to do checks of the
12     prisoners?
13  A.  Yes.
14  Q.  Do you know most of the officers at the Brockton Police
15     Department?
16  A.  The old ones, yes; the new ones --
17  Q.  Some of the younger ones, you don't know; right?
18  A.  No.
19     MR. ADAMS:  Could we get this marked, please.
20
21     (Prisoners Watch Form, was marked as Exhibit
22  No. 4.)
23
24  Q.  I'll show you now, Officer Drane, what's been marked as

56

1      Exhibit 4 to your deposition.  And before I ask you about
2      Exhibit 4, let me ask you, have you ever been assigned to the
3      booking desk during your shift?
4   A.  Yes.
5   Q.  How many times have you done that, been booking officer,
6      you think?
7   A.  Numerous times.
8   Q.  Say, more than 10?
9   A.  Oh, yeah.
10  Q.  More than 20?
11  A.  Yeah.
12  Q.  In your 20-year career, maybe as many as a hundred times?
13  A.  Yes.
14  Q.  Could you describe what Exhibit 4 is, for us?
15  A.  It shows the time of --
16  Q.  Well, let me interrupt you, I'm sorry.  Do you call this form,
17     this particular form, something, at the police department?
18  A.  Yeah, it's a Prisoners Watch Form.  It tells you how many
19     prisoners you have, their condition, and other stuff.
20  Q.  Where is this -- Is this kept in a book?
21  A.  In a binder, yes.
22  Q.  Like a three-ring binder?
23  A.  Yes.
24  Q.  And that three-ring binder is kept where, at the booking desk?

57

1   A. At the booking desk, yes.
2   Q. Do you know what happens to the older ones?
3   A. No, I don't know.
4   Q. You don't know if they go -- there's a records department they
5       go to?
6   A. That's possible.
7   Q. I believe I asked you before if you remembered the name of
8       the booking officer who was on later, rather --
9               MR. ADAMS: Strike that.
10  Q. -- the booking officer who was on four-to-midnight?
11  A. This isn't accurate, though.
12  Q. Okay. You're pointing to Exhibit 4 and to the top left corner
13      and saying, this is not accurate.
14  A. This is 19:00 hours, which is seven o'clock. There's three
15      hours that are missing, which might be on that one.
16  Q. We'll get to this one.
17              MR. ADAMS: Off the record for a second.
18              (Off the Record.)
19
20  EXAMINATION BY MR. ADAMS(cont'd):
21              MR. WALSH: I'm just going to make an objection
22      to the document so far as it may not be a complete
23      document, I guess. Or if we can identify it as the Prisoners
24      Watch Form, for a certain period of time.

58

1               MR. ADAMS: Well, I don't know where I got it
2       from; I don't know if I got it from you. It's not complete.
3       Maybe you need to inquire of the city.
4               MR. WALSH: Yeah, I couldn't tell you. All I know
5       is, for the record, it doesn't appear that's a complete
6       document according to Officer Drane.
7   Q. You'd agree with me, Officer Drane, that it's a partial record of
8       the four-to-midnight shift for the Prisoners Watch Log;
9       correct?
10  A. I would say it's partial, yes.
11  Q. It's partial in the sense that the earliest time that appears on
12      the sheet is seven o'clock in the evening; correct?
13  A. That's correct, 7 p.m.
14  Q. There hasn't been any lines blotted out on the sheet or on the
15      record; correct?
16  A. No.
17  Q. So that the time before 7 p.m. is likely on another sheet; is
18      that correct?
19  A. That's possible, yes.
20  Q. Do you recognize this officer's name here, on the top
21      right-hand corner, and ID number?
22  A. S. Landry, it looks like Scott Landry.
23  Q. Do you know Officer Landry?
24  A. Scott, yeah.

59

1   Q. Is Scott Landry a veteran Brockton Police Officer?
2   A. I don't know how long he's been on, now.
3   Q. And you also see below that, another officer's name, at some
4       point.
5   A. O'Malley.
6   Q. Do you know Officer O'Malley?
7   A. Patrick O'Malley, yes.
8   Q. From looking at this log that's Exhibit 4, and again, you've
9       filled out logs like this; correct?
10  A. Yes.
11  Q. Now, in looking at this --
12              MR. ADAMS: Strike that.
13  Q. Is there any instruction given to you in how to fill these out?
14  A. No.
15  Q. Are there rules or regulations about how to fill them out?
16  A. Every 15 minutes.
17  Q. The rules and regulations tell you you're supposed to do a
18      prisoner check every 15 minutes and make an entry in the
19      log; is that correct.
20  A. That's correct.
21  Q. And when you were first trained, or at some point you were
22      trained by a booking officer, "Okay, this is how we fill out the
23      log"; is that fair to say?
24  A. Yes.

60

1   Q. So, if I were a new police officer and I was on my very first
2       time at the booking station, somebody would show me "Hey,
3       this is how you fill out the log"; correct?
4   A. That's correct.
5   Q. Is it fair to say from looking at this, that this Exhibit 4, that
6       Steve Landry --
7   A. Scott Landry.
8               MR. ADAMS: I'm sorry. Strike that.
9   A. Scott Landry was the officer checking the cells from 7 p.m.
10      until what looks like --
11  A. Eight-fifteen.
12  Q. His last entry of 8:15 p.m.; is that correct?
13  A. That's what it looks like, yes.
14  Q. And it looks like Patrick O'Malley's first entry is --
15  A. Eight-thirty.
16  Q. Is 8:30 p.m.; is that correct?
17  A. Yes.
18  Q. And then Patrick O'Malley continues to make entries all the
19      way until what appears to be midnight of, well, it would
20      actually be --
21  A. It would still be 6/25.
22  Q. Well, you consider midnight for the purposes of this form,
23      6/25, but midnight is actually the beginning of a new day;
24      correct?

61

1    A. Yeah.
2    Q. I mean that's the way we consider it. The 24:00 here, right,
3        is the very end, the 24:00 that's the very end of 6/25; correct?
4    A. Of the --
5    Q. June 25?
6    A. Yes.
7    Q. Now, I've noticed, Officer Drane, that on this report, on this
8        prisoner custody -- what do you call it, again? I'm sorry.
9    A. It's observation, a booking observation sheet, a total of how
10       many prisoners, or whatever.
11   Q. The binder at the booking desk in which these sheets are
12       kept, does it have a title on it down the spine, or anything like
13       that?
14   A. Not that I recall.
15   Q. Like prisoner log, or anything like that?
16   A. Not that I recall.
17   Q. In looking at this, at Exhibit 4, there's an entry for the time,
18       19:45. And where it says, "Condition of Prisoners," for the
19       19:45 entry, it says "One bailed"; is that correct?
20   A. Uh-huh.
21   Q. And if you look again, down at the entry for 23:30, which is
22       11:30 at night; correct?
23   A. That's correct, yes.
24   Q. And it says, "Three bailed"; is that fair to say?

62

1    A. Yes.
2    Q. It appears that between, somewhere between -- that would
3        be like 7:45, quarter-of-eight at night, and 11:30 at night. The
4        bail commissioner came twice or the assistant magistrate
5        was at the police station twice?
6    A. Yes.
7    Q. Tell me how that works when the bail commissioner shows
8        up. With whom does he interact, with the booking officer?
9    A. Most of the time, yes.
10   Q. You as booking officer, I imagine you interacted with different
11       clerk magistrates or bail commissioners; correct.
12   A. Yes.
13   Q. Have you ever worked with William Martin?
14   A. Willy Martin, Clerk Creedon --
15   Q. That's Clerk Kevin Creedon?
16   A. Yes.
17   Q. Assistant Clerk Magistrate Tony Gibbs?
18   A. Yes.
19   Q. Anybody else?
20   A. Burns.
21   Q. John Burns?
22   A. Yes.
23   Q. He is also an assistant clerk magistrate of Brockton District
24       Court; is that correct?

63

1    A. Yes.
2    Q. And William Martin is an assistant clerk magistrate of
3        Brockton District Court?
4    A. Yes.
5    Q. Anybody else? Oh, you said Clerk Magistrate of Brockton
6        District Court, Kevin P. Creedon?
7    A. Yes.
8    Q. Anybody else?
9    A. Those are the only ones I can recall, off-hand.
10   Q. Do you know if there are any other bail commissioners or
11       assistant clerk magistrates, or clerk magistrates who do bails
12       at Brockton Police Station?
13   A. I don't know.
14   Q. And you don't know who showed up on the 25th, which
15       according to the Exhibit 4, showed up around, you know
16       somewhere between, somewhere before eight o'clock,
17       around quarter-of-eight --
18   A. No.
19   Q. -- and 11:30?
20   A. No.
21   Q. When they show up, do they come in through the front door
22       just like you and I would come through -- well, not you -- but
23       just like I would come into the police station?
24   A. Yeah.

64

1    Q. They don't go through the employees entrance, or the east
2        door, or anything like that?
3    A. No, sir.
4    Q. So, they come in and they go right up to the -- like I would as
5        a citizen, you go up to the front desk and they say, "I'm the
6        bail guy, I'm here."
7    A. Yes.
8    Q. Something along those lines, they identify themselves?
9    A. Yes.
10   Q. Frequently they're recognized though by the desk officer;
11       correct?
12   A. Yes.
13   Q. Because when you walk into the Brockton Police Station as
14       you go straight ahead there's a front desk in front of you;
15       correct?
16   A. Yes.
17   Q. With a big Plexiglas window?
18   A. Yes.
19   Q. There's also a small -- or there used to be, I don't know -- is
20       there still a small area where an officer can --
21   A. They called it the "Penalty Box" at one time but it's gone.
22   Q. They called it the "Penalty Box"?
23   A. Yeah.
24   Q. It was like an information officer out there who dealt with the

65

1   public as they came in, or something like that?
2   A.  The lobby officer, yes.
3   Q.  So, there's no more lobby officer; correct?
4   A.  The person that you see when you walk in the door, the first
5       person you see, that's the lobby officer.
6   Q.  So, the person that's now behind the Plexiglas in the --
7   A.  Enclosure, yes.
8   Q.  And that's also where dispatch is; is that correct?
9   A.  No.
10  Q.  What goes on in that area?
11  A.  You have the lobby officer and then you have a petition that
12      separates the report room area where you do reports, your
13      complaints, your arrest reports, and investigative reports.
14  Q.  So, the clerk magistrate comes in or the assistant clerk
15      magistrate comes in, or the bail commissioner comes in, and
16      tells the lobby officer he's there?
17  A.  Yes.
18  Q.  And then what happens?
19  A.  He goes down and does whatever.  He sets bail, bails
20      people.
21  Q.  You can't just open any door to get in.  Once you walk in the
22      doors are all locked; correct?
23  A.  That's correct.
24  Q.  So, they have to open a door for you, for you to get further

66

1   into the police station other than that lobby where the
2   Plexiglas is; correct?
3   A.  Correct.
4   Q.  So, somebody opens the door to let the bail commissioner
5       in; right?
6   A.  Yes.
7   Q.  Would that be the booking officer, or would that be the lobby
8       officer?
9   A.  The lobby officer.
10  Q.  So, the lobby officer, does he throw a switch?
11  A.  Just hit a button and open.
12  Q.  Hits a button and the door opens and he goes inside?
13  A.  Yes.
14  Q.  Does he walk down to the booking area?  What does the bail
15      commissioner do?
16  A.  Generally, he walks down to the booking area.
17  Q.  Is it the booking officer and he handle the bails together, or
18      how does that work?
19  A.  The booking officer is in control of the booking area.  He gets
20      the prisoners or gets the people that are getting bailed.
21  Q.  So, you've bailed people when you were a booking officer;
22      correct?
23  A.  Yes.
24  Q.  What would you do as booking officer?

67

1   A.  Whoever is bailable just -- he signs his forms and I get the
2       party out of the cell, and forms are signed, and he or she are
3       on their way.
4   Q.  Who makes the determination of whether or not the individual
5       is bailable?
6   A.  The clerk.
7   Q.  He does that based upon what information?
8           MR. TEHAN:  Object.  Don't speculate as to that.
9       If you know, you can give it to him.
10  A.  However he --
11  Q.  Okay.  When the clerk magistrate comes in, or the assistant
12      clerk magistrate comes in to do bails, he doesn't know who's
13      locked up in there does he, as far as you know?
14  A.  As far as I know.
15  Q.  It could be anybody as far as you know, you know?
16          MR. ADAMS:  Well, strike that.  You have no
17      knowledge as to the state of his knowledge.
18  Q.  How does he know to come down to bail people?
19          MR. WALSH:  Objection.  He doesn't know
20      about what he knows.
21  Q.  Is there a procedure for calling a clerk magistrate or assistant
22      clerk magistrate, or do they just show up willy-nilly, as it were?
23  A.  We call them.
24  Q.  So, you call them from the police station?

