```
                                    Volume: I
                                    Pages: 1 - 55
                                    Exhibits: --
```

### UNITED STATES DISTRICT COURT
### COMMONWEALTH OF MASSACHUSETTS

```
********************
MARY GOMES, GUARDIAN OF THE
ESTATE OF RICHARD P. GOMES, et al.,
     Plaintiffs,

         vs.                  Civil Action
                              No. 04-11464MLW

THE CITY OF BROCKTON, et al.,
     Defendants.
********************
```



DEPOSITION of CHIEF WILLIAM K. CONLON, taken on behalf of the Plaintiffs, pursuant to the Federal Rules of Civil Procedure before Eileen Baker, Registered Professional Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the Law Office of Paul Adams, One Centre Street, Brockton, Massachusetts, on Wednesday, June 7, 2006, commencing at 10:14 a.m.

```
          Catherine L. Zelinski, CSR
            22 North Lakeview Road
         Norton, Massachusetts 02766
    TEL. 508.285.8198 FAX 508.285.9968
```

APPEARANCES:

LAW OFFICE OF PAUL ADAMS
(By P.J. Adams, Esq.)
One Centre Street, 2nd Floor
Brockton, Massachusetts 02301
    On behalf of the Plaintiffs

WYNN & WYNN, P.C.
(By John A. Walsh, Esq.)
90 New State Highway
Raynham, Massachusetts 02767
    On behalf of the City of Brockton and
    Chief William K. Conlon

KOPELMAN & PAIGE, P.C.
(By Joseph L. Tehan, Jr., Esq.)
101 Arch Street, 12th Floor
Boston, Massachusetts 02110
    On behalf of Jess Drane

1  Q.   Could you describe for me the policies,
2       practices and procedures of the Brockton
3       Police Department that were in existence on
4       June 25th and June 26th, 2001 with respect
5       to the medical well-being of persons in
6       custody at the Brockton Police Department?
7  A.   Yes.
8  Q.   Would you describe those policies and
9       procedures for me?
10 A.   Yes.  When a prisoner is in a cell block
11      it's the policy of the department that they
12      will be checked at least every 15 minutes by
13      the booking officer to ensure their
14      well-being, and if anything is found to be
15      awry or in need of medical attention, it's
16      to be brought to the attention of the shift
17      commander and the shift commander shall
18      decide whether the person needs to be seen
19      by a doctor or transported to a hospital.
20 Q.   So, it's the shift commander's decision
21      whether or not to seek the aid of
22      professional medical help?
23 A.   Yes.
24 Q.   So, you haven't spoken with either of the

1    shift supervisors here, either Richard
2    Cudworth or Francis Riordan, with regard to
3    Mr. Gomes on June 26th and June 25th, 2001?
4  A. No. I haven't seen either one of them in
5    quite sometime.
6  Q. Are they still employees of the Brockton
7    Police Department?
8  A. Lieutenant Cudworth is, but he's out on a
9    long-term injury. Sergeant Riordan is
10   retired.
11 Q. Has the city adopted any new policies or
12   procedures since June 25th or June 26th
13   regarding the medical well-being of persons
14   in the custody of the department?
15 A. No.
16 Q. Are you aware of any situations where
17   persons in custody or detainees have alerted
18   police department personnel to particular
19   medical issues that they have?
20 A. I couldn't say with any specifics.
21 Q. Well, prisoners have been transferred or
22   transported from the police department to
23   the hospital on prior occasions; is that
24   correct?

1   designed to show the different cells in the
2   station with the prisoner's name, and there
3   is room there to note if there is anything
4   that the booking officer or relief officer
5   should be aware of concerning any given
6   prisoner.
7  Q.   And that, of course, gets wiped down?
8  A.   When a prisoner leaves.
9  Q.   So, there is no permanent record of it?
10 A.   No.
11 Q.   Are there any policies or procedures or
12      guidelines informing a booking officer as to
13      when he should contact the shift commander
14      regarding potentially transporting a
15      prisoner to the hospital?
16          MR. WALSH: Objection. Asked and
17      answered. You may answer that again, chief.
18 A.   The policy is that the shift commander is
19      ultimately responsible for.
20 Q.   I understand that testimony and I understand
21      that you testified to that. What I'm asking
22      is the shift commander doesn't generally
23      come down to the cell block, does he?
24 A.   Not unless he's called down there.

