UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARY GOMES, GUARDIAN OF THE ESTATE OF RICHARD P. GOMES; et al.<br>*Plaintiffs*,<br><br>*vs.*<br><br>THE CITY OF BROCKTON; et al.<br>*Defendants*. | *CIVIL ACTION*<br>No. **04-11464 MLW** |

**PLAINTIFFS' MEMORANDUM OF LAW ON SUMMARY JUDGMENT MOTIONS**

I.   MATERIAL FACTS

The material facts are as set forth in Plaintiff's Counter-Statements of Undisputed Facts, and as set forth in the Rule 56 materials submitted for the Court's consideration.

II.  ISSUES PRESENTED

A.   Do Genuine Issues of Material Fact Require a Jury Trial on Some or All of Plaintiff's Claims Against the City of Brockton?

B.   Are Plaintiffs Entitled To Judgment As A Matter of Law on Their ADA and Rehabilitation Act Claims Against the City of Brockton?

III. ARGUMENT

A.   <u>Claims Presented by the Complaint</u>.

For analytical purposes the twelve counts set out in plaintiffs' complaint seeking compensatory damages may be grouped as follows:

(a)   Counts IV, V and XI, against the state of Massachusetts, under Title II of the Americans with Disabilities Act ("Title II" or "ADA"), Section 505 of the Rehabilitiation Act ("RA"), and the Massachusetts Tort Claims Act, G. L. c. 258, §

        1, et seq. ("MTCA") respectively, which claims were previously dismissed by order of this court on ;

(b)      Counts II and III, against the City of Brockton ("Brockton"), under Title II and the RA, respectively;

(c)      Counts I, VI, VIII, against Brockton, the defendant Jesse Drane, and certain unknown named Brockton police officers, respectively, for compensatory damages under 42 U.S.C. § 1983, for violation of Richard's right to adequate medical care guaranteed by the substantive component of the Fourteenth Amendment's due process clause;

(d)      Counts VII and IX, under 42 U.S.C. § 1983, against the defendant Jesse Drane, and certain unknown named Brockton police officers, respectively, for punitive damages under 42 U.S.C. § 1983;

(e)      Count X, against Brockton, under the MTCA;

(f)      Count XII, against all the defendants, for parental consortium and consequential damages to Mary as the parent of here permanently disabled son, Richard.

With regard to all claims against Officer Drane, grouped in "(c)" and "(d)" above, plaintiffs have not filed any written opposition to Officer Drane's motion for summary judgment.

Finally, all the federal claims against Brockton – i.e. both the statutory (Count II under the ADA and Count III under the RA) and the constitutional (Count I, under 42 U.S.C. § 1983, for violation of rights under the Fourteenth Amendment Substantive Due Process guarantee) – also request the following equitable relief:

> that this Court provide permanent injunctive relief on behalf of Richard and all those similarly situated requiring Brockton to promulgate policies and guidelines that direct and require that adequate medical care under the Due Process Clause of the Fourteenth Amendment be provided for diabetics generally, and for Type 1 diabetics particularly, by those Brockton officers having custody of arrestees and pretrial detainees

Complaint, at pp. 6, 7 & 9. It is plaintiffs position that the defendant, the City of Brockton, has not addressed this requested relief in moving for summary judgment.

    B.    Brockton's Motion for Summary Judgment[1]

        1.    *Compensatory Damages Under § 1983.*

Brockton has moved for Summary Judgment on plaintiffs' section 1983 claims advancing three arguments. It argues that plaintiffs cannot prevail because there is no record evidence that: (a) Brockton had any policy that violated Richard's constitutional right to adequate medical care; (b) the procedures that Brockton had in place caused Richard's injuries; and (c) a city employee may have misapplied the policy resulting in a deprivation of a constitutional right. Brockton's S.J. Memo. (Doc. No. 49), at p. 3.

Count I alleges that "Brockton … promulgated ***or acquiesced*** in a policy, practice or custom … that both amounted to deliberate indifference and contributed to the deliberate

---

[1] Brockton's summary judgment memorandum makes an argument that plaintiffs cannot establish the city's liability under 42 U.S.C. § 1985(3), which provides in pertinent part as follows:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3). Plaintiff's complaint neither asserts any claim, nor makes any allegations, implicating this statute as a remedy. Plaintiffs will not respond to this portion of Brockton's argument.

indifference of its police officers, toward the medical needs of diabetics in the custody of such Brockton officers as arrestees or as pretrial detainees." Complaint, at ¶ 20. That policy, practice or custom became evident during the deposition of Brockton's chief of police, conducted pursuant to a Rule 30(b)(6) notice of deposition, a copy of which is submitted herewith as Ex. M.

