**Thomas J. Deters, Ph.D.**
Clinical Neuropsychologist
1753 Massachusetts Avenue
Cambridge, MA 02140
Tel/Fax: (617) 661-7516

Board Certified in Clinical Neuropsychology
American Board of Clinical Neuropsychology

Licensed Psychologist
Massachusetts and New Hampshire

## NEUROPSYCHOLOGICAL EVALUATION

**Name:** Richard Gomes
**Date of birth:** 8/13/61
**Age:** 44
**Dates of evaluation:** 3/30, 3/31, 4/7/06
**Marital status:** Divorced (Mr. Gomes could not recall the number of years)
**Hand dominance:** Right
**Race:** Black
**First language:** Portuguese; started learning English at age 3 or 4 and that became his primary language.

### REFERRAL REASON:

Mr. Gomes was referred by Attorney John Walsh for a comprehensive neuropsychological evaluation. The evaluation was requested to assist in determining if Mr. Gomes experiences permanent neuropsychological deficits resulting from a medical event that occurred on or around June 26, 2001.

### Summary of Opinion

It is my opinion to a reasonable degree of neuropsychological certainty that from both a qualitative and quantitative point of view, there is no indication of deterioration in Mr. Gomes' neuropsychological functioning that is causally related to the June 26, 2001 medical incident. It is my opinion to a reasonable degree of neuropsychological certainty that Mr. Gomes neuropsychological functioning is unchanged or improved at this time relative to his preinjury level of functioning.

Qualitative descriptions of Mr. Gomes behaviors since the time of the June 26, 2001 incident such as reports of significant memory deficits, very limited activity level, dependence on his mother, inability to work, and limited social contacts are nearly identical to descriptions of his daily functioning prior to this incident.

From a quantitative point of view, comparisons of pre-injury and post-injury psychological/neuropsychological test scores indicate that there has been no substantial deterioration in his functioning, but rather indicate that his neuropsychological functioning is unchanged or improved relative to his preinjury level of functioning.

Gomes, Richard
3/30/06, 3/331/06, 4/7/06

Mr. Gomes reported that he has not used any recreational drugs since the time of this incident. This has been a problem that he has not been able to control since his teenage years, it is clearly an improvement in his life, and is likely at least a partial explanation for his stable or improved functioning since the time of the June 2001 incident.

### *LIMITS OF CONFIDENTIALITY:*

I informed Mr. Gomes that I am a neuropsychologist and that I was seeing him for a neuropsychological evaluation. I informed him that I would be interviewing him and that I would be administering an extensive set of tests to evaluate his neuropsychological functioning. I informed Mr. Gomes that this evaluation was being conducted at the request of Mr. Walsh, the attorney that represents the opposing party in his lawsuit. I informed him that the normal limits of patient-doctor confidentiality did not apply in this situation and that I would be discussing the results with Mr. Walsh and forwarding my report to him. I informed Mr. Gomes that the results of my evaluation would be available to his attorney, and other parties that are engaged to provide professional services related to his lawsuit. Mr. Gomes indicated that he understood these conditions and agreed to participate in the evaluation.

Mr. Gomes attorney, Mr. Adams was present while I discussed the limits of confidentiality with Mr. Gomes. Mr. Adams expressed concerns about the limits of confidentiality. After a brief discussion, I suggested that Attorney Adams contact Attorney Walsh to discuss his concerns prior to the initiation of the examination. Attorney Adams called Attorney Walsh, had a brief conversation with him, and agreed to have Mr. Gomes proceed with the evaluation.

### *EVALUATION PROCEDURES:*

Neurobehavioral Interview, Rey 15 Item Memory Test, Test of Memory Malingering, Green's Word Memory Test, Wechsler Test of Adult Reading, Wechsler Adult Intelligence Scale- III, Trail Making Tests A and B, Stroop Neuropsychological Screening Test, Wechsler Memory Scale – III, Visual Naming Test, Sentence Repetition Test, Token Test, Speech Articulation Rating Scale, Writing Praxis Rating Scale, Wechsler Individual Achievement Test – 2 (Word Reading and Numerical Operations), Draw a Clock Test, Target Cancellation task (Letters), Target Cancellation task (Symbols), Grooved Pegboard Test.

### *RECORDS REVIEWED:*

Massachusetts General Hospital
Caritas Good Samaritan Medical Center
Spaulding Rehabilitation Hospital
Greenery Rehabilitation and Skilled Nursing Center at Middleboro
Lemuel Shattuck Hospital
American Medical Response ambulance report- 6/21/01
Bruce Ring, M.D.
Mary Butterworth, M.D.
John R. Kania, M.D.
Steven C. Hentoff, Ph.D.

Gomes, Richard
3/30/06, 3/331/06, 4/7/06

Disability Determination and Transmittal
Disability Report – 11/28/94, signed by Richard Gomes
Alcohol/Drug Questionnaire – 11/29/94, signed by Richard Gomes
Functional Assessment Questionnaire for Family or Friends of Claimant – 12/8/94, signed by Richard Gomes
Activities of Daily Living – 8/26/95, signed by Richard Gomes
Boston City Hospital
Answers to Interrogatories Propounded by the Defendant, the City of Brockton to the Plaintiff, Mary Gomes
Deposition of Richard Gomes – 3/15/06
Deposition of Mary Gomes – 6/21/05
Deposition of Taylease Pina – 9/13/05
Deposition of Joseph Gomes – 9/13/05
Correctional Medical Services

## *CURRENT MEDICATIONS:*

Mr. Gomes indicated that he uses insulin for treatment of diabetes and that he is treated with a medication for seizures, but was unable to recall the name of the medication.

## *NEUROBEHAVIORAL INTERVIEW:*
### Pre and Post June 26, 2001 Medical Status

I started my interview with Mr. Gomes by asking him to describe his current medical problems. He initially stated "just diabetes, that's it." He then stated that he "used to have seizures." He said that he did not recall any other current medical problems.