68

1   A.  That's correct.
2   Q.  What information do you give him when you call him?
3   A.  There's parties that need to bailed.  There's parties that you
4       can set bail on, that need to be set bail on.
5   Q.  Now, as far as your understanding goes, how does the --
6           MR. ADAMS:  Strike that.
7   Q.  What other information does the clerk -- so, the clerk
8       magistrate shows up and you give him information as the
9       booking officer about the people in custody; correct?
10  A.  Say that again.
11  Q.  When the clerk magistrate shows up, what happens next?
12  A.  Just give them the information.
13  Q.  What information do you give him?
14  A.  If this person is bailable, he'll set the bail.  If the person is n
15      bailable or --
16  Q.  I believe you testified that the clerk magistrate makes the
17      determination whether or not the individual is bail able; is that
18      correct?
19  A.  That's correct.
20  Q.  Do you give the clerk magistrate the information on every
21      individual that's in custody in the cells when you are the
22      booking officer?
23  A.  He reads the report or he asks the officer.
24          MR. WALSH:  Do you know that willy-nilly is

69

1    actually in this dictionary?
2              MR. ADAMS:  We're on the record, so.  Off the
3    record.
4              (Off the Record.)
5
6    EXAMINATION BY MR. ADAMS(cont'd):
7    Q.  Do you keep a list of the booking sheets of, you know, do you
8        keep a package of booking sheets for everybody in custody
9        when you're at the booking station?
10   A.  What do you mean?
11             MR. ADAMS:  Strike that.
12   Q.  How do you know who you've got in the cells?
13   A.  There's slots and you put the booking sheets in the slots.
14   Q.  You have some sort of like cabinet or something like that by
15       the booking desk; is that fair to say?
16   A.  Yes.
17   Q.  And that cabinet has a series of open slots; is that fair to say?
18   A.  Yes.
19   Q.  And each one of those slots represents a cell; is that fair to
20       say?
21   A.  Yes.
22   Q.  And all the cells, all the holding cells, all the detention cells a
23       the Brockton Police Station are single cells; is that fair to say?
24   A.  Yes.

70

1    Q.  You're never going to have two prisoners in one cell, or it
2        would be rare?
3    A.  We had them but it's rare.
4    Q.  You try not to double up?
5    A.  You're not supposed to, yes.
6    Q.  So, I know who's in each one of those cells by the booking
7        sheets that's in the respective slot; is that correct?
8    A.  Yes.
9    Q.  So, when the bail commissioner comes back, does he go
10       through the booking sheets and the slots themselves looking
11       at each one of the individuals?
12   A.  He could, yes.
13   Q.  I believe you testified that this Exhibit 3, this booking sheet,
14       this could have been changed; is that your testimony?
15   A.  It could have; I'm not sure.
16   Q.  But you originally filled it out; correct?
17   A.  Yes.
18   Q.  And you'd agree with me, wouldn't you that --
19             MR. WALSH:  Are you looking for this?
20             MR. ADAMS:  No, I need this one.
21   Q.  You'd agree with me, wouldn't you, that the information that's
22       on Exhibit 3 is not the same as the information that's on
23       Exhibit 1; is that correct?
24             MR. TEHAN:  I'll object.

71

1    Q.  I'll ask a different question.  What's the name of the arrestee
2        on Exhibit 3?
3    A.  Richard P. Gomes. .
4    Q.  What's the name of the arrestee on Exhibit 1?
5    A.  Joseph Gomes.
6    Q.  Different names; correct.
7    A.  Yes.
8    Q.  And I think we already established from looking at these two
9        documents that there's different Social Security numbers on
10       each one; is that correct?
11   A.  Yes.
12   Q.  And there are also different dates of birth; is that correct?
13   A.  Yes.
14   Q.  And you filled out this incident report the same day?
15   A.  The arrest report, yes.
16   Q.  And I think you indicated that the information that you fill out
17       on the computer at the booking station, that under the
18       computer system at the Brockton Police Department, you
19       don't have to duplicate that information when you do your
20       arrest report; correct?
21   A.  Say that again.
22   Q.  Do you remember saying something about the TBRO
23       number?
24   A.  Yes.

72

1    Q.  And you said the information -- didn't you say the information
2        from the TBRO number transfers over to where you do your
3        police report?
4    A.  It could, yes.
5    Q.  It does or it could?
6    A.  It could.
7    Q.  Well, do you recall if you filled this information in separately
8        when you did your police report on Exhibit 1?
9    A.  I don't recall.
10   Q.  So, you don't recall whether or not when you booked this
11       individual, he gave you the name Richard Gomes or if he
12       gave you the name Joseph Gomes?
13   A.  I don't recall.
14   Q.  But he could have given you the name Joseph Gomes;
15       correct?
16   A.  He could've.
17   Q.  And you might have filled out the booking sheet with Joseph
18       Gomes; correct?
19   A.  I could have.
20   Q.  And then somebody else came along and changed it
21       afterwards; is that possible?
22   A.  That's possible.
23   Q.  Have you ever done that as booking officer?
24   A.  Changed information?

73

1  Q. Yes.
2  A. Yes, I have.
3  Q. If that information is changed after the police report is
4     written --
5           MR. TEHAN:  Arrest report?
6           MR. ADAMS:  No, on the booking sheet.
7  Q. Have you, sir, ever changed information on a booking sheet?
8           MR. TEHAN:  Thank you.
9  A. Yes.
10 Q. Like Exhibit 3?
11 A. Yes.
12 Q. You didn't change Exhibit 3, though, that you remember?
13 A. I don't recall.
14 Q. But if the information on a booking sheet was changed after
15    the arrest report was done, how would you tell that?  Could
16    you tell that?
17 A. Not unless they put "modified" on it, I couldn't tell.
18 Q. Is there anywhere on Exhibit 3 that indicates that it was
19    modified?
20 A. Under comments, it just says, "At hospital, had given false
21    info," that's all.
22 Q. When you fill out this booking sheet the information is typed;
23    right?
24 A. Yes.

74

1  Q. Are you able to type it in on the computer, the comments
2     portion?
3  A. You can.
4  Q. And you'll agree with me that the comments portion on Exhibit
5     3 is not typed in, but handwritten; correct?
6  A. That's correct.
7  Q. Also at the bottom of the booking report is a portion that says,
8     "bail amount," do you see that?
9  A. Yes.
10 Q. Do you know whose handwriting that is?
11 A. I couldn't even tell you.
12 Q. Do you know if Mr. Gomes was ever given the opportunity to
13    make a telephone call?
14 A. That's one of his rights; I don't know if he made one or not.
15    I'm not sure.
16 Q. You don't remember whether or not he made a telephone
17    call?
18 A. I don't recall.
19 Q. But it's your practice to always inform, as booking officer,
20    when you're booking someone, to always inform them they
21    have a right to make a telephone call; correct?
22 A. That's correct.
23 Q. And there's a telephone available for individuals to use at the
24    booking station?

75

1  A. Yes.
2  Q. And that's a free telephone call?
3  A. I'm not sure.
4  Q. That's a poorly phrased question.  Does the arrestee have to
5     have change on him to make the telephone call?
6  A. No.
7           MR. TEHAN:  Could we take a break for a
8     minute?
9           MR. ADAMS:  Sure.
10          (Off the Record.)
11
12 EXAMINATION BY MR. ADAMS(cont'd):
13          MR. ADAMS:  Can you tell me what my last
14    question was because I have no idea.
15
16          (The following question was read back by the
17    reporter:  Question, Does the arrestee have to have change
18    on him to make the telephone call?)
19
20 Q. Let's go to Exhibit 3, again, the booking sheet.  There's
21    handwriting at the bottom of this, would you agree with me?
22 A. Yes.
23 Q. Do you know whose handwriting that is?
24 A. No.

76

1  Q. Where it says, "Released by," and there's some handwriting
2     next to that.  It appears to be "OPC," for officer.  Do you
3     recognize the name after that?
4  A. It could be Vadara.
5  Q. Do you know who Officer Vadara is?
6  A. Frank Vadara.
7  Q. Then handwritten it's got "Released to," just below that.  In
8     handwriting is "Released to," what appears to be "Officer
9     Sullivan."  Do you know who that is?
10 A. No.
11 Q. After each one of those there appears to be like signatures,
12    or initials, or some sort of scribbled handwriting.  Do you see
13    that?
14 A. Yeah.
15 Q. You don't recognize whose writing that is, or who that is, do
16    you?
17 A. No.
18 Q. But you'd agree with me that the first one, next to "Officer,"
19    what appears to be "Vadara," that looks like it could be an
20    F, maybe F.V., initials?
21 A. I'm not sure.
22 Q. Let me ask you, what is the "Released by" box for?
23 A. I'm not sure.
24 Q. For example, if you bail somebody at the booking station, you

77

1  know, when Clerk Magistrate Creedon comes in and the
2  prisoner is bailed, would you sign the bottom of the booking
3  report, "Released by," and you'd write in, "Jesse Drane"?
4 A. No.
5 Q. What is this "Released by" box for, on this form?
6 A. The clerks.
7    MR. ADAMS:  Excuse me for a moment.
8 Q. So, is it your testimony that the "Released by" is for, the
9  information that's supposed to be filled in there is the name
10  of the clerk magistrate?
11 A. Yes.
12 Q. Who fills in the information for the "Release or hold" part, do
13  you know?
14 A. Say that again.
15 Q. If you look here, there's different sections of this arrest
16  booking report, is that fair to say?
17 A. Yes.
18 Q. There's a part that appears -- the first section appears to be
19  titled, "Arrestee"; correct?
20 A. Yes.
21 Q. That appears to contain all the particular information of the
22  individual?
23 A. Yes.
24 Q. Who is in custody; correct?

78

1 A. Yes.
2 Q. Then below that there's another section.  The next section
3  starts out "Charge"?
4 A. Yeah.
5 Q. That contains the particular information of the particular things
6  for which you believe, or for which it's been determined, or
7  determination has been made of probable cause to arrest
8  and hold the individual; correct?
9 A. Correct.
10 Q. That also has -- it identifies the name of the arresting officer,
11  the arrest location, and the arrest date, and whether or not
12  domestic violence is involved; correct?
13 A. Yes.
14 Q. The time on it, does it indicate the arrest time, or is it the
15  booking time?
16 A. Booking time.
17 Q. So, if I look back at the police report, it also has the time of
18  15:53, the same time that's on the booking report.  You
19  actually took him into custody before 15:53, wouldn't you say,
20  because you had to drive from CVS to the booking station,
21  and 15:53 is actually the time you're booking him; is that fair
22  to say?
23    MR. TEHAN:  No.  It doesn't appear to be, to me
24  counselor.  There's an arrest time of 15:53 and a booking

79

·1  time of 16:35.
2 Q. That's in the control section that you have.  I see that; you're
3  correct.  Let me look at this, it's got an arrest time of 15:53 in
4  the booking sheet but --
5    MR. ADAMS:  Oh, okay.  Strike that.
6    MR. TEHAN:  Okay?
7    MR. ADAMS:  Forget it.
8 Q. So, that's the arrest time, the same time that's on this, 15:53
9  is the arrest time?
10 A. That's correct.
11 Q. And that's the time you actually, more or less, right around the
12  time you put the handcuffs on him, and informed him he was
13  under arrest, and handcuffed him and began to transport him
14  to the police station?
15 A. Exactly.
16 Q. Below the charge section, the very next section is "Control";
17  is that correct.
18 A. Yes.
19 Q. And that gives like the cell number, the booking officer's
20  name, and is that the booking time next to the booking
21  officer's name?
22 A. Yes.
23 Q. It also has "Rights given by."  Is that the person who
24  Mirandizes the arrestee at the police station?