| | | |
|---|---|---|
| 1 | | medical condition, asthma, and I need my |
| 2 | | inhaler and the booking officer said to |
| 3 | | himself that's a bunch of crap, I don't |
| 4 | | believe that, the shift commander might |
| 5 | | never find out, correct? |
| 6 | | MR. WALSH:  Objection. |
| 7 | | MR. TEHAN:  Objection. |
| 8 | A. | That would be -- I'd be speculating to |
| 9 | | answer that. |
| 10 | Q. | Are booking officers vested with any |
| 11 | | discretion to make credibility |
| 12 | | determinations with regard to special |
| 13 | | medical conditions or needs reported by |
| 14 | | prisoners? |
| 15 | | MR. WALSH:  I'll object to the |
| 16 | | form.  You can answer that question if you |
| 17 | | understand it, chief. |
| 18 | A. | I believe every officer has some discretion |
| 19 | | as to whether he finds things credible or |
| 20 | | not, but they tend to err on the side of |
| 21 | | safety. |
| 22 | Q. | As part of your in-service training, the |
| 23 | | standard in-service training, there was some |
| 24 | | instruction on recognizing signs of diabetic |

```
 1           shock and signs of and how to respond.  Did
 2           any of that training include the dangers of
 3           diabetic shock?
 4      A.   Yes.
 5      Q.   Did that training say that people could
 6           lapse into a coma and die as a result of
 7           diabetic shock?
 8      A.   Yes.
 9      Q.   Now, is there any set procedure for friends
10           or relatives of someone in custody to inform
11           the police department of special medical
12           needs or conditions of persons in custody?
13                MR. WALSH:  Object to the form.
14      A.   My answer would be no.
15      Q.   So, it would just rely on the common sense
16           of the lobby officer or whoever else the
17           family or friends interacted with at the
18           police station; is that fair to say?
19                MR. WALSH:  Again I'll object to
20           the form.
21      A.   I'm not sure I understand your question.
22      Q.   Your attorney is objecting to hypotheticals
23           and he's objecting when I ask you about
24           policies and procedures.  So, I don't really
```

|   |   |   |
|---|---|---|
| 1 |   | know how to ask you this question, but I'm |
| 2 |   | just going to keep plugging away and trying. |
| 3 |   | This time we'll try as a hypothetical. |
| 4 |   | If I walk into the Brockton Police |
| 5 |   | Station, because let's say my cousin was in |
| 6 |   | custody and my cousin had asthma, how would |
| 7 |   | I get that information to the person in |
| 8 |   | charge of my cousin's well-being? |
| 9 |   | MR. WALSH: Objection. |
| 10 | A. | Again, it would be speculation how you would |
| 11 |   | get it there. I couldn't say. |
| 12 | Q. | So, there is no way to inform the person in |
| 13 |   | charge of my cousin that he's got a special |
| 14 |   | condition that jeopardizes his life and |
| 15 |   | needs to be cared for? |
| 16 | A. | Well, you could inform the lobby officer. |
| 17 | Q. | But he might or might not do something about |
| 18 |   | it; is that correct? |
| 19 |   | MR. WALSH: Objection. |
| 20 | A. | That would be speculation on my part to say |
| 21 |   | that he wouldn't do something. |
| 22 | Q. | Does he have the discretion to ignore it? |
| 23 | A. | He would not ignore it. |
| 24 | Q. | Would he note it? |

```
 1              COMMONWEALTH OF MASSACHUSETTS
 2    SUFFOLK, ss.
 3              I, Eileen Baker, Registered
 4    Professional Reporter and Notary Public in
 5    and for the Commonwealth of Massachusetts,
 6    do hereby certify:
 7              That CHIEF WILLIAM K. CONLON, the
 8    witness whose deposition is hereinbefore set
 9    forth, was duly sworn by me and that such
10    deposition is a true record of the testimony
11    given by the said witness.
12              IN WITNESS WHEREOF, I have hereunto
13    set my hand this 14th day of June, 2006.
14
15    THE FOREGOING CERTIFICATE OF THIS TRANSCRIPT
      DOES NOT APPLY TO ANY REPRODUCTION OF THE
16    SAME BY ANY MEANS UNLESS UNDER THE DIRECT
      CONTROL AND/OR DIRECTION OF THE CERTIFYING
17    REPORTER.
18
19
20              EILEEN BAKER, Notary Public
                My commission expires:
21              May 12, 2011
22
23
24
```