> Q. The Brockton Police Department operates under a set of regulations, correct?
>
> A. Yes.
>
> Q. And those are issued under the authority of the chief, correct?
>
> A. Yes.

Ex. N (Conlon dep.), at 22:18-23.

> Q. Are you aware of any situations where persons in custody or detainees have alerted police department personnel to particular medical issues that they have?
>
> A. I couldn't say with any specifics.
>
> Q. Well, prisoners have been transferred or transported from the police department to the hospital on prior occasions; is that correct?
>
> A. Yes.
>
> Q. And that had happened prior to June 25th and June 26th, 2001; is that correct?
>
> A. Yes.
>
> Q. Are you aware of any particular incident where somebody was transported to the hospital prior to June 25th or June 26th, 2001?
>
> A. I couldn't point to a date or a specific name, but I do recall incidents where it's happened.
>
> Q. Do you recall what the reasons for the transport were?
>
> A. There has been many different reasons.
>
> Q. Can you remember one?
>
> A. Attempted suicide, tried to hang themselves. Other persons have split themselves open by banging their head against the wall until they cracked their head open. Other people have claimed to be having a heart attack.

-5-

> Q. So, if somebody is claiming to have a heart attack, it's the shift supervisor who is going to determine whether or not to give credence to that claim and whether or not to have the person transported to the hospital?
>
> A. It's his responsibility, yes.
>
> Q. Are there any policies or procedures or guidelines that inform him of which way he should lean on the judgment as to whether to have someone transported to a hospital?
>
> A. It doesn't specifically say. There is too many areas that -- it would be impossible to write a when you will or when you won't policy.
>
> Q. What are some of the informing guidelines?
>
> A. It's up to his discretion.
>
> Q. Do you know if Lieutenant Cudworth or Sergeant Riordan had any training in medicine or nursing or paramedic training?
>
> A. I don't know.
>
> Q. But it's not a requirement to be a shift supervisor at the Brockton Police Department, correct?
>
> A. Correct.

Ex. N (Conlon dep.), at 19:16-21:20. Later, Chief Conlon testified to a custom or practice pursuant to which the shift supervisor would not go down to the cell block unless he was called down there (presumably by a subordinate officer), and the absence of any written or formal policy requiring the booking officer to report serious or special medical conditions to the shift commander.

> Q. Are there any policies or procedures or guidelines informing a booking officer as to when he should contact the shift commander regarding potentially transporting a prisoner to the hospital?
>
>> MR. WALSH: Objection. Asked and answered. You may answer that again, chief.
>
> A. The policy is that the shift commander is ultimately responsible for.

Q.   I understand that testimony and I understand that you testified to that.  What I'm asking is the shift commander doesn't generally come down to the cell block, does he?

A.   Not unless he's called down there.

Q.   Are there any policies or procedures or guidelines that inform the booking officer when he should call the shift commander to come on down, because somebody may or may not need to go to the hospital?

> MR. WALSH:  I'll put the same asked and answered objection.  You may answer that again, chief.  Are you asking, P.J., if there's a separate set of instructions to the booking officer other than the instructions or the policy that is set forth for all of the police officers?

> MR. ADAMS:  To the extent that my question is unclear, let me just say it simply like this.

Q.   How does the booking officer know when he should call up the shift supervisor, because somebody needs to go to the hospital or says they need to go to the hospital?

A.   There is not a written policy that says this is when.  You have to rely on some common sense.

Q.   So, if a prisoner said to the booking officer, you know, I have this special medical condition, asthma, and I need my inhaler and the booking officer said to himself that's a bunch of crap, I don't believe that, the shift commander might never find out, correct?

> MR. WALSH:  Objection.

> MR. TEHAN:  Objection.

A.   That would be -- I'd be speculating to answer that.

Q.   Are booking officers vested with any discretion to make credibility determinations with regard to special medical conditions or needs reported by prisoners?

> MR. WALSH:  I'll object to the form.  You can answer that question if you understand it, chief.