Mr. Gomes said that he has had diabetes for fourteen to fifteen years. He said that he takes "regular insulin" and NPH, once in the morning and once in the evening. Mr. Gomes said that he was found "unconscious" at least three to four times during the last month because of low sugar. He said that he has been hospitalized on each of these occasions. Mr. Gomes said that this has occurred because he doesn't eat, that he is supposed to eat four to five times a day, but that he forgets to eat. Mr. Gomes said that he has the ability to prepare simple items such as heating up a cup of soup. He said that if there is someone there to remind him to eat, he does eat, and does not need to be hospitalized. He said that a nurse comes to see him approximately once per week.

With regard to seizures, Mr. Gomes estimated that he experienced approximately four seizures during the past month. He estimated that he has experienced six to seven seizures during the past six to seven months. He said that he was first diagnosed with seizures approximately three to four years ago while at the Massachusetts General Hospital following an incident [the June 26, 2001 incident] at the police department. He said that he did not remember the number of seizures that he has experienced since that incident, but estimated it at approximately ten to fifteen.

Mr. Gomes denied experiencing any other medical problems. I reviewed a series of symptoms

Gomes, Richard
3/30/06, 3/331/06, 4/7/06

and conditions with him to prompt his memory if he had forgotten any conditions. When asked about his vision, he said that the vision in his right eye has been substantially impaired since birth. He said that if he holds written material within 2-3 inches of his right eye he is able to "make it out." He said that he wore glasses when he was younger, and that his vision with his right eye was normal with glasses. When asked why he does not wear glasses now, he said "I don't care any more," but he also said that he is going to see an optometrist within a couple of weeks and will be getting glasses. Mr. Gomes said that his vision with his left eye is normal. He said that despite the problem with his right eye, he is able to read and watch television without difficulty.

Mr. Gomes denied hearing difficulties. He denied any problem with taste or smell. He denied numbness, tingling, or other sensory deficits. He denied motor difficulties. He said that he experiences a tremor, dizziness, and fainting episodes associated with diabetes and low sugar levels. He denied experiencing headaches. He said that bowel, bladder and sexual functioning are normal. He denied any significant changes in his weight. Mr. Gomes denied any other current medical problems, or other past medical history.

### Description of June 2001 Incident
I asked Mr. Gomes to explain to me his understanding of the events surrounding his current lawsuit. He said he did not remember the date or year, but that he and another person were arrested. He said that that other person, his girlfriend, told the police that he was diabetic. He said that he remembered her telling the police that he was diabetic. Mr. Gomes said that the police said that they do not handle that type of situation at the police station. He said that he was put in a cell, and was waiting to see the judge the next day. He said ". . . the next thing I knew I was in the hospital." He said that he had been taken to Brockton Hospital and was then transferred to the Massachusetts General Hospital. He said that he was at the MGH for approximately two years, followed by five months at a rehab center in Middleboro.

### Current Functioning and Related History
Mr. Gomes said that he currently lives with his mother and stepfather. He said that currently his mother is hospitalized, and she has been in the hospital for approximately twelve to fourteen days. He did not know the reason for her hospitalization, but did not believe that it was serious. He said that his stepfather is available to assist him, and that his oldest son's mother comes in every day to check on him. He said that she stays for approximately three to four hours a day. He said that she feeds him, and makes sure that he takes his pills. He said that when his mother is at home, she generally takes care of him by waking him and preparing his meals.

I asked Mr. Gomes to identify changes that he has experienced since the time of the 2001 incident at the police station. He stated that his memory "was shot" after the incident and that he has gained a lot of weight. I asked Mr. Gomes to try to be as specific as possible in describing changes in him that have occurred since the time of this incident. He said that he doesn't do anything now but sit at home and watch TV all day. I asked him the reason for this, and he said that he tried to get a job but that no one would employ him because of his diabetes and seizures.

Gomes, Richard
3/30/06, 3/331/06, 4/7/06

I asked Mr. Gomes to identify other specific changes that have occurred since this incident. He again said that his memory is now "shot." He said that he didn't remember things from one day to the next. I asked him about other problems, and he said that he is not as fit as he used to be, noting that that in the past he had been very physically fit. I asked him why that was the case, and he said that he is currently not as active as in the past. He said that he used to go out and take walks, but does not do that anymore. He described it as "like a punishment within myself." He said that he feels sorry for himself because he is not able to do the things that he used to do. He indicated that in the past he went to see friends, but now feels sorry for himself and doesn't do it. He said, "I feel sorry for myself and there is nothing to feel sorry for." He then said that his sister recently died, and reiterated that his mother is in the hospital. He said that he tends to dwell on these matters rather than ". . . learning for myself what I should be able to do." He said that in the past he would attend AA meetings, NA meetings, and go to events like Foxwood. He referred to these as efforts to try to better himself, but that "I don't care anymore." He said, "I don't care anymore, I don't feel like doing things, but it's nobody's fault but my own."

I asked Mr. Gomes if he experienced any cognitive difficulties other than memory problems. He said "not really." I reviewed a series of cognitive symptoms to prompt his memory. When I asked him about difficulties with disorientation or confusion, he again described memory difficulties, but denied disorientation or confusion. When asked about speech or language difficulties, he said that he does not speak as much as he had in the past. He denied difficulties understanding others, word finding difficulties, or paraphasic errors. He denied difficulties with reading. When asked about writing, he said that prior to the 2001 incident he would often write letters to family and friends. He said that every day or every other day he would write a letter to someone, and that he currently doesn't write at all. When asked for the reason for this, he said, "I really don't care."