80

1 A. That's correct.
2 Q. And name of that individual on this form is, Thomas Lafratta?
3 A. Yes.
4 Q. Is he a sergeant with the --
5 A. He was, he's a lieutenant now.
6 Q. Do you recognize the other handwriting on this control
7  section, where it is says, "At hospital and given false info," or
8  "had given false info?"
9 A. No, I don't know whose writing that is.
10 Q. The next section after control is "Juvenile"; correct?  Do you
11  see that?
12 A. Yes.
13 Q. This really shouldn't have anything filled in for this individual
14  on Exhibit 3; correct, because he's not a juvenile?
15 A. Yes.
16 Q. But "Hold" is circled in the juvenile section there; isn't it?
17 A. Yes.
18 Q. Do you think that's just a mistake?
19 A. I'm not sure.
20 Q. You don't know?
21 A. No.
22 Q. Did you circle "Hold" on this form?
23 A. No.
24 Q. And you didn't write "At hospital and had given false info";

81

1      correct?
2   A.  No.
3   Q.  You see up top at the "Caution" and the "Arrestee" section,
4       where "Caution: drugs" is kind of circled around?
5   A.  Yes.
6   Q.  You didn't draw that circle around it; correct?
7   A.  No.
8   Q.  Also where it says, "Bail amount" and it's written in under "Bail
9       amount," "Hold," you didn't write that, did you?
10  A.  No.
11  Q.  Do you have any idea who did write that?
12  A.  No.
13  Q.  Where it says, "Six" and the date, it says, "Date and time
14      released," do you know who wrote that?
15  A.  No.
16  Q.  Other than getting information from Mr. Gomes at booking, do
17      you remember any other conversation or words you had at
18      the police station?
19  A.  No, just the information that he gave me that I put into the
20      computer for the booking and that was it.  I did my arrest
21      report.
22  Q.  Did you speak to him at all or did he speak to you at all on the
23      ride in the police cruiser from CVS to the police station?
24  A.  Just that he had a drug addiction, heroine.  That's why it's

82

1      marked "Drugs" on the booking sheet.
2   Q.  So, he told you he had a heroine addiction but he didn't tell
3       you anything else?
4   A.  No.
5   Q.  In connection with booking, is there a form or do you take any
6       medical information from any prisoner?
7   A.  No.
8   Q.  You don't ask them if they have a heart condition or anything
9       like that?
10  A.  No, I do not.
11  Q.  Well, I'm not asking you what you do; I'm asking you, what's
12      generally done?
13  A.  I'm not sure.
14  Q.  Does the police department have any form for you to fill out,
15      or fill in at booking for asking medical questions of prisoners?
16  A.  No.
17  Q.  If a prisoner were to give you medical information during the
18      booking procedure, if they were, for example, to tell you that
19      they had some sort of medical condition, would that be noted
20      on the booking report?
21  A.  It could be, yes.
22  Q.  It might be put in the comments section, say?
23  A.  Yes.
24  Q.  But it might not be, also; correct?

83

1            MR. WALSH:  Objection.
2   A.  That's correct.
3   Q.  Is there any policy, or procedure, or regulation that you're
4       aware of at the Brockton Police Department that requires you
5       to inquire as to medical conditions of arrestees or prisoners?
6   A.  No.
7   Q.  Is there any regulation, policy, or procedure, that you know of
8       at the Brockton Police Department that requires you to note
9       on the arrest report, or any place else, or on the booking
10      report, any medical information given to you by a prisoner?
11  A.  No.
12  Q.  What's the policy and procedure that you're supposed to
13      employ at the Brockton Police Department as booking officer
14      and in charge of the cells when you find somebody who's --
15            MR. ADAMS:  Well, strike that.
16  Q.  Have you ever found anybody sick or unconscious in the cell
17      area at the Brockton Police Department?
18  A.  I don't recall.
19  Q.  Have you ever called an ambulance for anybody in the cells at
20      the Brockton Police Department?
21  A.  I don't recall.
22  Q.  Have you ever seen anybody taken from the cells at the
23      Brockton Police Department by ambulance?
24  A.  Yes.

84

1   Q.  Do you recall what they were taken by ambulance for?
2   A.  No.
3   Q.  You ever know of anybody having a heart attack, or anything,
4       while in custody at the Brockton Police Department?
5   A.  No.
6   Q.  Never while you were booking officer, that you can
7       remember; correct?
8   A.  That's correct.
9            MR. ADAMS:  I don't think I have anything further
10      at this time.
11            MR. TEHAN:  I think I have just a few.  Could I
12      see the Exhibits for a moment, please.
13            MR. ADAMS:  Absolutely.
14            MR. TEHAN:  Thank you.
15            MR. ADAMS:  And you want me to make
16      photocopies of these?
17            MR. TEHAN:  You can send them to me in the
18      mail, afterwards.
19            MR. ADAMS:  I just as soon save the stamp.
20            MR. TEHAN:  Whatever you'd like.
21
22      EXAMINATION BY MR. TEHAN:
23  Q.  Officer Drane, in terms of the arrest that we're discussing,
24      what was the date of that arrest?

85

1    A.  6/25/2001.
2    Q.  Prior to that date, do you recall having any encounters with
3        Richard Gomes?
4    A.  No.
5    Q.  As I understand it, you were working the traffic assignment
6        that day?
7    A.  Yes.
8    Q.  What were your duties in that regard?
9    A.  Traffic enforcement around the city.
10   Q.  Is it true that your encounter with Mr. Gomes was the result of
11       a dispatch?
12   A.  Yes.
13   Q.  And again, the dispatch was for what, sir?
14   A.  Shoplifting at Shaw's.
15   Q.  Upon your arrival at Shaw's, did you have a discussion with a
16       gentleman by the name of, Angelo Lapanna?
17   A.  Yes.
18   Q.  What did you understand his position to be?
19   A.  That two parties were in the store attempting to steal items.
20       As soon as they spotted him, they took off, proceeded to run
21       toward CVS.  I proceeded toward CVS and encountered the
22       individuals at CVS.
23   Q.  Did Mr. Lapanna, at any point, point out to you the individuals
24       whom he claimed had shoplifted?

86

1    A.  Yes.  They were coming out of the store, out of CVS, and he
2        pointed to the two individuals, a male and female.
3    Q.  Was one of those persons Mr. Gomes, Mr. Richard Gomes?
4    A.  Yes.
5    Q.  Did I understand correctly that you also spoke with some
6        official from the CVS pharmacy?
7    A.  Yes, the manager, yes.
8    Q.  Was that at or about the same time you spoke to Mr.
9        Lapanna?
10   A.  Around the same time.
11   Q.  What did that person tell you?
12   A.  That they were in the store, they attempted to steal some
13       items, but as soon as they saw him, the manager, walk
14       towards them, they proceeded out the door, out the front
15       door.
16   Q.  You then proceeded to have a discussion with the individual
17       who proved to be Richard Gomes, and the lady whose last
18       name is Pina; is that correct?
19   A.  Yes.
20   Q.  As I understand your testimony in response to my bother's
21       questions, you were given a Social Security number by Mr.
22       Gomes?
23   A.  Yes.
24   Q.  And you were alerted by your dispatcher that that Social

87

1        Security number corresponded to a female; is that correct?
2    A.  That's correct.
3    Q.  Did you have a discussion, at some point, with Mr. Gomes
4        about drug addiction?
5    A.  Yes.
6    Q.  When and where did that take place?
7    A.  On the scene and at the police station.
8    Q.  What did he tell you in that regard?
9    A.  He had a heroine addiction.
10   Q.  When you learned that information, did you make any further
11       inquiry of the dispatcher concerning the criminal background
12       of the person you were speaking to?
13   A.  Yeah.  I asked them to do a Board of Probation check.
14   Q.  Was this before or after you arrested Mr. Gomes?
15   A.  In the same time frame of the arrest and investigation.
16   Q.  What did you learn in that regard, at that time?
17   A.  That the individual gave me a different name.  He gave me
18       another name on the street.  I think he gave me Joseph
19       Gomes, at first.  Then we went to the -- after gathering
20       information and couldn't identify who he really was, I
21       proceeded to place him under arrest and transport him to the
22       station.
23   Q.  Did you learn whether Joseph Gomes had any warrants out
24       against them?

88

1    A.  I don't recall.  At this point, I don't recall.
2    Q.  Did the dispatcher indicate to you, when you were speaking
3        with him or her, whether Richard Gomes, had any outstanding
4        warrants?
5    A.  Yes.
6    Q.  What did you learn in that regard?
7    A.  That there were some warrants for Richard Gomes, with a
8        different date of birth and a Social Security that was given
9        from the Board of Probation check.
10   Q.  This was at or before the time you arrested Mr. Gomes?
11   A.  Around the same time, yes.
12   Q.  Let me look with you for a moment at Exhibit 3, which is the
13       arrest booking report, do you see that?
14   A.  Yes.
15   Q.  There are six charges listed; is that correct?
16   A.  Yes.
17   Q.  Did you fill in those charges?
18   A.  Yes.
19   Q.  The first is for shoplifting?
20   A.  Yes.
21   Q.  Did you arrest Mr. Gomes for shoplifting?
22   A.  Yes.
23   Q.  On what basis?
24   A.  Probable cause.

89

1  Q.  What comprised probable cause to you at that time?
2  A.  That he concealed merchandise at Shaw's, put it in his
3      pocket, ran out the door, then dropped the items out of his
4      pocket, which is probable cause.
5  Q.  And that's the information you received from the Shaw's and
6      CVS security officials; is that true?
7  A.  Yes.
8  Q.  The second charge is called, "False name/SS number."
9  A.  Yes.
10  Q.  Do you see that?
11  A.  Yes.
12  Q.  Did you arrest Mr. Gomes under Chapter 268, Section 34E,
13      for giving you a false name and security number?
14  A.  Yes.
15  Q.  How was it that you knew at the point of arrest that the
16      information he gave you was false?
17  A.  The Social Security number that he gave me came back to a
18      female, the name and date of birth that he gave me --
19      because I found out that he had been arrested before --
20      nothing came up as an arrest, and then further investigation.
21      It took me about 15 minutes to do an investigation on
22      information on this party.  During the Board of Probation
23      check, that's when it came back as Richard Gomes, with the
24      Social Security number, date of birth.

90

1  Q.  Did you have all that information before you made the arrest?
2  A.  I had that, yes.
3  Q.  Out on the street, at the scene of the arrest, did the man
4      whom you arrested ever identify himself, correctly, as Richard
5      Gomes?
6  A.  Yes.  At the booking desk, that's what he gave me.  And as a
7      matter-of-fact, Ms. Pina, when I spoke to Ms. Pina, she told
8      me that his name was Richard, because I spoke to her also,
9      and she told me his name was Richard.
10  Q.  Let's break this down, if we could.  When and where did Ms.
11      Pina tell you that?
12  A.  Right at the scene.  She was standing right next to him and I
13      pulled her aside and I spoke to her individually, and she told
14      me that his real name was Richard.
15  Q.  So, at the point of his arrest, did you know that the person you
16      were arresting had outstanding warrants, or believe that to be
17      the case?
18  A.  Believed that to be the case.  Hiding identification, his false
19      name and Social Security number.
20  Q.  The arrest report lists Joseph Gomes; is that correct?
21  A.  Yes.
22  Q.  Is that the name that was given to you on the street?
23  A.  Yes.
24  Q.  The booking sheet, or the booking report, lists Richard

91

1      Gomes?
2  A.  Yes.
3  Q.  And again, where did you get that information?
4  A.  From him.
5  Q.  Is there any other source that could have come from?
6  A.  No.
7  Q.  Were there any changes or alterations that you've identified
8      to this report, to information that you entered on it?
9  A.  No.
10  Q.  At the time you arrested Mr. Gomes, did he tell you that he
11      was a diabetic?
12  A.  No, he did not.
13  Q.  Did anyone at the scene tell you he was a diabetic?
14          MR. ADAMS:  I'm going to object to the form, but
15      go-ahead.
16  A.  No.
17  Q.  Did you see in your search of Mr. Gomes, or of Ms. Pina,
18      something known as an insulin kit?
19  A.  No, I did not.
20  Q.  Did you see any medical paraphernalia including drugs or
21      needles?
22  A.  No, I did not.
23  Q.  Did Ms. Pina tell you at the point of arrest that Mr. Gomes was
24      a diabetic?

92

1  A.  No.
2  Q.  Did you drive him to the police station?
3  A.  Yes.
4  Q.  Was Ms. Pina with you two gentlemen at that point?
5  A.  No.
6  Q.  On route to the station, did Mr. Gomes tell you that he was a
7      diabetic?
8  A.  No, he did not.
9  A.  Did he make any request of you that insulin or any other
10      medication be provided to him at the station?
11  A.  No, he did not.
12  Q.  On the booking sheet there is a time of 16:35, under the
13      control section; is that correct?
14  A.  Yes.
15  Q.  What does that time denote?
16  A.  The time he was booked at the police station.
17  Q.  Is it when the booking began, or when it was completed, or
18      what does it indicate?
19  A.  About the time it was completed.
20  Q.  During the booking process -- how long did the booking
21      process with Mr. Gomes take, approximately?
22  A.  Ten minutes, maybe.
23  Q.  Would that be your best memory?
24  A.  Yes.