A.   I believe every officer has some discretion as to whether he finds things credible or not, but they tend to err on the side of safety.

Ex. N (Conlon Dep.), at 33:1 – 34:21. Thus, because there is no regulation or procedure which requires officers to report serious medical conditions (other than this involving trauma around the arrest), see Ex. I (to Brockton's Motion for Summary Judgment), at p. 5, to the shift commander, discretion is shifted to whichever particular officer may be directly informed of the condition.

Upon learning that a prisoner may have a serious medical condition, a Brockton Policy officer may decide to call up the boss and tell him, or not to call him up and tell him, without violating any Brockton police department practice or regulation. See Ex. I  In other words, by failing to promulgate a regulation, or engender a custom or practice that requires, in all circumstances, officers to report to the shift commander a claim that a prisoner suffers from a serious medical condition (and to identify some basic parameters of what constitutes a serious medical condition), Brockton leaves it to the arbitrary and unfettered discretion of individual officers whether a prisoner will receive any necessary or critical medical monitoring, treatment or care. This is the very arbitrariness condemned by our guarantee of substantive due process under the Fourteenth Amendment. *See Sacremento v. Lewis*, 523 U.S. 833, 845, 118 S.Ct. 1708 (1998)("Since the time of our early explanations of due process, we have understood the core of the concept to be protection against arbitrary action ….").

> By requiring the government to follow appropriate procedures when its agents decide to "deprive any person of life, liberty, or property," the Due Process Clause promotes fairness in such decisions. And by barring certain government actions regardless of the fairness of the procedures used to implement them, *e.g., Rochin, supra,* it serves to prevent governmental power from being "used for purposes of oppression," *Murray's Les v. Hoboken Land & Improvement Co.,* 18 How. (59 U.S.) 272, 277, 15 L.Ed. 372 (1856) (discussing Due Process Clause of Fifth Amendment).

*Daniels v. Williams*, 474 U.S. 327, 331-332, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

Brockton's policy for its subordinate officers might be more simply stated as: "don't ask and, if you hear, tell or don't tell, its up to you." It evinces the "city's … deliberate indifference to the constitutional rights of its inhabitants." *Canton v. Harris*, 489 U.S. 378, 392, 109 S.Ct. 1197 (1989). In Brockton, subordinate officers interacting with the citizenry do not need to pay any attention to claims that prisoners suffer a serious medical condition because Brockton police officers do not view it as part of their job to be concerned with the medical condition of those in custody. When a Brockton officer has custody of a prisoner she is not required to inquire about the existence of any potentially serious medical conditions. If the officer hears about such conditions, she is not required to make a record, but may do so in her sole discretion. And, unless there is an obvious "injury" to the prisoner – as there might be from physical trauma in connection with the events leading to or surrounding the arrest or, as in this case, a prisoner found unconscious and having a seizure in a cell – a Brockton police officer with custody of a prisoner is not required to report a prisoner's potentially serious medical needs. Hence, Brockton's policy is to be deliberately indifferent to the potentially serious medical needs of prisoners at the Brockton police station.

The undisputed testimony is that Brockton police officers were informed of Richard's insulin dependent diabetic condition the evening of his arrest. SOF, at ¶¶ 23 & 27. According to Chief Conlon, the officers working the desk that night have no memory, one way or the other, whether such conversations took place. Ex. N (Conlon Dep.), at 11:6 – 14:18. In other words, they are unable to deny that they were informed by Ms. Pina and Mrs. Gomes of Richard's serious medical condition. It seems likely that, had municipal policy required them to make a record of the report of Ms. Pina and Mrs. Gomes, then these officers would remember, or could have their memory refreshed. Of course Brockton itself has denied in its Answer to the

Complaint that it had any notice of Richard's serious medical condition (whether from Ms. Pina and Mrs. Gomes) in advance of his experiencing seizures on the morning of June 26, 2001. Complaint, at ¶ 13; Answer, at ¶ 13. If a jury were to credit the testimony of Ms. Pina and Mrs. Gomes – i.e. that one or more of the desk officers did receive notice of Richard's serious medical condition – then a jury could determine that the failure to provide minimal diabetes monitoring and/or care for Richard, and his subsequent seizure and coma, were proximately caused by Brockton's policy that its officers needn't inquire about, take any note of or report to the shift commander any serious medical needs of prisoners.