With regard to his emotional status, Mr. Gomes described his mood as "up and down." He said that when he sees his mother, he feels happy, but when he thinks about the death of his sister, he feels depressed. He said that she died a few weeks ago as a result of falling out of a third story window. He said that she was married and had four children. He said that prior to this incident, his mood was "pretty good." He denied experiencing depression, and denied any history of depression. On review of symptoms related to depression, Mr. Gomes reported that sleep, appetite, and energy level were all within normal limits. He denied guilt feelings. He denied any changes in libido. He denied suicidal or homicidal ideation. His affect was somewhat restricted, but appropriate and consistent with his thought content.

Mr. Gomes denied symptoms of anxiety or any history of anxiety. I asked Mr. Gomes if he had any history of being exposed to traumatic events such as witnessing the death of someone. He said that in his lifetime on at least fifteen to twenty-five occasions "people have been killed in front of me." He said that he goes to a funeral once every one to two weeks. This seemed implausible to me, and I said this to Mr. Gomes. He insisted that this was accurate and that his estimate of witnessing fifteen to twenty five deaths was a conservative estimate. I asked him if he felt as though this left any emotional scars, and he said that it had not, and indicated that it

5

Gomes, Richard
3/30/06, 3/331/06, 4/7/06

was the norm for him growing up on the streets.

Mr. Gomes denied any history of obsessions or compulsions. He denied any history of abuse. He denied delusions, hallucinations, or other signs of a thought disorder.

Mr. Gomes denied any current use of alcohol. He said that he has been sober for ten years. He denied being an alcoholic. He said that he was a drug addict, and that his primary drug use included cocaine, heroin, and marijuana. He said that his last use of any drug was prior to the 2001 incident. He said that the reason he was arrested at that time was he was looking to steal money for drugs. He said that he had used drugs within 24 to 48 hours of being arrested. He said that he had sniffed heroin the morning that he was arrested. He indicated that at that time he had been injecting heroin on a daily basis. I asked Mr. Gomes what he had been using during the weeks and months prior to the 2001 incident. He said that he was using drugs approximately two to three times a month. He said he liked heroin better than cocaine.

With regard to his drug history, Mr. Gomes said that he started using marijuana at approximately age 10, and that he was using it up to the time of the 2001 incident. He said that he started using cocaine between 1981 and 1985, and was using it up to the time of the 2001 incident. He started using heroin in 1976 or 1977 and continued using it until the time of the incident. He said that he had experimented with "acid" at approximately age 13 or 14, but did not use it after that time.

With regard to psychologic or psychiatric treatment, Mr. Gomes said that he has been seeing a psychiatrist in Brockton for approximately 6-9 months. He was unable to recall the psychiatrist's name. He said that he seems him approximately once a month to obtain pills for seizures. With regard to previous psychiatric treatment, he said that he would "see counselors when in trouble."

**Educational History**
Mr. Gomes reported that he completed the ninth grade at Brockton High School. Prior to that, he attended the Lucy Stone Elementary School in Dorchester. He said that from grades one through five his grades were generally in the B/C range. He said that in the sixth grade he started skipping school and his grades dropped to the D/F range. Mr. Gomes said that approximately age 8 or 9 he started picking pockets, and from that time on "I was always in jail or running from the police." Mr. Gomes said that he recognized difficulties with spelling and reading after the sixth grade. He said that he always had difficulties with math. I asked him about special education, and he said that he received special education services for behavior problems. He denied ever having to repeat a grade or a subject.

**Functioning Prior to the June 2001 Incident**
I asked Mr. Gomes to describe his functioning prior to the 2001 incident. I did not initially ask him about legal problems, but immediately focused on this aspect of his history. He said, "I was in a lot of trouble." He said that he had frequently been in prison and in trouble with the police. He reported having been incarcerated at Walpole, Concord and Shirley. He said that he was usually in trouble for picking someone's pocket. He said that he started picking pockets at age 8.

6

Gomes, Richard
3/30/06, 3/331/06, 4/7/06

He denied ever using a weapon. However, he said that he was eventually incarcerated at Walpole because he was charged with armed robbery. He said that this was false charge, but that the Boston police wanted to get him off the streets.

Later in the interview, I asked Mr. Gomes about the details of his history of incarcerations. He said that he was incarcerated approximately three to four times. He said that the total number of years of his incarcerations was approximately four to five years. He said that he was incarcerated for stealing, breaking and entering, larceny, and armed robbery.

Mr. Gomes said that immediately prior to the June, 2001 incident he had moved into his own apartment in Dorchester. On further inquiry, he said that this was actually the apartment of his oldest son's mother, and that he paid her to stay there. He said that he sometimes stayed in this Dorchester apartment, and he sometimes stayed with his mother in her house in Brockton. However, he indicated that he was generally living on the streets and picking pockets.

I asked Mr. Gomes when he last worked before the 2001 incident. He said that he thought that he was laid off approximately three to six months before the incident. He said that he was employed at Polaroid at that time for approximately seven to eight months. He said that approximately a month before his employment at Polaroid, he served as a counselor for juvenile defendants for approximately six months. He said that he was paid a little more than minimum wage, and that his role was advising kids to avoid activities that would result in their incarceration.

Mr. Gomes said that he has four children, two sons, and two daughters. He identified them as Richard, age 27, Tanita, age 22, Derek, age 21, and Renita, age 16. He said that Tanita and Derek have the same mother (Maria), Richard has a different mother (Rhonda Adams), and Renita has a different mother (Arlene). He said that he speaks to Rhonda and Arlene every day, and that Rhonda has come in to take care of him while his own mother has been hospitalized. He said that he does not speak to Maria because she is using drugs. He said that none of his children use drugs.