93

1  Q. At any point during the booking process, did Mr. Gomes
2     apprise you of the fact that he was a diabetic?
3  A. No, he did not.
4  Q. At any point during the process booking process, did he ask
5     you to secure, or have brought to the station on his behalf,
6     any medicine?
7  A. No.
8  Q. On the booking sheet, Exhibit 3, there is the "Caution: drugs,"
9     do see that?
10 A. Yes.
11 Q. When you put in drugs, what were you referring to?
12 A. His heroine use.
13 Q. As my brother elicited from you, you were near the end of
14    your shift at the time of the arrest; is that correct?
15 A. Yes.
16 Q. You actually stayed after shift to book Mr. Gomes; is that
17    correct?
18 A. Yes.
19 Q. Did you do anything further in your capacity as a police
20    officer, that you recall that day, after you booked him?
21 A. No.
22 Q. And would it be accurate to say that shortly after the booking
23    was completed, you departed?
24 A. Yes.

94

1  Q. By the time you left the station that day, had anyone told you
2     that Mr. Gomes was a diabetic?
3  A. No.
4  Q. Had anyone told you that he needed some medicine for any
5     medical condition?
6  A. No.
7  Q. Did you have any knowledge to that effect from any source?
8  A. No.
9  Q. Did you work the next day?
10 A. No.
11 Q. Was it a day off?
12 A. Yes.
13 Q. Do you recall when you returned to the station, next, to work?
14 A. I had two days off. I believe it was the 28th, I believe it was.
15 Q. Now, when you say your two days off, that's because as you
16    testified earlier, you customarily worked a four-on, two-off
17    shift; is that true?
18 A. Yes.
19 Q. By the way, for the record, would you state your race.
20 A. Black, African-American, Indian.
21 Q. And do you consider yourself to be dark complected?
22 A. Medium.
23 Q. At any point while you were still at the station on June 25, did
24    you encounter Ms. Pina?

95

1  A. Say that again.
2  Q. You saw Ms. Pina at the site of the arrest?
3  A. Yes.
4  Q. Did you see her, at any point, after you released her later that
5     day?
6  A. No.
7  Q. While you were at the station, did you have any encounter
8     with the true Joseph Gomes, Mr. Gomes' brother, or with his
9     mother?
10 A. No.
11 Q. Before you left the station, did anyone attempt to give you any
12    medication on behalf, or for, Mr. Gomes?
13 A. No.
14 Q. And before you left the station that day -- and can you
15    approximate what time you left?
16 A. About 5:30.
17 Q. Did anyone tell you before you left the station at 5:30, that Mr.
18    Gomes was a diabetic who might require insulin or the
19    medication?
20 A. No.
21        MR. TEHAN:  May I just have a moment, please?
22        MR. ADAMS:  Sure.  I'm going to run these
23 through.
24        MR. TEHAN:  Yes, okay, fine.  I won't ask him any

96

1  questions until you get back.
2        MR. ADAMS:  You can ask, just ask loud.
3        MR. TEHAN:  Okay, I will.
4        WITNESS:  I've got to make a phone call;
5  baseball today.
6        MR. WALSH:  Tell me about it.
7        MR. TEHAN:  We're off; right?
8        COURT REPORTER:  Do you want to be?
9        (Off the Record.)
10
11 EXAMINATION BY MR. TEHAN(cont'd):
12 Q. Office Gomes, at any time --
13 A. Officer Drane.
14        MR. ADAMS:  I did the same thing.
15 Q. Sorry.
16        MR. ADAMS:  Off the record.
17        (Off the Record.)
18
19 EXAMINATION BY MR. TEHAN(cont'd):
20 Q. At any point on June 25, Officer Drane, did you work as the
21    so-called, lobby or desk officer?
22 A. No.
23 Q. After your completion of the booking of Mr. Gomes, at
24    approximately 4:35, did you have any responsibility for the

97

1    monitoring of prisoners in their cells?
2    A.  No.
3    Q.  Have you ever spoken to Mary or Joseph Gomes, to you
4        memory?
5    A.  I don't even know who they are.
6    Q.  Were you present in the station at the point that Mr. Gomes
7        was transported to the hospital?
8    A.  No.
9                MR. TEHAN:  I have nothing further.
10               MR. ADAMS:  Do you have anything, John?
11               MR. WALSH:  No questions.
12               MR. ADAMS:  I just have a quick couple.
13
14   EXAMINATION BY MR. ADAMS:
15               MR. ADAMS:  Can you mark that one, too.
16
17               (Prisoners Watch Form, dated 6/26/01, was
18       marked as Exhibit No. 5.)
19
20   Q.  Without giving me any names, Officer Drane, don't tell me
21       anybody's name in response to this question, okay?
22   A.  Okay.
23   Q.  Do you know anybody who works as a police officer at the
24       Brockton Police Department who is a diabetic?

98

1    A.  No.
2    Q.  To your knowledge, you don't know anybody who has
3        diabetes who's a Brockton Police Officer; is that right?
4    A.  No, I do not.
5    Q.  I'm going to show you what's been marked as Exhibit 5 to
6        deposition.  Is that essentially the same sort of log sheet as
7        what's been marked as Exhibit 4 to your deposition?
8    A.  Yes.
9    Q.  It's like a Prisoner Watch List, or something like that; is that
10       correct?
11   A.  Yes.
12   Q.  It's the 15-minute checks, it records the 15-minute checks
13       that the booking officer does at the cells at the Brockton
14       Police Department?
15   A.  Yes.
16   Q.  This is just for different date; correct?
17   A.  The 26th, yes.
18   Q.  Starting at midnight; correct?
19   A.  Yes.
20   Q.  Do you know who M.K.P is, the officer's name that's at the
21       beginning of this sheet?
22   A.  Powers.
23   Q.  You pointed to the top of the sheet where it says, "Powers,"
24       over to the left and in the middle "6/26/01'; is that correct?

99

1    A.  Yes.
2    Q.  Do you know which Officer Powers that is?
3    A.  Michael Powers.
4    Q.  How long has Officer Powers been a police officer?
5    A.  I'm not sure.
6    Q.  You don't know?
7    A.  No.
8                MR. ADAMS:  I think that's all I have.
9                MR. TEHAN:  Nothing further.
10
11               (Whereupon, the deposition in the above-entitled
12       matter was concluded at 4:40 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24

100

ERRATA SHEET DISTRIBUTION INFORMATION.
DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS

ERRATA SHEET DISTRIBUTION INFORMATION
When the Errata Sheet has been completed by the deponent
and signed, a copy thereof should be delivered to each party
of record.

INSTRUCTIONS TO DEPONENT
After reading this volume of your deposition, please indicate
any corrections or changes to your testimony and the reasons
thereof on the Errata Sheet supplied to you and sign it.
DO NOT make marks or notations on the transcript itself.  Add
additional sheets if necessary.  Please refer to the above
instruction for the Errata Sheet distribution information.

101

ERRATA SHEET
PLEASE ATTACH TO THE DEPOSITION OF
JESSE DRANE - VOLUME - 1 - 05/11/06

CASE:  MARY GOMES, GUARDIAN, et al
        vs. THE CITY OF BROCKTON, et al

INSTRUCTIONS TO WITNESS:  1)  Please note desired
corrections to your testimony by page and line number.  2)
Enter text as it appears in the transcript.  3)  Enter text as it
should appear.

PAGE        LINE        CORRECTION
_____
_____
_____
_____
_____
_____
_____
_____
_____

---

103

COMMONWEALTH OF MASSACHUSETTS
COUNTY OF BRISTOL, ss.

        I, Anne Ouellette, a Professional Court Reporter
and Notary Public duly commissioned and qualified in and for
the Commonwealth of Massachusetts, do hereby certify that:

        On the 11 day of May 2006, JESSE DRANE,
the witness whose deposition is hereinbefore set forth was duly
sworn by me and identified by me with photo ID, and that the
forgoing transcript is a true record of the testimony given by
such witness, to the best of my knowledge, skill and ability.

        I further certify that I am neither attorney nor
counsel for, nor related to or employed by, any of the parties
to the action in which this deposition is taken, and further that I
am not a relative or employee of any attorney or counsel
employed by the parties hereto or financially interested in this
action.

        In Witness Whereof, I have hereunto set my hand
and affixed my Notary Seal this 24 day of May 2006.

        _____
        Anne Ouellette, Notary Public
        My Commission Expires:  March 16, 2012

THE FOREGOING CERTIFICATION OF THIS
TRANSCRIPT DOES NOT APPLY TO ANY
REPRODUCTION OF THE SAME IN ANY RESPECT
UNLESS UNDER THE DIRECT CONTROL AND/OR
DIRECTION OF THE CERTIFYING REPORTER.

---

102

SIGNATURE   PAGE

        I, JESSE DRANE, do hereby certify that I have
read the foregoing transcript of my testimony, and further
certify that said transcript is a true, accurate and complete
record of said testimony.

        Signed under the pains and penalties of perjury
this_____day of_____2006.

        _____
        JESSE DRANE

**1**

1 22:20 33:8,13 36:11
37:1 40:20 42:6 43:13
44:21 51:18 70:23 71:4
72:8
10 53:21 56:8
10/28/60 8:5
11-year-old 7:19
11:30 61:22 62:3 63:19
13-year-old 7:19
14 7:17
14-year-old 7:19
15 7:6 53:21 54:6 59:
16,18 89:21
15-minute 98:12,12
15:53 38:4 78:18,19,21,
24 79:3,8
16:35 79:1 92:12
19:00 57:14
19:45 61:18,19
1978 8:7
1986 7:9
1999 7:6,6

**2**

2 35:17,24
20 7:8,8 54:6 56:10
20-year 56:12
2001 55:9
2001/06/25 34:18
2077 11:22
20th 6:19
22 3:1
23:30 61:21
24:00 61:2,3
25 55:9 61:5 94:23 96:
20
25th 63:14
268 89:12
26th 98:17
28th 94:14

**3**

3 10:1 41:12,21 42:15,
22 43:15 47:18 51:19
54:21 70:13,22 71:2 73:
10,12,18 74:5 75:20 80:
14 88:12 93:8
3:53 37:23 38:4
30 4:7,17
34e 89:12
35 3:2

**4**

4 55:22 56:1,2,14 57:
12 59:8 60:5 61:17 63:
15 98:7
4:35 96:24
4:40 99:12
41 3:3

**5**

5 97:18 98:5
5:30 95:16,17
55 3:4

**6**

6/25 60:21,23 61:3
6/25/2001 85:1
6/26/01 3:5 97:17 98:
24
6/27/01 36:14

**7**

7 10:1 58:13,17 60:9
7:45 62:3

**8**

8:15 60:12
8:30 60:16

**9**

97 3:5

" .

"officer 76:8

**A**

able 26:1 68:17 74:1
above-entitled 99:11
absolutely 84:13
access 28:8
according 37:21 49:7
58:6 63:15
accurate 57:11,13 93:
22
across 47:7
actually 9:24 11:9 12:
19 18:5 23:12 33:21 48:
4,8 51:15 55:1 60:20,
23 69:1 78:19,21 79:11
93:16
adams(cont'd 36:4 49:
1 57:20 69:6 75:12
addiction 81:24 82:2
87:4,9
additional 40:13
address 31:17 32:1,6,
9,12,13,21,22 48:20
admissions 40:8
admitted 40:3
admitting 40:5
advise 42:2
affidavit 22:14 34:1
36:10
african-american 94:
20
afternoon 5:9,10
afterwards 42:14 72:
21 84:18
ago 10:1,17 54:6
agree 34:12 42:9 51:20
58:7 70:18,21 74:4 75:
21 76:18
agreed 4:16
ahead 64:14
alcohol 44:4
alerted 86:24
alias 31:4
aliases 31:1
allegations 39:24
almost 7:7 11:5 37:24
already 7:9 71:8
alterations 91:7
am 24:9 36:8
ambiguous 5:23
ambulance 83:19,23 84:
1
amount 74:8 81:8,9
an 6:17 7:19 8:14 17:
23 18:2,12 22:11 24:12
26:8 27:6 30:18 31:19
33:12 35:3,3 36:15 38:
7 45:6,8,14 50:17,21
51:15 53:11 54:11 57:

21 59:18 61:17 62:23
63:2 64:20,24 76:19 78:
24 79:3 83:19 89:20,21
91:18
angelo 16:14 16:5,7 17:
7 20:11 85:16
anne 1:30
another 12:21 58:17
59:3 78:2 87:18
answer 19:15 21:12 29:
4,8 36:17 44:13,15 50:
13
answered 49:19
answering 49:18
answers 5:23
anticipate 6:8
antique 54:5
anybody 7:3 14:12 20:
11 25:9,10 62:19 63:5,
8 67:15 83:16,19,22 84:
3 97:23 98:2
anybody's 97:21
anyway 47:24
apologize 8:12 41:18
appear 58:5 78:23
appears 40:21 43:9 51:
19,22 52:1 58:11 60:19
62:2 76:2,8,11,19 77:
18,18,21
application 22:11,14
34:1 36:10,10,15,18
apprise 39:2
approach 15:3
approached 16:3,24
appropriately 44:10
approximate 95:15
approximately 37:22
92:21 96:24
area 42:2 45:14 46:7,
17,18,19,21,22 47:13
53:14,15,18 64:20 65:
10,12 66:14,16,19 83:
17
around 9:8 14:18 48:2
63:15,17 79:11 81:4,6
85:9 86:10 88:11
arraignment 38:8
arrested 23:7,10 28:
12,18,24 29:9,10 30:23
31:2,6 34:20 37:2,21
39:2 41:7 42:2,3,5 55:
9 87:14 88:10 89:19 90:
4 91:10
arrestee 45:6,8 52:12
53:7 71:1,4 75:4,17 77:
19 79:24 81:3
arrestees 83:5
arresting 48:5 53:8
78:10 90:16
arrests 51:9
arrival 85:15
arrived 14:2,10,13 20:
21
aside 50:18 90:13
asks 68:23
assigned 34:9 55:1 56:
2
assignment 85:5
assist 45:9
assistance 24:3,10,13
assistant 38:15 62:4,
17,23 63:2,11 65:14 67:

11,21
associate's 8:14,16,
20
assume 4:5 28:20 29:7
37:16
assuming 28:15
attack 84:3
attempt 95:11
attempted 16:1,10 17:
11 18:23 21:6,22 86:12
attempting 85:19
attorney 6:6 33:13
available 74:23
avenues 30:18
avoid 39:21
aware 83:4
away 14:15,16 39:21
awhile 25:5 50:18

**B**

bachelor's 8:17,22
back 12:24 18:7,24 26:
8,12,22 27:2,5,9,11,14
28:2,3,5,7 29:12,23 30:
9,9,10,19 31:16 32:14
39:13 54:7 70:9 75:16
78:17 89:17,23 96:1
background 87:11
backwards 19:9 21:11
bad 21:10,13,15
bail 38:15,16,19 62:4,
7,11 63:10 64:6 65:15,
19 66:4,14 67:18 68:4,
4,14,17 70:9 74:8 76:
24 81:8,8
bailable 67:1,5 68:14,
15
bailed 61:19,24 66:20,
21 68:3 77:2
bails 63:11 65:19 66:
17 67:12
baseball 96:5
based 67:7
basement 46:19
basic 9:11,22 10:8
basically 10:10 11:14
14:22 39:5
basis 88:23
bat 47:7,9,11
bathroom 6:4 55:6
began 15:19 79:13 92:
17
beginning 47:24 60:23
98:21
behalf 93:5 95:12
behind 39:11,12 46:2
65:6
believe 12:15,20,20
17:11,12 19:11 23:2,18
24:22 25:14 30:15,17
57:7 68:16 70:13 78:6
90:16 94:14,14
believed 90:18
belonging 16:22
below 46:24 47:1 59:3
76:7 78:2 79:16
besides 7:20 26:16
best 15:22,22 92:23
between 31:22 62:2,2
63:16
big 35:22 64:17
binder 56:21,22,24 61:

11
birth 8:4 23:15 26:3,5,
6,16,19 27:7,9,12,15
30:16 31:15,23 32:3 71:
12 88:8 89:18,24
bit 16:9
black 94:20
blotted 58:14
board 87:13 88:9 89:22
book 29:19 56:20 93:16
booked 72:10 92:16 93:
20
born 8:1
both 24:16 51:19
bother's 86:20
bottom 34:4,9 35:5 36:
13 74:7 75:21 77:2
bounced 9:8
box 34:4 64:21,22 76:
22 77:5
boy 7:18 8:3
break 6:4,7 55:6 75:7
90:10
bring 18:7,8,9,14,15
brockton 3:1,2 6:15,
17 7:7 8:1,6,8 9:4,11
11:1,23 18:11 19:2 22:
19 28:8 35:16 36:9 45:
6,11 48:11 53:15,24 54:
1 55:14 59:1 62:23 63:
3,5,12 64:13 69:23 71:
18 83:4,8,13,17,20,23
84:4 97:24 98:3,13
brother 93:13 95:8
brought 42:2 93:5
building 13:14 45:15,
19
burns 62:20,21
bus 47:7,9
business 6:10
button 66:11,12

C

cabinet 69:14,17
call 6:5 10:3,4,16,16
12:22 23:17,20 29:2 45:
24 47:6,11,23 56:16 61:
8 67:23,24 68:2 74:13,
17,21 75:2,5,18 96:4
called 11:2 12:24 24:1,
4 27:2,7,16,24 30:2,9
64:21,22 83:19 89:8
calling 67:21
came 11:9 12:20 14:24
16:2 26:8 27:9,11,14
28:3,5,6 29:12 30:9,16,
19 31:16 62:4 65:1 72:
20 89:17,20,23
camera 46:8
capacity 93:19
car 15:2 18:4,5,6 26:
22 39:6 46:16 54:5
care 54:17
career 10:8 56:12
carr 11:8
carried 29:21
carrying 24:19
cars 45:17
case 5:15 20:3 35:20
36:9 44:22 49:19,20,21,
24 50:1 51:15,16,20,22
90:17,18

cases 5:15 11:12
cause 78:7 88:24 89:1,
4
caution 48:19 50:13
81:3,4 93:8
cave 47:11
cell 52:22,23 53:3,7
67:2 69:19 70:1 79:19
83:16
cells 53:12,14 60:9 68:
21 69:12,22,22,22,23
70:6 83:14,19,22 97:1
98:13
certain 11:17,17 57:
24
change 24:6 73:12 75:5,
17
changed 49:17 70:14
72:20,24 73:3,7,14
changes 4:17 51:11 91:
7
chapter 89:12
charge 53:11 54:12,14,
24 78:3 79:16 83:14 89:
8
charges 88:15,17
chase 46:12
chasing 12:15,15
check 27:3 30:11 32:15
59:18 87:13 88:9 89:23
checked 27:10 30:12
checking 26:6 60:9
checks 55:11 98:12,12
chief 9:14,16
children 7:14
circle 80:22 81:6
circled 80:16 81:4
circumstances 18:18
23:6
citizen 64:5
city 7:4 58:3 85:9
civil 1:30
civilly 23:10
claimed 85:24
clearly 5:24
clerk 38:15,19 62:11,
14,15,17,23 63:2,5,11,
11 65:14,14 67:6,10,12,
21,22 68:7,7,11,16,20
clerks 77:6
close 46:2,9
clothes 10:12,14
coats 25:10
coffee 55:6
college 8:17
combative 48:20
come 18:7 26:12 28:2
32:14 63:21,22,23 64:4
67:18 91:5
comes 14:15,15 67:
11,12 70:9 77:1
coming 7:8 12:8,10,11
54:7 86:1
comments 73:20 74:1,4
82:22
commissioner 29:1 38:
15,19 62:4,7 65:15 66:
4,15 70:9
commissioners 62:11
63:10
commit 23:8

commonwealth 23:18
compare 43:7
complaint 22:10,11,15
34:2 36:11,15,18
complaints 65:13
completed 96:4
complete 57:22 58:2,5
completed 35:9 92:17,
19 93:23
completion 96:23
comprised 89:1
computer 52:15,18 71:
17,18 74:1 81:20
concealed 89:2
concerning 87:11
concluded 99:12
condition 56:19 61:18
82:8,19 94:5
conditions 83:5
confused 43:23
congratulations 8:18
connection 82:5
consider 60:22 61:2
94:21
contain 77:21
contains 78:5
continues 60:18
contract 7:3
control 46:4,5,7 54:9
66:19 79:2,16 80:6,10
92:13
conversation 13:19 15:
4 17:2,6,9 81:17
conversations 20:19
copy 4:21,23 33:19,22
44:17,20
corner 13:13,14 51:19
52:7 57:12 58:21
corpse 8:11
correctly 29:24 86:5
90:4
corresponded 87:1
could've 72:16
couldn't 58:4 73:17
74:11 87:20
counselor 78:24
couple 35:11 36:19 97:
12
course 6:3 30:7 54:4
court 3:2 5:19 11:10
18:8,9 20:7,9 22:10 34:
1 35:11,16 36:9 38:7,
10,17 62:24 63:3,6 96:
8
courts 37:17,19
created 42:12,14,15,
19
creedon 62:14,15 63:6
77:1
crime 18:2,3,19 23:3
45:9
criminal 8:21,23 11:
12 22:11,14 34:2 87:11
cruiser 13:22 14:3,18,
19,21 15:2 39:13 40:12
45:21 46:11 81:23
cruisers 45:18 47:2
curry 8:16 9:1
custody 18:19 19:4 53:
14,21 54:12 61:8 68:9,
21 69:8 77:24 78:19 84:
4

customarily 94:16
cvs 12:6,7,8,9,19,20,
21,23 13:1,2,5,8 14:1
15:1,1 16:6,8 17:8,10,
18 19:22 20:4,12,23 21:
5,17 25:16 40:1,14 42:
5 49:8 78:20 81:23 85:
21,21,22 86:1,6 89:6

D

damage 18:21
damages 18:16
dangerous 48:19
dark 94:21
date 8:4 23:15 24:8 26:
3,5,6,16,19 27:7,9,12,
14 30:16 31:15,23 32:3
34:13,13,16,23 35:2,3,
3,4,5 37:23 78:11 81:
13,13 84:24 85:2 88:8
89:18,24 98:16
dated 3:5 36:14,19 97:
17
dates 71:12
day 20:16 35:8 36:22
37:2,5,18,22 38:20,22,
24 55:9 60:23 71:14 85:
6 93:20 94:1,9,11 95:5,
14
days 4:7,17 10:9,9 35:
12 36:19 94:14,15
dead 8:11
dealt 64:24
decided 17:13
deem 44:16
deemed 4:16
defendant's 40:21 41:
6
degree 8:15,16,17,20,
22
denied 40:3
denote 92:15
denying 40:6
departed 93:23
department 3:1 6:18 9:
4,12 18:11 19:3 20:7
22:19 24:3,10,12 28:8
31:1,4 48:11 53:15 55:
15 56:17 57:4 71:18 82:
14 83:4,8,13,17,20,23
84:4 97:24 98:14
deposition 5:14 33:9
35:24 41:21 42:6 56:1
98:6,7 99:11
describe 15:19,22 16:
14,18 17:6 48:10 56:14
described 16:10
describing 50:24
desk 55:1,5 56:3,24 57:
1 61:11 64:5,10,14 69:
15 90:6 96:21
details 15:23
detective 9:12 10:11
detectives 9:14 10:12
detention 53:14 69:22
determination 67:4 68:
17 78:7
determined 30:20 78:6
diabetes 98:3
diabetic 91:11,13,24
92:7 93:2 94:2 95:18
97:24

dictionary 69:1
different 9:6,18,19,
20 42:9 43:17 52:17 62:
10 71:1,6,9,12 77:15
87:17 88:8 98:16
directed 12:6
directly 47:7
discretion 19:6
discussing 84:23
discussion 85:15 86:
16 87:3
disoriented 44:1
dispatch 46:7 65:8 85:
11,13
dispatched 11:22
dispatcher 12:13,24
27:2 28:5 29:12 30:2,5,
9,10,19,20 31:11 32:14
86:24 87:11 88:2
district 3:2 35:16 36:
9 62:23 63:3,6
division 9:9,12,12,16,
17,18 10:11
divisions 9:11
docket 3:2 35:16,20 36:
14
document 33:24 36:5
57:22,23 58:6
documents 42:12 51:18,
22 52:1 71:9
dog 6:14
domestic 78:12
done 6:7,8 42:14,21,24
50:14 56:5 72:23 73:15
82:12
door 13:11,13,16 14:21,
22,22,24 16:5 45:20,20,
23,24 46:1,2,4,9,15 47:
6 63:21 64:2 65:4,21,
24 66:4,12 86:14,15 89:
3
doors 45:19 65:22
double 39:15 70:4
down 5:19,21 11:23 12:
3 17:1 26:9 29:16,19,
24 30:5 31:8 35:5 39:
16 61:12,21 65:19 66:
14,16 67:18 90:10
drane 4:15 5:5,9 6:14,
15 10:13 11:2 33:2,2,3,
4,12 35:23 36:6 41:20
55:24 58:6,7 61:7 77:3
84:23 96:13,20 97:20
draw 81:6
dressed 25:9
drive 45:10,17 46:1 78:
20 92:2
driven 46:15
driver's 14:21 28:15,
20
dropped 89:3
drug 81:6 87:4
drugs 44:4 48:19 81:4
82:1 91:20 93:8,11
ducked 13:2
duly 5:5
duplicate 71:19
during 6:3 18:20 39:20
50:4,11,22 56:3 82:17
89:22 92:20 93:1,4
duties 85:8
duty 47:14,16,21 55:4