2.  *Compensatory Damages under Title II and the RA.*

In analyzing plaintiffs' claims for monetary damages for disability discrimination under federal law, neither Brockton nor plaintiffs rely on any meaning distinction been the relevant provisions of Title II of the ADA, and the RA. *See Iverson v. City of Boston*, 452 F.3d 94, 97 (1st Cir. 2006) ("Since the parties have briefed and argued this appeal as though the ADA and Rehabilitation Act claims are coterminous, we construe counts 1 and 2 as presenting a single claim.").

> To state a claim for a violation of Title II, a plaintiff must allege: (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits or discrimination was by reason of his disability. *Parker v. Universidad de Puerto Rico,* 225 F.3d 1, 4 (1st Cir.2000); 42 U.S.C. § 12132.

*Toledo v. Sanchez,* 454 F.3d 24, 31-32 (1st Cir. 2006).

As an initial matter, Brockton makes no argument that the record evidence is insufficient to satisfy the first required showing: that Richard "is a qualified individual with a disability." Id. Such an argument would fail, especially given entries in his medical record describing his diabetes as brittle and difficult to control. *Arnold v. United Parcel Service, Inc.,* 136 F.3d 854,

866 (1st Cir.1998); *LaCorte v. O'Neill*, 139 F. Supp. 2d 45, 47, n. 5 (D.D.C. 2001)(Diabetic an individual with a disability under the Rehabilitiation Act). Furthermore, mitigation factors which would normally be considered cannot be here because Richard's confinement by Brockton eliminated his ability to control and mitigate his disability. *Cf.* S*utton v. United Air Lines, Inc.*, 527 U.S. 471 (1999) (In Title III, employment context, policies underlying ADA require that mitigating factors like medication or prescription eye ware be considered in the "substantially limits a major life activity" calculus.").

Instead, Brockton argues that plaintiff "cannot establish a claim for violation of 42 U.S. C. § 12132 because she cannot establish that Richard was excluded from participating in or denied benefits of services, programs, or activities of the Brockton Police Department based on his diabetic condition." Brockton's S.J. Memo, at p. 4.  This argument fails because even if one narrowly construes these statutes so that basic medical care for detainees by municipal police departments is not a "service" by a "public entity", a claim is still made out if Richard "was otherwise discriminated against … by reason of his disability."  The testimony of Mrs. Gomes as to her conversation with the desk officers at the police station clearly supports the inference that Richard was discriminated against based upon his diabetes: "He says, We don't deal with needles here.  That's what the police told me.  We don't deal with the needles in the police station." Ex. O (Mary Gomes dep.), at p. 54:18-21.

      3.    *Negligence Claims under the MTCA.*

Brockton's argument under the MTCA appear to be threefold.  First, Brockton argues that plaintiffs are confined to a single theory of negligence expressed in their presentment letter under Mass. Gen. Laws ch. 258, § 4: "that the City failed to promulgate policies and procedures to ensure the provision of critical medical care for known or constructively known chronic

conditions suffered by persons who are in their custody." Second, it argues that "[t]he undisputed facts show that there was a policy and procedure in place with respect to providing medical care for prisoners." Finally, it argues that "there is no contemporaneous medical record or expert opinion which establishes its etiology[ … plaintiffs cannot] establish a nexus between any alleged negligence and Richard's seizure." Brockton's S.J. Memo, at p. 7.

Contrary to Brockton's argument, plaintiff's presentment letter does not confine its negligence theory to the failure of the city to promulgate adequate policies and procedures. Specifically, plaintiff's present letter stated as follows:

> The **injuries** described above were the **direct and proximate result of the negligent breach**, **by** … the City of **Brockton**, and [its] respective **agents and servants**, **of duties owed** (a) pre-trial detainees generally, (b) pre-trial detainees with known or constructively known physical disabilities, and (c) Mr. Richard Gomes particularly. These **duties include the duty to provide, allow or arrange for critical care or treatment for known or constructively known chronic conditions suffered by persons who are in their custody** ….

Ex. K, at p. 3 (Emphasis supplied.) In *Gilmore v. Commonwealth,* 417 Mass. 718, 723, 632 N.E.2d 838 (1994), the Massachusetts Supreme Judicial Court set forth the test for assessing the sufficiency of the content of a presentment letter under Mass. Gen. Laws. ch. 258, sec. 4.