### *TEST BEHAVIORS/OBSERVATIONS:*
Mr. Gomes was seen for evaluation in my Cambridge office. He was seen over 3 days. On each occasion he was driven to the evaluation by his attorney, Mr. Adams. On the first day, he was scheduled for 9 AM, and was not brought in until approximately 1 PM. On the third day, he was scheduled for 1:30 PM, and was brought in at 9 AM. Since I was unable to see him in the morning, Mr. Gomes said that he took the time to visit his mother in the hospital. Mr. Gomes reported that he had only two hours sleep the night before. It was obvious, particularly by late afternoon, that he was very fatigued. His fatigue likely compromised the validity of the test results on the third day.

With the exception of his fatigue on the third day, his behavior was consistent across all three sessions. He was normally alert and interactive. Grooming and hygiene were normal. He

Gomes, Richard
3/30/06, 3/331/06, 4/7/06

presents with no apparent physical anomalies. His general demeanor was pleasant, agreeable, and candid. He freely agreed to participate in the evaluation and generally appeared to be cooperative with the evaluation process. However, there is some question regarding his effort on neuropsychological tests. This will be discussed in later sections of this report.

Mr. Gomes exhibited mild fluctuation in his attention, particularly on the third day when exhibiting signs of fatigue. He exhibited moderate to severe memory/retrieval difficulties. Conversational expressive language was marked by dysfluency, with speech having a halting quality, mild to moderate difficulties in initiation of speech, and word retrieval difficulties. Rate of speech was mildly to moderately slower than normal. Volume and voice quality were normal. He made occasional semantic paraphasic errors. At times, he was tangential, but responded well to redirection. Comprehension of average length sentences was within normal limits. His reasoning appeared to be very concrete. His general insight appeared to be below average.

Overall, Mr. Gomes was cooperative with the evaluation. However, there is some question with regard to his overall effort on the evaluation, and concerns regarding the effect of fatigue on his performance on the third day of the evaluation. In summary, I have concerns regarding the overall validity of the test results.

## *TEST RESULTS:*
**Interpretation key:**
Very superior: 98 -100 percentile
Superior: 91-97 percentile
High average: 75-90 percentile
Average: 25-74 percentile
Low average: 10-24 percentile
Borderline: 3-9 percentile
Extremely Low: 0-2 percentile

**Response Bias/Motivation**
On the Rey 15 Item Memory Test, Mr. Gomes recalled twelve of fifteen items, which is within normal limits. He made one qualitative error, a letter reversal error. This was somewhat suspicious as I asked Mr. Gomes to print the alphabet, and he had no difficulties with letter reversals.

On the Test of Memory Malingering, scores on two of the three of three trials are below the normative criterion scores suggesting that Mr. Gomes was not making a full effort on this measure. His responses on these trials were at approximately chance level, similar to what he might obtain if he were guessing. His pattern of responses is also atypical. His highest score was on the first trial, with a decrease in performance on the second trial, and a further decrease in performance on the third trial. The expected pattern is that he would have improved substantially on the second trial, and retained this material on the third trial.

Gomes, Richard
3/30/06, 3/331/06, 4/7/06

On a word memory test, his scores on all trials are below expected levels and suggest that he was not making a full effort on this measure. When compared to normative groups, his scores are at or below a "fake impairment group" and below an advanced dementia group with an average age of 78.

In summary, on measures of response bias and motivation, Mr. Gomes' scores are very low, and suggest that he was not making a full effort. His low scores in part could be due to long standing memory impairments, but it is my opinion that they are lower than expected even when considering his memory impairments.

**Temporal Orientation**
Orientation and recall of general information is in the low average range. Mr. Gomes was able to respond accurately to thirteen of fourteen general information and orientation questions. He was unable to recall my name, or the street name on which my office is located.

**General Intellectual Functioning**
On a test of general intellectual functioning, the Wechsler Adult Intelligence Scale – III (WAIS-III), Mr. Gomes obtained a Verbal IQ in the borderline range (75), a Performance IQ in the extremely low range (67), and a Full Scale IQ in the extremely low range (69). There is not a statistically significant difference between his Verbal and Performance IQ scores.

Mr. Gomes' intellectual functioning was analyzed in greater detail through review of the four WAIS-III indices (Verbal Comprehension, Perceptual Organization, Working Memory, and Processing Speed). On the Verbal Comprehension Index, a measure of verbal applied knowledge and verbal reasoning, his functioning is in the borderline range. His Perceptual Organization Index Score, Working Memory Index Score, and Processing Speed Index Score are all in the extremely low range.

Further detailed interpretation of the WAIS-III was conducted through analysis of the individual subtests. For this evaluation, seven of the seven verbal subtests and six of the seven performance subtests were administered. The verbal subtest scores range from the average range to the extremely low range. When compared with his average score (mean = 5.71- borderline) on the verbal subtests, Mr. Gomes showed a statistically significant relative strength on a measure of remote memory/general fund of knowledge. He did not show any statistically significant relative weaknesses.

The performance subtest scores range from the borderline range to the extremely low range. When compared with his average score (mean = 4.17- extremely low range) on the performance subtests, Mr. Gomes showed no statistically significant relative strengths or weaknesses.

**Attention/Concentration/Executive Functions**
Span of attention for digits forward and backward is in the borderline range. Mr. Gomes' longest span of attention for digits forward was 5, with approximately 95% of the standardization sample

Gomes, Richard
3/30/06, 3/331/06, 4/7/06

recalling 5 or more digits. His longest span of attention backward was 3, with approximately 96% of the standardization sample recalling 3 or more digits backwards.

Span of attention for visual stimuli forward (longest span = 4) is in the borderline range. His span of attention for visual stimuli backward (longest span = 4) is in the average range.
On a series of mental tracking and mental control tasks such as counting backward from 20 to 1 and reciting the months of the year forward and backward, functioning is in the extremely low range. He lost set on two of the eight tasks.

On the Trail Making A and B Tests, measures of graphomotor speed, visual scanning, and executive abilities, functioning is in the borderline range and extremely low range, respectively. Mr. Gomes made one error on the Trail Making B Test.