E

each 9:20 52:1 69:19
70:6,11 71:10 76:11
earlier 52:3 94:16
earliest 58:11
earth 46:13
east 8:2,3 47:6 64:1
educational 11:3
effect 94:7
eight 43:16
eight-fifteen 60:11
eight-thirty 60:15
eight-to-four 9:22 38:
23
either 17:15,18 19:22
20:23 21:5,21
elicited 93:13
employ 83:13
employee 15:1
employees 64:1
employees' 47:4
enclosure 65:7
encounter 85:10 94:24
95:7
encountered 12:7,19
16:7 85:21
encounters 85:2
end 38:24 39:2 47:24
61:3,3 93:13
enforcement 8:22 85:9
england 25:23
enough 38:5 54:4
entered 91:8
entirely 19:6
entrance 45:15 47:4
64:1
entries 36:14 60:18
entry 36:13 59:18 60:
12,14 61:17,19,21
errata 4:23
essentially 39:3 98:6
established 71:8
even 21:12 27:14 37:7
74:11 97:5
evening 58:12
event 11:17
eventually 17:5
everybody 6:9 69:8
evidence 15:24 28:18:
3,4,5,19,20 19:4,21
exact 29:13
exactly 7:23 24:5 30:
8 32:20 37:13,15 48:1
50:16 79:15
examination 5:8 36:4
49:1 57:20 69:6 75:12
84:22 96:11,19 97:14
example 18:15 23:6 76:
24 82:18
except 4:13
excuse 48:23 77:7
exhausting 30:18
exhibit 22:20 33:8,13
35:17,24 36:11 37:1 40:
20 41:12,21 42:6,15,22
43:13,15 44:21 47:18
51:18,19 54:21 55:21
56:1,2,14 57:12 59:8
60:5 61:17 63:15 70:13,
22,23 71:2,4 72:8 73:

10,12,18 74:4 75:20 80:
14 88:12 93:8 97:18 98:
5,7
exhibits 50:19,19 84:
12
expansive 6:1
expensive 43:2
extras 43:2
eyes 44:8

F

f.v 76:20
face 45:19 50:9
facing 14:24,24
fact 19:23 20:10 93:2
fair 9:6,11 15:20 20:
18,19,20 22:11 24:21
25:13 38:5 40:3,5,8 43:
8,12 47:21 54:1,22 59:
23 60:5 61:24 69:15,17,
19,23 77:16 78:21
fairly 44:10,15
false 73:20 80:7,8,24
89:8,13,16 90:18
familiar 45:9
far 14:16 18:11,14 51:
11,13 57:22 67:13,14,
15 68:5
fatherhood 7:21,22
federal 1:30
female 12:12,16 14:5
16:6 17:4 20:22 21:18,
22 22:1,5,23 23:1 28:3,5,
7 29:12 30:10,19 48:21
86:2 87:1 89:18
females 53:16
ferris 11:6
few 84:11
fifteen 7:13
filed 20:7 22:11 36:15,
18
filing 4:15
fill 52:15 59:13,15,22
60:3 71:16 73:22 82:14,
15 88:17
filled 52:10 59:9 70:
16 71:14 72:7,17 77:9
80:13
fills 77:12
find 19:14 28:4,16 29:
9 83:14
fine 4:22 23:21 32:21
95:24
fined 23:10
finished 39:7
first 5:5 12:17 15:3,4,
4 17:7 22:6 24:15 27:9
32:3 36:13 42:13,14,15
43:20 59:21 60:1,14 65:
4 76:18 77:18 87:19 88:
19
five 27:13 53:16
florida 54:8
following 75:16
follows 5:6
force 54:4
forget 7:23 79:7
forgot 15:10
form 3:4,5 4:14 21:11
26:13 52:15 55:21 56:
16,17,18 57:24 60:22
77:5 80:2,22 82:5,14
91:14 97:17

format 5:18 53:10,10
forms 67:1,2
forth 48:21
found 19:16,21 83:16
89:19
four 10:6,9 37:14,24
39:5 48:2 53:16,16,16
four-on 94:16
four-to-midnight 9:
23 55:8 57:10 58:8
frame 87:15
frank 76:6
free 75:2
frequently 64:10
friends 20:18
front 13:11,11 14:20,
22 15:2 39:11 54:6 63:
21 64:5,14,14 86:14
full 6:12 53:18 54:1
further 65:24 84:9 87:
10 89:20 93:19 97:9 99:
9

G

g.r.e.a.t 10:18
gang 10:15 11:3
garage 45:15,19,20,20,
22,23 46:14,15,20,21
47:2
garages 45:17,22
gather 27:4
gathering 87:19
gave 26:6,11 27:7,21
29:11,23 49:7,8,9,11
50:4,6,10,11,12,21 72:
11,12 81:19 87:17,17,
18 89:16,17,18 90:6
general 24:1 28:8 48:
13,14
generally 38:15,16 48:
17 49:19 66:16 82:12
gentleman 85:16
gentlemen 10:22 24:9
92:4
gestures 5:22
gets 54:17 66:19,20
81:16
getting 20:11 66:20
gibbs 62:17
give 16:21 18:24 26:7
27:6,15,19 28:22 67:9
68:2,8,12,13,20 82:17
95:11
given 26:18 28:6 59:13
72:14 73:20 74:22 79:
23 80:7,8,24 83:10 86:
21 88:8 90:22
gives 79:19
giving 89:13 97:20
glance 43:1
glass 6:5
glassy 44:8
go-ahead 91:15
god 45:8 54:10,11
god's 46:13
gomes' 95:8
got 8:14 12:17 13:5 14:
15 15:2 31:6 35:3,5 40:
16,22 43:2,6 45:2 49:
22 58:1,2 69:12 76:7
79:3 96:4
gotten 41:3,8

governor 24:6
grabbed 21:20,21
graduated 8:7,16
grandfathered 6:23
granite 47:10
great 5:2 10:21 54:11
green 46:13
grew 8:1
ground 16:4 25:15
grow 7:24
guardian 5:12
guess 32:18 52:3 57:23
guy 12:8 54:11 64:6

**H**

half 43:13
half-hour 34:22
handcuffed 39:9,11,19
 79:13
handcuffs 39:15 79:12
handle 66:17
handwriting 34:18 74:
 10 75:21,23 76:1,8,12
 80:6
handwritten 35:5 74:5
 76:7
handy 43:3
hang 31:8
happen 20:13
happened 12:5 15:19,
 24 30:14 36:22
happens 24:1 57:2 65:
 18 68:11
happily 54:7
he'll 68:14
head 5:22
heading 12:23 13:1
heart 82:8 84:3
heavy 25:10
held 14:12 20:22 21:7
 38:13,14
heroine 81:24 82:2 87:
 9 93:12
herself 22:2 23:11
hiding 90:18
high 8:6,8,8 10:2
highway 2:90
hill 8:3
himself 15:5,8,9 25:6
 48:6 49:15 90:4
hip 26:24
hit 66:11
hits 66:12
hold 50:20 77:12 78:8
 80:16,22 81:9
holding 69:22
holiday 37:4,12,16,16,
 19
holidays 37:7
hospital 73:20 80:7,
 24 97:7
hours 57:14,15
however 67:10
hundred 56:12
husbandry 7:22

**I**

ice 25:18
id 24:12,15 26:9 29:5,
 7 58:21
idea 16:21 26:8 75:14
 81:11

identification 22:2,3,
 4,23 23:1,3,13,14,16,
 17 24:16,18 26:2 30:15,
 18 90:18
identified 15:5,8 17:
 18 22:2 23:11 91:7
identifies 78:10
identify 15:8 26:10
 57:23 64:8 87:20 90:4
imagine 18:12
impact 10:2,3,4
implemented 9:24
impound 18:7
impounds 18:12
impression 20:21 21:4,
 16 43:21
incident 20:16 33:19
 35:3 36:22 54:7 71:14
incidents 51:8 53:24
included 40:9
including 91:20
incomplete 31:19
independent 50:17,21
indian 94:20
indicate 78:14 88:2
 92:18
indicated 52:6,9 71:
 16
indicates 35:8 73:18
individual 16:1,3,3,
 24 22:22 23:11 26:1 37:
 2 43:10 67:4 68:17,21
 72:11 77:22 78:8 80:2,
 13 86:16 87:17
individually 5:13 90:
 13
individuals 12:11 15:
 7 16:12 17:15 19:11,23
 25:18 28:9 45:9 70:11
 74:23 85:22,23 86:2
influence 44:3
info 73:21 80:7,8,24
inform 74:19,20
informed 79:12
initials 76:12,20
inkling 27:6
inquire 58:3 83:5
inquiry 31:12,12 87:
 11
inside 46:4,8,9 66:12
instruction 59:13
insulin 91:18 92:9 95:
 18
insure 46:11
interact 62:8
interacted 62:10
interrupt 12:1 56:16
interviewing 43:20
intoxicated 44:3
inventory 18:12
investigation 87:15
 89:20,21
investigative 65:13
involved 78:12
irrespective 37:12
isn't 11:1 51:16 57:11
 80:16
it's 5:17,24 10:1 11:
 17 13:13 19:6 20:10 23:
 3,5,9,19,19,23 24:3 25:
 5,13 31:19 32:21 33:2,
 19,22 34:9 35:3,4 36:8

37:14 40:5 43:17 51:4,
 15 54:17 56:18 58:2,7,
 10,11 61:9 64:21 70:3
 74:19 76:7 78:6 79:3
 81:8,24 98:9,12
items 16:1,3,12,13,14,
 16,19,21,23,24 17:12,
 17,20,20,21,24 18:23,
 23 19:21 85:19 86:13
 89:3
itself 34:23 36:17 47:
 17 50:10

**J**

jail 29:2
jeans 24:23
jesse 5:5 6:14 77:3
job 54:17
jobs 7:20
john 11:8 51:14 62:21
 97:10
joseph 50:7 71:5 72:12,
 14,17 87:18,23 90:20
 95:8 97:3
jr 6:14
jump 43:5
june 37:7 55:9 61:5 94:
 23 96:20
justice 8:21,23
juvenile 80:10,14,16
juveniles 53:17

**K**

keep 31:5 69:7,8
keeps 31:1,4
kept 56:20,24 61:12
kevin 62:15 63:6
kind 53:18 81:4
kit 91:18
knowledge 67:17,17 94:
 7 98:2
known 52:3 91:18
knows 67:20

**L**

lady 86:17
lafratta 34:12 80:2
lakeview 1:22
lakeville 6:16 7:5
landry 58:22,22,23 59:
 1 60:6,7,9
lapanna 15:12,13,14,
 14 17:3 20:3,13,24 21:
 6,16,21 39:24 40:14 85:
 16,23 86:9
lapanna's 40:16
laparra 15:10
last 6:12 15:10 22:6
 60:12 75:13 86:17
late 23:23
later 57:8 95:4
law 8:22
lawyers 8:10
learn 87:16,23 88:6
learned 87:10
leave 21:23
leaving 21:8,18 55:5
left 11:9 19:6 49:11
 50:12 57:12 94:1 95:11,
 14,15,17 98:24
left-hand 52:7
less 7:2,3 53:23 79:11

letting 21:2
level 46:19,19,22,23,
 24 47:1
license 23:7,9 28:15,
 20
lieutenant 33:3 54:9
 80:5
light 30:16
likely 58:17
limited 23:5
lines 15:17 18:16 58:
 14 64:8
list 69:7 98:9
listed 88:15
lists 90:20,24
little 16:9 19:8 49:22
live 7:4
living 33:5
lobby 46:22 65:2,3,5,
 11,16 66:1,7,9,10 96:
 21
location 78:11
lock 39:15
locked 65:22 67:13
log 58:8 59:8,19,23 60:
 3 61:15 98:6
logs 59:9
long 6:8 7:5,12 11:4
 27:11 54:4 59:2 92:20
 99:4
look 25:6 33:9 35:24
 40:19,20 47:18 51:18
 61:21 77:15 78:17 79:3
 88:12
looked 47:17
looking 24:5 50:17 59:
 8,11 60:5 61:17 70:10,
 19 71:8
looks 58:22 60:10,13,
 14 76:19
loose 29:21
loss 12:6,8,15,20 13:1,
 19 15:1,13,16 20:1
lost 19:8 49:22
lot 13:8 45:11
loud 96:2
lucky 45:7