> [A] presentment letter should be precise in identifying the legal basis of a plaintiff's claim" and must "not [be] so obscure that educated public officials ... find themselves baffled or misled with respect to [whether] a claim" is being asserted "which constitutes a proper subject for suit" under G.L. c. 258.

Id. In their presentment letter plaintiffs specifically claimed "negligent breach, by … Brockton … agents and servants … of duties owed … includ[ing] the duty to provide, allow or arrange for critical care or treatment for known or constructively known chronic conditions suffered by persons who are in their custody …" Ex. K, at p. 3, as a proximate cause of their injuries. Under *Gilmore* and its progeny, plaintiffs presentment letter adequately put Brockton on notice that one of their claims under Mass. Gen. Laws ch. 258, included vicarious (or "respondeat superior")

liability for the negligence of Brockton police officers while acting within the scope of their employment.

> The Massachusetts Tort Claims Act ("the Act"), provides that "public employers will be liable for injury ... or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment ..." G.L.c. 258, § 2. If the statute applies, the public employer is liable for plaintiff's harm and the public employee is freed from liability for his or her negligent actions.

*Morin v. Leppo*, 1998 WL 1181156, *2 (Mass.Super.), citing **Kelly v. Rossi,** 395 Mass. 659, 661, 481 N.E.2d 1340 (1985); *Williams v. Bresnahan,* 27 Mass.App.Ct. 191, 192, 536 N.E.2d 365 (1989). Understandably Brockton does not argue that it cannot be held vicariously liable under Mass. Gen. Laws ch. 258 for the desk officers' negligent failure to act on the notice of serious medical condition provided by Ms. Pina and Mrs. Gomes. *Cf. Black v. New York, N.H. & H.R. Co.,* 193 Mass. 448, 79 N.E. 797 (1907) (Regarding the common law negligence liability of a principal for the privileged conduct of its agent in removing an intoxicated person from a railroad car where the removal was negligently performed by the agent leaving the removed passenger in a dangerous place considering his condition.) Rest. 2nd Torts, § 324 (Duty of One Who Takes Charge of Another Who is Helpless).

Lastly, there is medical evidence in the summary judgment record indicating a causal link between Richard's diabetes and the seizure and coma he suffered while in custody at the Brockton Police Department. Specifically, two "visit notes," from the Joslin Clinic's medical records, one dated July 10, 2003, and the other July 22, 2003, indicate that Richard had suffered a diabetic coma and anoxic brain injury. Ex. P. His discharge summary from the Shattuck Hospital, apparently dictated on October 5, 2001 (some two months after Richard's discharge on July 30, 2001), states:

> Hypoglycemic encephalopathy was a possibility. He had no encephalopathy on EEG. Anoxic encephalopathy was a possibility and their plan was to do an MRI and repeat the LP and check his BUN and creatinine to rule out a chronic hypoglycemia syndrome, however, the patient signed out before these tests could be done. … Hypoglycemic encephalopathy was a possibility. He had no encephalopathy on EEG. Anoxic encephalopathy was a possibility and their plan was to do an MRI and repeat the LP and check his BUN and creatinine to rule out a chronic hypoglycemia syndrome, however, the patient signed out before these tests could be done. … The patient's brother signed him out of the hospital A.M.M. and took him to Mass General.

Ex. Q, at p. 2.  A medical certificate signed by Dr. Marion Eakin of the Spaulding Rehabilitation Hospital on 8/20/01, less than two months after the accident, and within three weeks of Richard's discharge from the Shattuck, provides as follows:

> This is a 40y old male with a history of brittle diabetes (complicated by seizures), substance abuse & psychiatric illness now gradually recovering from an acute brain insult 6/26.  At that time he was found seizing & unconscious, subsequently comatose x 1½ weeks.  Since coming out of the coma he has had a persistent encephalopathic state, albeit with small improvements.  He was initially minimally verbal, unable to care for himself & seemingly unaware of his surroundings.  Currently he is oriented to himself, can name the hospital but not why he is here, has no idea of the date/year.  He cannot give any history (medical or otherwise), is continent of ??? at times, continued to be confused (e.g. tried to get in shower while dressed today), wanders without clear direction, has an extremely short attention span, continues to grab and eat other patient's food without regard to the diabetes, and has no insight into his profound cognitive deficits.  ….