On the Stroop Neuropsychological Screening Test, a measure of response inhibition and executive abilities, functioning on the color-word task is in the extremely low range. His response times were very slow on both the color task and the color-word task.

**Memory/Learning**
The Wechsler Memory Scale-III (WMS-III) is a multi-dimensional measure of learning and memory ability. It is comprised of eight primary indices, each of these indices made up of a number of subtests. The indices include the Auditory Immediate Index comprised of two subtests (Immediate Recall of Stories and Immediate Recall of Paired Words), the Visual Immediate Index comprised of two subtests (Immediate Recognition of Faces and Immediate Recall of Pictures), and the Immediate Memory Index which is a composite of the four immediate memory subtests. The Auditory Delayed Index (two subtests) and the Visual Delayed Index (two subtests) are measures in delayed memory for the earlier presented verbal and visual stimuli. The Auditory Delayed Recognition Index is comprised of two recognition memory measures (recognition of elements from a story and recognition of a series of paired words). The General Memory Index is a summary score of the five delayed memory subtests. The Working Memory Index is comprised of two working memory tasks (sequencing of a series of numbers and letters, and a visual/spatial span test).

There is very little variability on these indices, with eight of eight index scores in the borderline to extremely low range.

There are eleven WMS-III primary subtest scores. For this evaluation eleven of these subtests were administered. There is mild variability on these subtests, with scores ranging from the low average to the extremely low range. Mr. Gomes' greatest relative strengths (low average range) were on measures that assess for immediate recognition memory for faces, delayed recognition memory for faces, and working memory for visually presented stimuli. Mr. Gomes' greatest relative weaknesses (extremely low range) were on measures which assess for immediate recall of orally presented stories, immediate recall of paired words, immediate recall of pictures, delayed recall of paired words, and delayed recall of pictures.

Gomes, Richard
3/30/06, 3/331/06, 4/7/06

The WMS-III also has a number of supplemental subtests. Immediate recall of themes of stories and delayed recall of themes of stories is in the borderline range and low average range, respectively. On a delayed recognition memory test for faces, the percentage of faces recognized is in the high average range. On the delayed recall subtest for detailed pictures, the percentage of information recalled is also in the high average range.

Auditory process composite scores were calculated in four areas. These include Single Trial Learning, Learning Slope, Retention, and Retrieval. Single Trial Learning and Learning Slope were both in the extremely low range. Retention is low average for age. Retrieval is average for age. (Higher retrieval scores are indicative of poor retrieval.)

**Estimated Premorbid Functioning**
The Wechsler Test of Adult Reading (WTAR) was used to estimate Mr. Gomes' premorbid functioning. His score is consistent with his current Full Scale IQ, but below his demographics predicted score. His score on this measure is very likely invalid due to his history of learning difficulties.

**Language**
During my interview with Mr. Gomes, while mildly dysfluent, he was able to effectively communicate his thoughts and ideas. He did not seem to have any difficulty comprehending average length sentences. On formal assessment of language abilities, naming on confrontation is in the extremely low range. On a sentence repetition task in which he was required to repeat increasingly length sentences, functioning is in the borderline range for age. On a verbal fluency/word generation task, functioning is also borderline range. On a receptive language task in which he was required to follow a series of commands, functioning is in the extremely low range. He did not seem to have significant difficulties with receptive language per se, but apparent difficulties with attention and concrete reasoning seemed to contribute to his poor performance on this measure. Rating of speech articulation is below normal due to dysfluent speech. On a writing sample, he printed, and his printing was very legible.

**Academic Achievement**
Academic achievement was assessed with the Wechsler Individual Achievement Test – 2 (WIAT-2). Two subtests were administered, the Word Reading subtest and the Numerical Operations subtest. On both these tests, functioning is in the borderline range for age.

**Visual Perceptual Functions**
As noted in the interview section of this report, Mr. Gomes described very limited vision with his right eye since birth. On a target cancellation test, his response time was slow, but he was able to identify all the targets in the left visual field, and missed three of thirty in the right visual field. On a target cancellation test with symbols, he missed two of thirty symbols in the left visual field and one of thirty in the right visual field. As previously reported, on the WAIS-III, Mr. Gomes obtained a Perceptual Organization Index score in the extremely low range. His low score is likely at least in part due to his primary vision limitations.

Gomes, Richard
3/30/06, 3/331/06, 4/7/06

On the Draw a Clock Test, when asked to draw a large circle, he drew an oval shaped figure. He showed mild visuospatial planning abilities in the placement of the numbers. He was able to set the hands at 11:20.

**Motor Functions**
Motor functioning as assessed with Grooved Pegboard Test is bilaterally in the extremely low range.

**Summary and Foundation of Opinion**
Mr. Gomes was referred by Attorney John Walsh for a comprehensive neuropsychological evaluation. The evaluation was requested to assist in determining if Mr. Gomes experiences permanent neuropsychological deficits resulting from a medical event that occurred on or around June 26, 2001.

**Summary of Salient Background Issues:**
Mr. Gomes has a long and complex medical and psychiatric history that predated the June 26, 2001 incident. He also has an atypical education and employment history that is relevant to the referral question. The following is a summary of the salient pre-injury events that are pertinent to this case.

Mr. Gomes' perinatal and early developmental history was not available. Mr. Gomes has very limited education. He reported that he completed the ninth grade, with various reports in the record indicating that he completed between the eighth and tenth grade. His educational records were requested, but not available. Mr. Gomes said that he did not experience learning difficulties in the early grades (grades one through five). However, based on psychological testing that was conducted in 1996, it is my clinical impression that Mr. Gomes very likely had substantial learning difficulties prior to the sixth grade. The testing that was conducted in 1996 reveals reading at the third grade level and spelling and arithmetic at the second grade level. This suggests that Mr. Gomes very likely never progressed beyond these grade levels and was likely experiencing learning difficulties at least as early as the third grade. Mr. Gomes said that he was in special classes while in school due to behavior problems. He said that his grades were in the D/F range beginning in the sixth grade, and continuing until he stopped attending school at the end of the ninth grade.