**M**

m.k.p 98:20
made 4:17 11:18 20:4
 31:11 40:8 74:14,16 78:
 7 90:1
magistrate 38:16 62:4,
 17,23 63:2,5 65:14,15
 67:11,12,21,22 68:8,11,
 16,20 77:1,10
magistrates 62:11 63:
 11,11
mail 84:18
main 11:22 13:5,9
male 12:11,16 14:5 16:
 6 17:3 20:22 21:17,22
 22:3,22 26:1 41:7 48:
 20 86:2
males 53:16
man 90:3
manager 12:9 16:7 17:
 8,10,13 20:3,12,23 21:
 5,17,21 40:1,14 86:7,
 13
many 53:14,21 56:5,12,

18 61:10
mark 49:17 97:15
marked 22:17,20 33:8,
13 35:14,16,23 41:10,
12,20 55:19,21,24 82:1
97:18 98:5,7
married 7:10,12
martin 62:13,14 63:2
mary 5:13 97:3
mass 29:5,7
massachusetts 23:19
massasoit 8:13,14
matched 23:15
matter 99:12
matter-of-fact 90:7
maui 12:3 13:6
mean 8:10 15:4 18:6 21:
1 25:9 26:14 43:22,23
51:4 53:13 61:2 69:10
means 25:21 33:5
medical 6:2,15,17,19
83:5,10 91:20 94:5
medication 6:5 92:10
95:12,19
medicine 93:6 94:4
medium 94:22
meet 13:3
memo 29:19
memory 15:22 25:8 47:
19 50:17,21 92:23 97:4
mental 43:21
merchandise 17:18 19:
14,21 89:2
michael 99:3
middle 43:17 98:24
midnight 60:19,22,23
98:18
midnight-to-eight 9:
23
might 16:17 18:22,22,
24 19:17,17 20:9,9 21:
20 27:6,19 29:17 31:6
32:13 40:24 47:22,23
48:18,19,19,20 49:11
50:10,10,11,14 53:9 54:
1 57:15 72:17 82:22,24
95:18
military 38:4
minor 9:2
minute 75:8
minutes 27:13 39:5 59:
16,18 89:21 92:22
mirandizes 79:24
misheard 53:5
missed 54:7
missing 57:15
mistake 80:18
modified 49:10,12,14,
15 73:17,19
moment 77:7 84:12 88:
12 95:21
monday 36:24 37:2,4,7,
16,19
monitoring 97:1
morning 38:10
most 31:3 55:14 62:9
mother 5:13 95:9
motions 4:14
motor 18:21
motorcycles 47:12
move 6:9
ms 22:7,9,10 39:16 40:

13 90:7,7,10 91:17,23
92:4 94:24 95:2
much 5:23 9:10 10:24
38:24 39:1
myself 20:10 26:11 47:
20

**N**

name/ss 89:8
names 24:6 40:15 42:9
50:1 71:6 97:20
nation-wide 11:1
near 93:13
necessarily 17:22 20:
1 49:17
need 5:5,5,5,6,7
48:22 58:3 68:3,4 70:
20
needed 40:12 94:4
needles 91:21
neither 40:3
never 10:11 28:18,24
29:1 45:6,8 51:11 70:1
84:6
new 2:90 9:24 24:6 25:
23 55:16 60:1,23
next 30:14 38:10 68:11
76:2,18 78:2 79:16,20
80:10 90:12 94:9,13
nicely 24:2
night 47:16 53:19 61:
22 62:3,3
nods 5:21
nor 40:3
north 1:22 45:11,20,23,
24 46:1,15
northeast 13:13
notarization 4:15
notary 4:9
note 83:8
noted 19:23 82:19
notes 31:8
nothing 26:8,12 27:9,
11,14 30:15 40:5 89:20
97:9 99:9
noticed 61:7
nowhere 28:11
numbers 28:9 31:5 43:
7,18 71:9
numerous 56:7

**O**

o'clock 37:24 48:2 57:
14 58:12 63:16
o'malley 59:5,6,7 60:
18
o'malley's 60:14
object 26:13 29:4 31:
19 67:8 70:24 91:14
objected 21:10
objection 21:9 29:8
36:16 39:8 57:21 67:19
83:1
objections 4:13
observation 61:9,9
observed 16:23
obtaining 30:18
october 7:6
ofc 76:2
off-hand 12:10 63:9
office 4:20 47:21 96:
12

officer's 19:6 58:20
59:3 79:19,21 98:20
officers 6:24 20:1 55:
14
official 35:21,21 36:
8 86:6
officials 89:6
oh 11:11 13:23 32:23
38:2 47:7 54:3 56:9 63:
5 79:5
okay 4:11 6:11 8:4,13
19:10 41:19 47:7 48:15
53:1,6,11 57:12 59:22
67:11 79:5,6 95:24 96:
3 97:21,22
old 7:16 47:10,11 55:
16
older 57:2
oldest 7:16,17
once 4:12 40:11 65:21
one 7:17 8:10 10:7 12:
3 13:13 16:12 37:14 42:
12 43:2,3 45:22 47:7
49:7,8 54:17 57:15,16
61:19 64:21 69:19 70:1,
6,11,20 71:10 74:14,14
76:11,18 86:3 97:15
ones 55:16,16,17 57:2
63:9
only 13:13 47:4 63:9
open 14:22 37:17,19 65:
21,24 66:11 69:17
opens 66:4,12
operates 33:24
opportunity 33:12 74:
12
original 4:20
originally 70:16
other 5:15 7:20 18:18
31:5 40:13 56:19 63:10
66:1 68:7 80:6 81:16,
17 91:5 92:9
ouellette 1:30
outside 14:1,2
outstanding 88:3 90:
16
over 12:20 13:1,3 18:6
46:12 72:2 98:24
owner 19:1

**P**

p.j 4:3 5:11 35:19 42:
21
p.m 10:1 37:23 58:13,
17 60:9,12,16 99:12
package 69:8
packaged 39:6,8
paper 29:20,21
paraphernalia 91:20
park 13:11
parked 13:16,20 14:21
47:2
parking 13:8 45:11,14
part 31:4 45:15 77:12,
18
partial 58:7,10,11
particular 50:3 53:22
56:17 77:21 78:5,5
parties 12:7 14:1,24
16:8 68:3,3 85:19
party 15:5 67:2 89:22
patrick 59:7 60:14,18

patrol 9:9,12,16,17,18
10:8
pause 45:5
penalties 34:5
penalty 64:21,22
people 14:8 31:1,2 53:
21 65:20 66:20,21 67:
18 68:9
perhaps 18:15 25:5
period 57:24
perjury 34:5
person 31:5 65:4,5,6
68:14,14 79:23 86:11
87:12 90:15
personal 48:21
persons 54:12 86:3
petition 65:11
pharmacy 86:6
phone 96:4
photocopies 84:16
photograph 18:16
photographs 18:9,10
photos 18:22
phrased 75:4
physical 18:18 19:3,
21 45:10
physically 14:12
piece 23:12 29:20,21
pieces 26:18
pina 16:8 22:6,7,9,10
39:16 40:13 86:18 90:7,
7,11 91:17,23 92:4 94:
24 95:2
place 11:9 39:22 52:23
53:8,9,9 83:9 87:6,21
placed 39:13 52:22 53:
2
places 53:7
plain 10:12,14
plaintiff 5:12
plaintiffs 5:12
plant 45:10
please 5:3 22:17 33:17
35:14 41:10 55:19 84:
12 95:21
plexiglas 64:17 65:6
66:2
pocket 16:2,4,12,13,23,
24 17:12 24:21 89:3,4
point 32:12 59:4,21 85:
23,23 87:3 88:1 89:15
90:15 91:23 92:4 93:1,
4 94:23 95:4 96:20 97:
6
pointed 86:2 98:23
pointing 57:12
policeman 7:20
policy 18:12 19:2 83:3,
7,12
poorly 75:4
portable 26:24
portion 74:2,4,7
position 85:18
possession 23:1,3
possible 57:6 58:19
72:21,22
powers 38:16 98:22,23
99:2,3,4
practice 74:19
prepare 44:17
prepared 44:21
present 97:6

pretty 5:23 9:10 10:24 38:24 39:1
prevent 21:7,17
prevention 12:6,8,15,20 13:1,19 15:1,13,16 20:1
previously 28:12,18,24 30:22
print 43:5
printed 31:11
prior 85:2
prisoner 59:18 61:8,15 77:2 82:6,17 83:10 98:9
prisoners 3:4,5 54:14 55:1,12,21 56:18,19 57:23 58:8 61:10,18 66:20 70:1 82:15 83:5 97:1,17
probable 78:7 88:24 89:1,4
probably 25:13,21 27:13 34:22 53:24
probation 29:1 87:13 88:9 89:22
procedure 1:30 39:20 67:21 82:18 83:3,7,12
proceed 31:21 46:17
proceeded 12:7 16:5 17:1 30:17 45:4 85:20,21 86:14,16 87:21
proceeding 6:4
process 45:4 48:10,12 92:20,21 93:1,4,4
program 10:24 11:1,2 23:19
projects 8:3
promptly 44:15,16
proved 22:3 86:17
provide 22:4,22 26:2
provided 24:17 31:9 40:24 41:1 92:10
psychology 9:2
public 65:1
pull 13:8 18:6 45:22
pulled 14:2 25:15 45:21,23 90:13
pump 28:12
purposes 60:22
purse 24:19
pursuant 19:22
pursuit 16:5
put 4:3 5:21 16:1,12,12,23 17:11 24:2 27:23 50:18 69:13 73:17 79:12 81:19 82:22 89:2 93:11

Q
quarter-of-eight 62:3 63:17
question 15:3 21:10,11,13,15 29:7 31:20 32:17 44:13 48:13,14 49:18 50:16,16 71:1 75:4,14,16,17 97:21
question-and-answer 5:18
questions 8:10 29:10 44:11 82:15 86:21 96:1 97:11
quick 97:12

quickly 6:9

R
r-a-n-e 6:14
race 94:19
racing 54:5
radio 12:21 26:24
radioed 12:14
raised 8:1
ran 16:6 89:3
rare 70:2,3
rather 57:8
read 29:23 30:10 75:16
reads 68:23
real 90:14
really 80:13 87:20
rear 40:11
recall 12:9,13,19 16:15 17:19 19:16,18 20:5,11 22:5 24:20,24 25:1,4,9 29:11,13 36:23 37:6 38:22 39:23 40:2,4 44:20 45:2 47:16 55:8,10 61:14,16 63:9 72:7,9,10,13 73:13 74:18 83:18,21 84:1 85:2 88:1,1 93:20 94:13
receipt 4:18
received 89:5
recites 36:14
recognize 33:15 41:22 58:20 76:3,15 80:6
recognized 64:10
record 4:4 6:13 21:14 29:1 31:4,5 35:21,21 36:1,2,8 48:23 57:17,18 58:5,7,15 69:2,3,4 75:10 94:19 96:9,16,17
records 31:1 57:4 98:12
recovered 18:24
refer 17:4 52:3,3
referenced 37:1
referring 93:11
refresh 25:6 47:19
regard 22:1,9 85:8 87:8,16 88:6
regarding 31:12
regards 11:23
registry 28:14 29:6
regular 37:4
regulation 83:3,7
regulations 59:15,17
release 77:12
released 76:1,7,8,22 77:3,5,8 81:14 95:4
relief 24:1
remarks 48:18
remember 11:20 15:4,6 16:19 19:15 22:6 25:11 32:20,21 50:6,14 53:24 54:4 71:22 73:12 74:16 81:17 84:7
remembered 57:7
rephrase 39:9
reported 43:15
reporter 5:19 75:17 96:8
reports 39:5 50:10 51:4 65:12,13,13
represent 5:11 36:8
represents 69:19

request 27:3,4 92:9
require 95:18
requirement 6:20
requires 83:4,8
reserved 4:14
reside 6:15,16
residency 6:20
resist 39:21
resistance 11:3
respect 39:16 43:17
respective 70:7
respond 26:4
response 86:20 97:21
responses 5:18
responsibility 96:24
responsive 44:10
rest 54:10,11
restaurant 12:3 13:6
restrain 21:6
restrained 14:12 20:23 21:1
result 85:10
resulted 36:9
returned 94:13
review 4:15,20 33:12
richard 5:12 50:7 71:3 72:11 85:3 86:3,17 88:3,7 89:23 90:4,8,9,14,24
ride 81:23
right-hand 58:21
rights 52:21 74:14 79:23
road 1:22
roll 47:23
room 46:5,7 65:12
route 92:6
rules 1:30 59:15,17
run 17:1,5 28:15 39:21 85:20 95:22
running 14:15