Ex. R.  A "Proposed Treatment Plan Affidavit" for Richard in connection with the guardianship, dated October 11, 2001, states as follows:

> Mr. Gomes is a 40 year old man admitted to Massachusetts General Hospital on 9/4/01.  He has a history of brittle diabetes complicated by seizures, substance abuse, and psychosis, as well anoxic brain injury that occurred in June, 2001, following a seizure.

Ex. S.  Lastly, one year before the incident, Richard went to Brockton Hospital shortly after being released from jail in order to obtain a prescription for insulin.  The prescription indicates

-13-

that he was supposed to monitor his blood, as well as take different types of insulin (Humulin R and Humulin NPH) as well as glucophage, several times throughout the day. Ex. T.

"Federal Rule of Evidence 803(4) provides that statements made for purposes of medical diagnosis or treatment are admissible as exceptions to the hearsay rule. It has been noted that '[b]ecause the declarant's motive to promote treatment or diagnosis is the factor crucial to reliability, Rule 803(4) does not require the statement to be made to a physician.' 4 J. Weinstein & M. Berger, Weinstein's Evidence p 803(4) (1990)." *Navarro de Cosme v. Hospital Pavia*, 922 F.2d 926 (C.A.1 (Puerto Rico), 1990). Brockton's objection appears to be that the records indicating a link between Richard's diabetic condition and his seizure in police custody are not sufficiently "contemporaneous." In the context of medical records, this objection may go to weight but not to admissibility, as Fed. R. Civ. P. 803(4) does not appear to have any requirement that such records be "contemporaneous." In any event, construed in the light most favorable to the plaintiffs, these documents suggest that plaintiffs will be able to present testimony from treating physicians as to the etiology of Richard's seizure and coma and establish a link between it and his diabetic condition.

        C.      <u>Plaintiffs' Motion for Partial Summary Judgment: Liability on Title II and RA Claims</u>.

As noted in part III., B., 2., *surpa.*, plaintiffs state a prima facie case under Title II and the RA. Furthermore, with regard to liability, plaintiffs are entitled to summary judgment on the Title II and RA claims. First, because:

> Title II imposes an affirmative obligation on public entities to make their programs accessible to qualified individuals with disabilities, except where compliance would result in a fundamental alteration of services or impose an undue burden. *Parker,* 225 F.3d at 5 (citing 28 C.F.R. § 35.150).

*Toledo, supra.* Brockton's "don't ask *and* tell if you feel like it" policy with respect to police

detainees with serious medical needs clearly violates such affirmative duties. Finally, the failure of the police to take affirmative steps for the care of Mr. Gomes after being warned by Ms. Pina and Mrs. Gomes, by itself warrants a finding of ADA and RA liability. *See Duvall v. County of Kitsap,* 260 F.3d 1124, 1141 (9th Cir.2001) (holding that the doctrine of respondeat superior applies to claims asserted directly under the ADA and the RA); *Navedo v. Maloney*, 172 F. Supp. 2d 276, 289 (D. Mass. 2001) ("[S]uits against government officials in their individual, non-official capacities do not appear to be contemplated by Title II of the A.D.A."). This is especially so given that Brockton is unable to dispute, via the testimony of persons with knowledge, that Ms. Pina and Mrs. Gomes actually warned Brockton police officers at the station that Richard was an insulin dependant diabetic. Thus, unless Brockton can make out facts showing the affirmative defenses of "fundamental alteration" or "undue burden", plaintiffs are entitled to summary judgment on the issues of ADA and RA liability.

IV.  CONCLUSION

For the foregoing reasons, this Honorable Court should DENY Brockton's motion for summary judgment, and allow plaintiffs' motion for summary judgment on Count II and Count III of their Complaint.

> Respectfully submitted,
> MARY GOMES, GUARDIAN and
> MARY GOMES, INDIVIDUALLY, *Plaintiffs*
> By their attorney:
>
> _/s/_
> P. J. Adams, MA BBO# 568173
> LAW OFFICE OF PAUL ADAMS
> One Centre Street, 2nd Floor
> Brockton, MA  02301-4092
> Tel. (508) 583-2019

Dated: *September 7, 2006*

CERTIFICATE OF SERVICE

     I hereby certify that on this date the foregoing document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent via first class mail, postage prepaid, to those indicated as non-registered participants.

Dated: *September 7, 2006*

                                                       Paul J. Adams