Mr. Gomes reported that for most of his adult years (after dropping out of school) he has been "living on the streets." He said that from age 8 or 9 he was supporting himself by picking pockets, often on the mass transit system (MBTA). He indicated that he had a reputation with the MBTA, with many of the police knowing him on a first name basis.
Mr. Gomes said that he was incarcerated on numerous occasions throughout his life for picking pockets and related types of crimes, and that he spent considerable time in various jails and prisons, including time at Walpole Prison for armed robbery. Consistent with this history, records reveal that Mr. Gomes has been diagnosed with anti-social personality disorder.

Gomes, Richard
3/30/06, 3/331/06, 4/7/06

Mr. Gomes' occupational history is very limited. Records from the Social Security Administration from January 1996 through December 2001 reveal that for many of these years his yearly income was less than $500 per year. His earnings exceeded $1000 a year for only five of the years during this period, and his highest earnings were in 1983 when he earned $3441.23. Mr. Gomes admitted to a limited occupational history, but had difficulties recalling specific dates and details related to his previous positions.

Mr. Gomes has a substantial substance abuse/dependence history. He said that he started using recreational drugs at age 10. He indicated that the primary drugs that he used for many years included marijuana, heroin, and cocaine. He said that he has used heroin since the 1970s, cocaine since the 1980s, and marijuana since age 10. He said that he used all these drugs up to the time of the June 26, 2001 incident. He reported, and records indicate that he had used heroin on June 25, 2001. Other drugs that he used in the past included "acid" and alcohol. He noted that he has been "sober" for ten years. A psychological evaluation conducted in 1996 reported that Mr. Gomes had been through detox approximately six to seven times. Numerous entries in the records refer to Mr. Gomes' long history of polysubstance abuse and dependence.

With regard to his medical history, records indicate, and Mr. Gomes reported that he is legally blind in his right eye. He has a long history of diabetes mellitus. In a report that was dictated on 1/28/95, Dr. Butterworth reported a history of abnormal glucose metabolism for six years. Dr. Butterworth reported that Mr. Gomes stated ". . . his control is difficult." She reported that he has never been in a coma, but that he has had episodes of hypoglycemia.

A Boston City Hospital emergency department report dated 1/21/95 indicates that Mr. Gomes overdosed on heroin. His Glasgow coma scale rating was 3, the lowest rating. He apparently regained consciousness the same day and was discharged from the hospital. [Note: This is difficult to imagine, but my impression from what appear to be incomplete records.]

Mr. Gomes had a history of seizures prior to the June 26, 2001. Dr. Butterworth stated in her 1/28/95 report that he related his seizures to the use of cocaine. He was apparently seizure-free while incarcerated, and began experiencing them again following his release from prison and initiation of cocaine use.

The details surrounding the June 26, 2001 medical event are not completely clear. Mr. Gomes had used heroin on 6/25/01, and it was likely he experiencing withdrawal from it. He was also reported to have been without insulin during the period of his incarceration on June 25 until the time of the medical event early the following morning. An ambulance report dated 6/26/01 indicates that Mr. Gomes was initially assisted by paramedics at approximately 6 AM on June 26. The "Clinical Impression" at the scene was "seizure." A Glasgow coma scale rating was 5. Mr. Gomes was taken to the Brockton Hospital emergency department and was admitted to the hospital. The only Brockton Hospital record available is an emergency department report that says that he came in ". . . with altered mental state of unknown etiology." A toxic screen was positive for opiates, most likely related to heroin use. It was also positive for benzodiazepines,

Gomes, Richard
3/30/06, 3/331/06, 4/7/06

most likely used for sedation and seizure control.

On 7/6/01, Mr. Gomes was discharged from Brockton Hospital and admitted to Lemuel Shattuck Hospital. Limited records (EEG and CT) related to his treatment at Lemuel Shattuck Hospital were available for my review. According to the deposition transcript of Mr. Joseph Gomes, the brother of Richard Gomes, he was concerned about the care that Richard was receiving at Lemuel Shattuck Hospital. On 7/31/01, Mr. Joseph Gomes had his brother discharged from Lemuel Shattuck Hospital, apparently against medical advice, and transported him in his car to the Massachusetts General Hospital Emergency Department. On that same date (7/31/01) Mr. Richard Gomes was transferred from the MGH to Spaulding Rehabilitation Hospital (SRH) where he was admitted and treated until September 4, 2001.

The SRH presenting complaint was "status post seizures and coma with question of anoxic brain injury." It was noted in the SRH discharge summary that "during the course of stay the picture that had been painted was more consistent with a psychiatric disorder than with brain injury behavior." Mr. Gomes was discharged from SRH to the MGH where he was treated in both the psychiatric and medical services. He was discharged from the MGH on 10/2/02 with a principle diagnosis of anoxic brain injury. Associated diagnoses include: labile diabetes type I, seizure disorder, history of aggressive behavior, history of polysubstance abuse, chronic renal insufficiency, hypertension, hypercalcemia presumed due to RDA type IV, status post deep venous thrombosis treatment at PICC site, status post Lyme infection, status post HSV-I infection and history of thyroid micro-follicular adenoma.

Mr. Gomes was discharged from the MGH to the Greenery Rehabilitation and Skilled Nursing Center at Middleboro. He received rehabilitation services there until he was discharged home on 3/14/03. He currently resides at his mother's house, with his mother and her male companion of many years.