S
same 8:22 9:3 11:6 12:11 29:7,8 30:2 43:15 46:19,22,23 49:8 51:23 52:1 70:22 71:14 78:18 79:8 86:8,10 87:15 88:11 96:14 98:6
saturday 53:19
save 84:19
saw 17:13 20:10 86:13 95:2
saying 57:13 71:22
says 33:21 34:4,13 39:6 61:18,19,24 73:20 74:7 76:1 80:7 81:8,13,13 98:23
scanned 43:6
scars 48:20
scene 12:17 20:21 32:24 87:7 90:3,12 91:13
school 8:8 10:21
scott 58:22,24 59:1 60:7,9
scribbled 76:12
seal 35:22
search 17:15 18:15 19:22 91:17
searched 19:11
second 12:1 13:20 45:15 48:24 57:17 89:8

section 77:18 78:2,2 79:2,16,16 80:7,10,16 81:3 82:22 89:12 92:13
sections 77:15
secure 93:5
secured 40:11
security 26:17,19 27:8,10,15,23,24 28:6,9,13,16,17,22 29:2,11,18 30:17 31:5,9,13,20,24 32:7,8,15 40:21 41:5 43:7,9,12,14,14 48:18 71:9 86:21 87:1 88:8 89:6,13,17,24 90:19
see 14:16 16:9 20:16 38:2 46:9 51:14 59:3 65:4,5 74:8 76:12 79:2 80:11 81:3 84:12 88:13 89:10 91:17,20 93:9 95:4
seem 43:23 44:1,3
seen 17:12 36:5 83:22
send 4:19,23 84:17
sense 21:4,16,20 58:11
sent 12:14
separately 72:7
separates 65:12
sergeant 33:3 34:11,12 53:9 80:4
series 69:17
set 19:2 33:10 68:4,4,14
sets 65:19
seven 7:2,3 39:5 57:14 58:12
shaw's 11:22 12:7,9,14,16,17 13:1 15:5,13,16 17:18 19:22 20:13 21:6 85:14,15 89:2,5
sheet 3:3 4:24 36:14 41:9,12,15 42:1,3,10,13,15,18 43:8 44:18,21 48:22 50:3,9 52:7 58:12,14,17 61:9 70:13 72:17 73:6,7,14,22 75:20 79:4 82:1 90:24 92:12 93:8 98:6,21,23
sheets 51:5 61:11 69:7,8,13 70:7,10
shift 9:3,20,24 10:1,2,3,4 38:22 39:2 55:4 56:3 58:8 93:14,16 94:17
shift's 47:24,24
shifts 9:6,19,22 10:6
shoplifted 17:21 18:23 85:24
shoplifter 12:16
shoplifters 14:8
shoplifting 85:14 88:19,21
shortly 93:22
shoulder 26:24
shouldn't 80:13
show 16:16 33:8 35:23 41:20 47:18 55:24 60:2 63:21 67:22 98:5
showed 23:14 63:14,15
showing 23:12
shows 38:16 56:15 62:7 68:8,11
sick 54:17 83:16
side 8:2,2,3 11:23 12:

14 43:13 47:5
sidewalk 25:18
sign 4:16 52:22 77:2
signature 34:5,7
signatures 76:11
signed 4:17 34:4,13 36:
  19 67:2
signs 52:21 67:1
similar 10:23 36:5
since 7:6
single 10:7 69:23
sir 7:11 9:5 64:3 73:7
  85:13
site 95:2
sitting 14:10
situation 54:9
six 81:13 88:15
slot 70:7
slots 69:13,13,17,19
  70:10
slurring 44:6
small 64:19,20
smaller 45:14
smashed 18:22
snow 25:15
so-called 96:21
social 26:17,19 27:8,
  10,15,23,24 28:6,9,12,
  16,17,22 29:2,11,18 30:
  16 31:5,9,12,20,24 32:
  7,8,14 40:20 41:5 43:7,
  9,12,14,14 48:18 71:9
  86:21,24 88:8 89:17,24
  90:19
somebody 15:3 18:6 20:
  8 38:16 54:17 60:2 66:
  4 72:20 76:24 83:14
somebody's 42:1
someone 74:20
sometimes 5:22 19:8,8
  20:1 44:19 46:10 53:18
somewhat 45:10
somewhere 62:2 63:16,
  16
son 7:16
sons 7:15
soon 34:20 84:19 85:20
  86:13
sorry 8:12 41:18 49:22,
  23 53:5 56:16 60:8 61:
  8 96:15
sort 40:8 69:14 76:12
  82:19 98:6
sought 21:17 22:10 39:
  22
soul 54:10,11
source 91:5 94:7
south 11:23 12:14 13:6
  45:15,19,20 47:5
speaking 17:7 87:12
  88:2
speaks 36:16
specifically 31:22 48:
  16
speculate 67:8
spell 6:12
spine 61:12
spoke 17:7 44:5 86:5,8
  90:7,8,13
spoken 97:3
spotted 85:20
spring 25:21

stamp 84:19
standard 53:10
standing 14:10,11 25:
  19 90:12
stands 50:13 51:6
started 6:19 7:9
starting 98:18
starts 78:3
state 2:90 4:12 5:23 6:
  12 32:18 43:21 67:17
  94:19
state-wide 10:24
statement 20:9,11
states 7:3
stayed 93:16
steal 16:1,11 85:19 86:
  12
steve 11:6 60:6
still 6:20 10:12 20:13
  60:21 64:20 94:23
stips 4:3
stipulations 4:13
stolen 17:20 18:6,15
stop 13:20
stopped 26:10
store 12:10 13:24 16:1,
  22 17:11,14 18:24 19:
  14 85:19 86:1,12
straight 64:14
street 8:3 11:22 13:5,
  9 26:9 87:18 90:3,22
strike 4:14 27:22 30:
  24 34:15 38:2 50:5 52:
  11 53:1 57:9 59:12 60:
  8 67:16 68:6 69:11 79:
  5 83:15
stuff 56:19
submit 34:1
submitted 35:11,13
sullivan 54:9
sullivan." 76:9
summon 20:8
supermarket 11:23
supervisor 9:17,18 34:
  9 53:9
supervisors 9:19
support 22:14 34:1
suppose 23:6 25:24
supposed 14:8 55:11
  59:17 70:5 77:9 83:12
suspect 14:5,5 17:3,4
  20:22,22 21:18,18,22,
  22 22:1,3,5 48:12 49:5
suspects 46:11 49:4
suspended 23:9
swear 5:2
switch 66:10
sworn 5:5
system 27:5 28:11 51:8,
  9 71:18

                  T

tbro 50:9,24 51:3,6 52:
  4 71:22 72:2
tehan 4:3,6,8,10,12,21
  5:1 21:9 23:22 25:5 26:
  13 29:4,8,13 31:19 32:
  17 33:7,10,21 36:16 39:
  8 41:14,17 48:13,15 49:
  18,22 50:2,13,20 52:24
  53:2 67:8 70:24 73:5,8
  75:7 78:23 79:6 84:11,

14,17,20,22 95:21,24
  96:3,7 97:9 99:9
tehan(cont'd 96:11,19
telephone 40:16 74:13,
  16,21,23 75:2,5,18
tells 56:18 65:16
template 52:17
ten 92:22
terms 84:23
testified 11:12 31:20
  68:16 70:13 94:16
testifies 5:6
testimony 36:16 70:14
  77:8 86:20
testing 25:7
themselves 20:2 64:8
  70:10
there's 9:11,14,16,18,
  24 10:23 13:13 27:4 34:
  5 40:5 42:9 45:11,14,
  17,20,20 46:17 47:1 48:
  4,20 51:8,8 52:17 53:
  10,16,16,17,24 54:13
  57:4,14 61:17 64:14,19
  65:3 68:3,3 69:13 71:9
  74:23 75:20 76:1 77:15,
  18 78:2,24
they're 53:2
thomas 80:2
though 6:24 27:14 57:
  11 64:10 73:12
three 7:15 9:22 11:5
  26:18 41:14 53:17 57:
  14 61:24
three-ring 56:22,24
threw 16:4 17:1
throughout 10:8
throw 66:10
title 61:12
titled 77:19
today 11:15 96:5
together 16:6 66:17
tony 62:17
took 11:9 16:3,24 26:
  15 31:8 78:19 85:20 89:
  2
top 26:17 43:8,13 51:
  19 52:7 57:12 58:20 81:
  3 98:23
total 61:9
tow 18:7
toward 12:23 85:21,21
towards 16:6 86:14
traffic 23:8 38:23 85:
  5,9
train 47:10
trained 59:21,22
training 11:3
transcribed 4:17
transcript 4:16
transfers 72:2
transitional 24:3,10,
  12
transport 79:13 87:21
transported 97:7
transpose 50:8,9
trial 4:14
tried 21:4,5,7 30:15
truck 18:7
true 85:10 89:6 94:17
  95:8
try 6:9 21:12 24:2 26:

15 39:21 70:4
trying 14:15
twenty 7:9 53:16
twice 62:4,5
two 8:13,14 9:11 10:9
  12:7,11 14:24 15:7 16:
  8 19:11 42:9 43:17 51:
  22 53:17 70:11 78 85:
  19 86:2 92:4 94:14,15
two-off 23:10
type 52:18 74:1
typed 73:22 74:5

                  U

uh-huh 28:21,23 61:20
unconscious 83:16
under 34:5 39:22 40:21
  41:5 42:5 44:3 48:18
  71:17 73:20 79:13 81:8
  87:21 89:12 92:12
underneath 45:14 46:
  14
understand 5:17 6:2
  11:14 36:11 38:5 53:11
  85:5,18 86:5,20
understanding 68:5
understood 50:2
unit 10:15,16 11:4,8
  26:24
unless 47:17 55:5 73:
  17
until 4:14 60:10,19 96:
  1
up 7:8,24 8:11 14:2 24:
  8 38:17 39:6,7,8 43:5
  45:8,10,21 54:2,6 62:8
  63:14,15,21 64:4,5 67:
  13,22 68:8,11 70:4 81:
  3 89:20
usual 4:5,13

                  V

vadara 76:4,5,6,19
variety 9:6
vehicle 18:14,15,21
vehicles 18:12
verbal 5:19
verify 27:19 30:15
veteran 59:1
video 46:8
violation 23:8
violence 78:12

                  W

wait 27:11
waiting 32:14
waive 4:9,14
walk 14:18 64:13 65:4,
  21 66:14 86:13
walked 14:20 15:2
walking 26:9 46:22
walks 66:16
wall 47:10
walsh 21:14 23:23 25:
  21,24 35:19 42:21,24
  43:3 57:21 58:4 67:19
  68:24 70:19 83:1 96:6
  97:11
wants 27:20
warrant 27:3
warrants 26:7,12 28:
  18 87:23 88:4,7 90:16

watch 3:4,5 55:21 56:
18 57:24 58:8 97:17 98:
9
water 6:5
way 8:4 16:18 26:15 39:
21 44:3 60:19 61:2 67:
3 94:19
wearing 24:23
week 36:23
welfare 23:20,20,21
west 8:2
whatever 6:7 10:15,16
16:2 20:10 24:1 44:16
54:5 61:10 65:19 84:20
whereupon 99:11
wherever 16:4
whether 5:24 8:11 32:
20,22 44:20 50:6 67:4
68:17 72:10 74:16 78:
11 87:23 88:3
who's 53:11 54:24 67:
12 70:6 83:14 98:3
who've 31:2
whoever 67:1
whole 39:20
whom 62:8 85:24 90:4
wic 23:19
wife 6:6
will 6:8 96:3
william 62:13 63:2
willy 62:14
willy-nilly 67:22 68:
24
window 64:17
windshield 18:21
winter 25:10
wintertime 25:13
within 4:17
without 25:8 50:17 97:
20
witness 5:10,15,20 6:
2,11 96:4
woman 30:22
wonderful 7:13
word 23:18
words 44:6 81:17
work 10:14 33:5 37:11,
12 39:7 66:18 94:9,13
96:20
worked 9:3,6,9 10:6,8,
11,12 62:13 94:16
working 38:22,23 85:5
works 20:13 62:7 97:23
would've 49:15
write 29:16,19 77:3 80:
24 81:9,11
writing 76:15 80:9
written 35:9 73:4 81:
8
wrote 30:5 34:16,21 39:
16 42:18 81:14

## Y

year 6:19 25:3
years 7:2,3,8,8,9,13 8:
13,14 10:1,17 11:5 54:
6
younger 6:22,24 55:17
youngest 7:18
yourself 46:22 94:21
youth 10:16

## Z

zayre's 54:6