During his hospitalizations, Mr. Gomes underwent numerous neurophysiologic and neuro-radiologic procedures. The earliest report that I found was a study dated 7/11/01 conducted at the Lemuel Shattuck Hospital. This is an EEG report that notes excessive sleepiness, but ". . . without evidence of encephalopathy, focal pathology, or epileptiform activity."

A CT scan of his head conducted on 7/30/01 at the MGH provided a clinical impression of "normal study." An EEG conducted on 9/25/01 at the MGH revealed an abnormal EEG because of mixed generalized and continuous slowing, more prominent in the temporal regions. No epileptiform activity was seen. An MRI of the brain conducted on 9/18/01 revealed "unremarkable MRI brain."
A CT of the head dated 11/24/01 at the MGH revealed "new non-enhancing ill defined small focus of hypo-density within the right forceps major subcortical white matter. The finding is non-specific and may reflect a focus of gliosis, small infarct or an underlying mass."

An MRI of the brain dated 11/28/01 revealed "predominantly subcortical and likely at least

Gomes, Richard
3/30/06, 3/331/06, 4/7/06

partially cortical lesion centered within the right parietal lobe, as described. No mass effect. The appearance is more consistent with a subacute than an acute process. While the appearance is nonspecific, this appearance may be related to seizure effect, subacute infarct, subacute demyelinating process, or subacute inflammatory/infectious etiologies."

An MRI of the brain dated 12/4/01 at the MGH revealed "near complete resolution of previously demonstrated subcortical white matter, T2 hyper-intensity within the right parietal lobe which was most likely postictal in nature."

An EEG was conducted on 12/18/01 at the MGH with the impression stating "abnormal EEG because of generalized and continuous slowing. No epileptiform activity was seen"

A CT scan of the brain was conducted on 8/29/02 at the MGH with an impression of "no acute intracranial process. No evidence of hemorrhage."

A CT scan of the brain was conducted on 8/30/02 at the MGH with an impression of "normal noncontrast CT of the brain. No evidence of acute head trauma."

An EEG was conducted on 9/11/02 at the MGH with an impression of "abnormal EEG because of generalized background slowing without focal features. No epileptiform activity was in evidence."

A CT of the brain was conducted on 9/23/03 at the MGH with an impression of "normal CT appearance to the brain. No findings to account for clinical presentation of mental status change."

**Summary of Pre-Injury Cognitive and Psychologic Functioning:**
Records indicate that Mr. Gomes experienced substantial cognitive impairments prior to the 6/26/01 incident. As described above, his academic performance was in the borderline to failing range from at least the sixth grade on, but learning difficulties were likely present before the sixth grade. Mr. Gomes said that he dropped out of school at the completion of the ninth grade.

He has a very marginal employment history, likely in part due to his limited cognitive abilities and psychiatric impairments. Records indicate that he held unskilled positions for relatively brief periods. He has a long history of substance abuse and dependency that started during his elementary school years and continued until the day of his arrest on June 25, 2001, and that has very likely contributed to a decline in his cognitive abilities over the many years that he has used these substances.

It is reported in the record that Mr. Gomes sustained a traumatic brain injury in 1975 and that he said that he was in a coma. This event was referred to at least twice in the medical records, but I do not find detailed medical records describing this event. If this is accurate, it certainly could be a cause of his substantial impairments prior to June of 2001.

Gomes, Richard
3/30/06, 3/331/06, 4/7/06

Mr. Gomes has very impaired vision with his right eye, a condition that was present prior to the 6/26/01 event, continues to be present, and has likely compromised his functional learning ability both prior to and since the time of this incident.

Disability Determination records reveal substantial pre-injury (prior to 6/26/01) cognitive and psychiatric dysfunction. A report dated 11/28/94 indicates that Mr. Gomes claimed that drug use, diabetes, and epilepsy caused him to stop working since June 6, 1991. Mr. Gomes stated that the condition that keeps him from working is "can't remember nothing!" In the same report he stated that his household maintenance activities include "nothing, watch TV." His recreational activities were described as "none – I make myself a sandwich." His only social contacts came through "some NA meetings."

In an undated (but apparently during or near 1994) alcohol/drug questionnaire, Mr. Gomes described his daily activities as "I sleep from 4-5 in the morning until 2 PM and eat when I get up." In response to the following question that referred to the effect of drugs and alcohol on his daily activities, he stated "I like to go places, but I forget a lot so they like me to stay home or with someone, and I sleep all day." In an Activities of Daily Living report dated 11/29/94, Mr. Gomes stated that he did not prepare his own meals, but that his mother prepared them for him, and if needed, she assisted him with medications. He indicated that he needed assistance with grooming, "coordinating my clothes." The only chore that he performed was taking out the trash. He indicated that his mother did his shopping, that he did not manage his own checking or savings account, and that he did not drive or have a driver's license. He indicated that he did use mass transportation.

Mr. Gomes indicated that he watched television nine hours a day, and that he fell asleep at 4:30 AM and woke up at 2:30 or 3 in the afternoon. He indicated that he did not read, but spent some time looking at pictures in magazines. He indicated that he had trouble concentrating or remembering what he read, likely the reason that he previously indicated that he did not read. He said that he had no interests, hobbies, or recreational activities and that he did not go out socially with family or friends. He stated, "I feel very paranoid." He said that change in routine upset him, and that he had problems with his memory. He stated, "I forget a lot, maybe it's from cocaine drugs."

In a functional assessment questionnaire dated 12/8/94 there are indications of behaviors/problems similar to the above-described problems. This report states that he routinely fell asleep at 4 or 5 in the morning, that his mother needs to help him with dressing, that his mother prepares his meals, that he is unable to cook, that his only chore is taking out the trash once per week, that his mother does the shopping and he stays home, that his mother assists him with travel because he "forgets a lot where he is going," that he watches television "all day and half the night," that he doesn't read or have hobbies, that he usually stays in the house, that he needs help using the telephone, and that "every day," "I can't remember nothing."

A psychological evaluation conducted by Dr. Hentoff, dated 5/28/96, revealed a Full Scale IQ of

16

Gomes, Richard
3/30/06, 3/331/06, 4/7/06

67, which placed him in the "intellectually deficient range" of intellectual functioning. Dr. Hentoff stated in his report that "the probability of gross organic compromise is quite likely." He went on to state "His intellectual and cognitive limitations would severely limit his vocational options and his personality dysfunction would interfere with his ability to get along with others in a work setting." The diagnoses given by Dr. Hentoff included: polysubstance dependency in early remission, cognitive disorder NOS, mathematics disorder, antisocial personality disorder, rule out mild mental retardation.

**Summary of Current Neuropsychological Evaluation Results**
I saw Mr. Gomes for evaluation over three days, 3/30/, 3/31 and 4/7/06. Mr. Gomes presented with a pleasant demeanor, and he was cooperative, but there was some question with regard to his overall effort. On the third day of the evaluation he indicated that he got only two hours sleep the previous night. He denied feeling fatigued, but appeared fatigued, with obvious nodding and brief periods of closing his eyes near the end of the evaluation session. His lack of sleep likely compromised the validity of the test results on the third day.

On measures of effort and motivation, his scores are generally very low, suggesting below normal effort. While these scores may in part be decreased due to his cognitive impairments, the pattern of his performance and his performance relative to normative groups indicates that he was likely not putting forth a full effort. This likely compromised the overall validity of the neuropsychological test results.

With the validity concerns in mind, neuropsychological test results ranged from the average range to the extremely low range, but functioning on most measures is in the borderline to extremely low range. His greatest relative strengths (average to low average range) were on measures of orientation, remote memory/general fund of knowledge, fundamental visuoconstructional abilities, functional expressive and receptive language abilities and fundamental expressive verbal skills. Functioning in other cognitive domains is generally in the borderline to extremely low range.

**Summary of Comparison of Pre-injury to Post-Injury Functioning**
While Mr. Gomes' overall current functioning is below normal, there are both qualitative and quantitative data that indicate that his current low functioning is not substantially changed relative to his pre-injury status. The qualitative factors have been previously discussed, and are summarized under the above heading: Summary of Pre-Injury Cognitive and Psychologic Functioning. It is evident that that prior to the 2001 incident, based on Mr. Gomes self report, and the reports of professionals, that his functioning prior to this incident was at an extremely low level. He reported (as documented in the record) factors such as severe memory impairment, inability to be employed, limitations in activities of daily living, a high degree of dependence on his mother, and an overall limited lifestyle. Similar and related impairments were identified by professionals, with many of them summarized in Dr. Hentoff's 1996 psychological evaluation of Mr. Gomes.

Gomes, Richard
3/30/06, 3/331/06, 4/7/06

To conduct a quantitative analysis of Mr. Gomes premorbid to post-morbid status, I compared the 1996 psychological test results with the results of my more recent evaluation. This comparison is summarized in Table 1.

**Table 1: Comparison of Test Scores from Pre-Injury to Post-Injury Status**

|  | 5/28/96 | 3/30, 3/31 & 4/7/06 |
|---|---|---|
| WAIS-R/WAIS-III | Standard Score | Standard Score |
| Verbal IQ | 71 | 75 |
| Performance IQ | 67 | 67 |
| Full Scale IQ | 67 | 69 |
| Information | 5 | 9 |
| Digit Span | 4 | 6 |
| Forward | 4 | 5 |
| Backward | 3 | 3 |
| Vocabulary | 5 | 6 |
| Arithmetic | 4 | 4 |
| Comprehension | 5 | 6 |
| Similarities | 5 | 4 |
| Picture Completion | 3 | 4 |
| Picture Arrangement | 4 | 6 |
| Block Design | 5 | 6 |
| Object Assembly | 7 | N/A |
| Digit Symbol | 3 | 3 |
|  |  |  |
| WMS-R/WMS-III |  |  |
| Mental Control |  |  |
| 20-1 | "several errors" | 0 errors |
| Alphabet | Errors noted | 2 errors |
| Serial 3's | Several errors | N/A |
| Logical Memory –I | 2 percentile | <2 percentile |
| Logical Memory-II | <2 percentile | 5 percentile |
| Verbal Paired Assoc.-I | Percentile unspecified | <2 percentile |
| Verbal Paired Assoc.-II | 0% retention | < 2 percentile |
| VR-I/Visual Immediate Index | 1 percentile | 3 percentile |
| VR-II/Visual Delayed Index | 0 % retention | 5 percentile |
| WRAT-3/WIAT-II | Standard Score | Standard Score |
| Reading | 62 | 72 |
| Spelling | 57 | N/A |
| Arithmetic | 48 | 75 |

Gomes, Richard
3/30/06, 3/331/06, 4/7/06

While there are limitations to this comparison, (e.g. the use of updated and in some cases different tests), it is my opinion that this is a valid comparison for purposes of this evaluation. Higher scores on these tests indicate a better performance. Inspection of the table reveals that almost without exception, Mr. Gomes' current test scores are at the same level or at a higher level than was the case at the time of the 1996 evaluation. Thus, using this comparison, it is my opinion that there is no indication that Mr. Gomes has experienced deterioration in functioning as a result of the June 2001 incident, and that his current functioning is either comparable to, or possibly improved relative to his 1996 functioning.

Thank you for referring Mr. Gomes for my evaluation.

Signed under the pains and penalties of perjury.

Thomas J. Deters, Ph.D.
Licensed Psychologist, #3637
Commonwealth of Massachusetts
Board Certified in Clinical Neuropsychology
American Board of Professional Psychology, #4531


TJD:jph Final edit: 6/7/06